1                    UNITED STATES DISTRICT COURT

2              DISTRICT OF SOUTH DAKOTA (SOUTHERN DIVISION)

3       * * * * * * * * * * * * * * * *      * * * * * * * * * *
                                          *  CR No.
4       UNITED STATES OF AMERICA, et al,  *  4:16-cv-04115-LLP
                            Plaintiff,    *
5                                         *  MOTIONS HEARING
               vs.                        *
6                                         *  JULY 23, 2020
        ASFORA, et al,                    *
7                           Defendants.   *
        * * * * * * * * * * * * * * * *      * * * * * * * * * *

8

9                    TRANSCRIPT OF MOTIONS HEARING

10            BEFORE THE HONORABLE LAWRENCE L. PIERSOL,

11                   U.S. DISTRICT COURT JUDGE

12       ALL APPEARANCES OF PARTICIPANTS IN THIS HEARING WERE

13      REMOTELY BY VIDEOCONFERENCE OR TELEPHONIC CONFERENCE

14      APPEARANCES:

15      FOR THE PLAINTIFF:   MEGHAN K. ROCHE
                             U.S. Attorney's Office (Sioux Falls)
16                           PO Box 2638
                             Sioux Falls, SD, 57101-2638
17                           605-330-4400
                             meghan.roche@usdoj.gov
18
                             ELLIE J. BAILEY
19                           U.S. Attorney's Office (Pierre)
                             255 South Pierre Street, Suite 337
20                           PO Box 7240
                             Pierre, SD, 57501
21                           605-224-5402
                             Ellie.Bailey@usdoj.gov
22
                             HARIN CHRISTINE SONG
23                           U.S. Department of Justice - Civil Div
                             PO Box 261
24                           Ben Franklin Station
                             Washington, DC  20044
25                           202-307-6971.
                             Harin.C.Song@usdoj.gov

```
1    APPEARANCES (continued):

2    FOR THE PLAINTIFF C. DUSTIN BECHTOLD, MD:

3                         ROBERT B. ANDERSON
                          MAY, ADAM, GERDES & THOMPSON LLP
4                         PO BOX 160
                          Pierre, SD 57501
5                         605-224-8803
                          rba@mayadam.net
6
                          JAY P. HOLLAND
7                         JOSEPH GREEWALD & LAAKE P.A.
                          6404 Ivy Lane, Suite 400
8                         Greenbelt, MD  20770
                          240-553-1198
9                         jholland@jgllaw.com

10                        VERONICA B. NANNIS
                          JOSEPH GREEWALD & LAAKE P.A.
11                        6404 Ivy Lane, Suite 400
                          Greenbelt, MD  20770
12                        240-553-1198
                          vnannis@jgllaw.com

13

14   FOR THE DEFENDANT WILSON ASFORA, MD:

15                        GRANT A. GEYERMAN
                          WILLIAMS & CONNOLLY LLP
16                        725 Twelfth Street N.W.
                          Washington, D.C.  20005
17                        202-434-5833
                          ggeyerman@wc.com
18
                          BENJAMIN W. GRAHAM
19                        WILLIAMS & CONNOLLY LLP
                          725 Twelfth Street N.W.
20                        Washington, D.C.  20005
                          202-434-5542
21                        bgraham@wc.com

22                        BRETT A. LOVRIEN
                          CADWELL, SANFORD, DEIBERT & GARRY LLP
23                        200 E. 10th Street, Suite 200
                          Sioux Falls, SD  57104
24                        605-336-0828
                          blovrien@cadlaw.com

25
```

```
1    APPEARANCES (continued):

2                         ALEX M. HAGEN
                          CALDWELL SANFORD DEIBERT & GARRY LLP
3                         200 E. 10th Street, Suite 200
                          Sioux Falls, SD  57104
4                         605-336-0828
                          ahagen@cadlaw.com
5
     FOR THE DEFENDANT MEDICAL DESIGNS LLC:
6
                          STEPHEN C. LANDON
7                         CALDWELL SANFORD DEIBERT & GARRY LLP
                          200 E. 10th Street, Suite 200
8                         Sioux Falls, SD  57104
                          605-336-0828
9                         slandon@cadlaw.com

10   COURT REPORTER:      SHERI L. NOT HELP HIM, RPR, CRR
                          Official Court Reporter
11                        550 Ninth Street, #302
                          Rapid City, South Dakota 57701
12                        Phone: (605) 399-6007.
                          Sheri_Nothelphim@sdd.uscourts.gov
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    PROCEEDINGS ~ July 23, 2000
 2                 Before Hon. LAWRENCE L. PIERSOL, Judge
 3
 4             (All appearances at this proceeding are via
 5             videoconference or telephonic conference.)
 6             (Proceedings in open court at 12:16 p.m.)
 7             THE COURT:  Good afternoon.  This is Judge
 8    Piersol.  I'm going to go through appearances to begin
 9    with.
10             First of all, who's appearing for the Plaintiff
11    United States of America?  And by the way, as you appear,
12    if you can't hear me the way I'm speaking now, tell me.
13    Okay?  So who's appearing for the United States of
14    America?
15             MS. ROCHE:  Good afternoon, Your Honor.  This is
16    Megan Roche appearing on behalf of the United States, and
17    I can hear you fine.
18             THE COURT:  Good.  All right.
19             MS. BAILEY:  Good afternoon, Your Honor.  This
20    is Ellie Bailey appearing on behalf of the United States.
21    And I can also hear you fine.
22             MS. SONG:  Good afternoon, Your Honor.  This
23    is --
24             THE COURT:  Hold on.  Hold on.  Wait a minute.
25             All right.  Ms. Bailey.  Then next, who's
```

```
 1    appearing?
 2               MS. SONG:  This is Harin Song, also on behalf of
 3    the United States.  And I'm appearing by telephone.  And I
 4    can hear you well.  Thank you.
 5               THE COURT:  All right.  Yes.  All right.  Thank
 6    you.
 7               Then for the Plaintiff Dustin Bechtold?
 8               MR. ANDERSON:  Robert B. Anderson at May, Adam,
 9    Gerdes and Thompson in Pierre, appearing for both
10    plaintiffs Bechtold and Wellman, Your Honor.  I can hear
11    you fine.
12               THE COURT:  All right.  Good.
13               Are you Jay Holland?
14               MR. HOLLAND:  Good afternoon, Your Honor.  Yes.
15    Jay Holland also appearing for Dr. Wellman and Bechtold.
16               THE COURT:  There is also Veronica Nannis here?
17               MS. NANNIS:  Yes, Your Honor.  Good afternoon.
18    Veronica Nannis also on behalf of Doctors Wellman and
19    Bechtold.  Thank you.
20               THE COURT:  And then for the Defendant Wilson
21    Asfora?
22               MR. GEYERMAN:  Good afternoon, Your Honor.
23    Grant Geyerman from Williams and Connolly on behalf of all
24    defendants.
25               THE COURT:  All right.  Is Benjamin Graham also
```

```
 1    on the phone?

 2              MR. GRAHAM:  Yes, Your Honor.  I'm here.  I can

 3    hear you just fine.

 4              THE COURT:  All right.  Then the local counsel,

 5    Steve Landon?

 6              MR. LANDON:  Yes, Your Honor.  Steve Landon and

 7    Brett Lovrien are here as well.

 8              THE COURT:  And then I understand that

 9    Mr. Landon and Mr. Lovrien, you're in one office.  And a

10    part of yours, Alex Hagen, is in another office.  Is that

11    right?

12              MR. LANDON:  That's correct.

13              MR. HAGEN:  Yes, Your Honor.  Alex Hagen.

14              THE COURT:  I'm not seeing you, Alex.

15              MR. HAGEN:  I'm sorry, Your Honor.  I'm not

16    seeing anyone on mine.  I can't see the video.  I've lost

17    the video.  But I don't have a speaking role, so I'm

18    content to just listen.  I don't know what the issue is.

19              THE COURT:  All right.  All right.

20              THE CLERK:  Mr. Landon, you're giving feedback.

21    Would you mute your mic when you're not speaking, please?

22              THE COURT:  All right.  It's the defendant's

23    motion, so the defendant will lead off.  And identify

24    yourselves again before you speak.

25              MR. GEYERMAN:  Thank you, Your Honor .  This is
```

1    Grant Geyerman.  Myself, along with my co-counsel, have

2    the pleasure of representing Dr. Wilson Asfora and his two

3    wholly owned medical device companies.

4           Approximately 30 years ago Dr. Asfora came to

5    Sioux Falls after receiving his educational medical

6    training in his native Brazil and from institutions such

7    as Oxford and Brazil.  He's nationally recognized and

8    likely is the most accomplished neurosurgeon ever to

9    practice in Sioux Falls, if not the entire state.

10   Unfortunately, this misguided lawsuit, filed originally by

11   two younger surgeons who competed for patients with

12   Dr. Asfora and now joined by the Department of Justice

13   that intervened as a principal party in interest, has

14   tarnished that reputation in the final years of his

15   career.

16          All three defendants, Dr. Asfora and his two

17   wholly owned medical device companies, have moved to

18   dismiss the complaint in its entirety.  In the complaint

19   the government is asserting violations of the Federal

20   False Claims Act under one of two distinct theories of

21   liability.  One theory is premised on the supposed taking

22   and receiving of kickbacks, and the other is predicated on

23   Dr. Asfora having performed unnecessary surgeries on

24   federal healthcare beneficiaries.

25          And while the complaints -- the government's

1    complaints and its brief at times blurs the line between

2    these two theories, in doing so it obscures the clear

3    legal and pleading deficiencies with each theory.  They

4    are, in fact, separate theories, and we're going to talk

5    about them today separately.

6              As to each theory, the defendants have three

7    separate and independent grounds upon which that claim can

8    be dismissed and should be dismissed.  The first and

9    predominant theory in the complaint, what we've called the

10   ownership kickback theory, is not actually where I'd like

11   to start the presentation today.  Given that you're most

12   interested in the medical necessity theory, that's where I

13   would plan to start.  My colleague, Mr. Graham, will

14   handle our presentation on the ownership kickback theory,

15   if that's acceptable to Your Honor for us to split the

16   argument.

17             The False Claims Act, which is the principal

18   cause of action that's asserted in this case, has three

19   prima facie elements:  One, false or fraudulent claim for

20   payment.  Two, that the defendant acted knowingly; the

21   mens rea component to the statute.  And third, that the

22   falsity was material to the government's decision to pay.

23             This is an Anti-Fraud Statute.  It's not in

24   statute intended to police compliance with regulatory

25   regimes or to substitute for a medical malpractice action.

1    It's a fraud statute.  And because it's an Anti-Fraud

2    Statute, the heightened pleading requirements of Rule 9(b)

3    apply in addition to the normal requirements of Rule

4    12(b)(6), and we have arguments that are predicated on

5    each of those rules independently.

6         So to start, Your Honor, we sent a couple of

7    hours before the hearing here some slides to your

8    chambers.  We sent them to opposing counsel as well.  I

9    don't know if you got a copy of them or not.  There are

10   just a few of them.  But I may reference those slides

11   during our presentation just to orient us all where we're

12   at.

13        And in -- I'll start with slide three, which is

14   a slide that lists both the ownership kickback theory and

15   the separate and independent arguments that we have for

16   dismissal of those claims, and separates the bases for

17   dismissal of the medical necessity theory claims.  And as

18   they say, I want to start with the medical necessity --

19        THE COURT:  Oops.  I just lost you.

20        MR. GRAHAM:  I think I hit space bar and muted.

21        THE COURT:  Now you're back.

22        MR. GEYERMAN:  Okay.  Thank you.  As to the

23   medical necessity theory, we have three independent

24   grounds for dismissal:  One, the complaint has not

25   sufficiently alleged repetitive surgeries to support a

1    false claim on a medical necessity theory; meaning, a

2    surgery that the allegations demonstrate was medically

3    unnecessary for a federal beneficiary for which a claim

4    for payment was submitted to the government.

5           Number two, that the complaint's allegations do

6    not demonstrate that Dr. Asfora's surgeries qualify as

7    medically unnecessary under the law.

8           And three, that the complaint contains

9    insufficient allegations to demonstrate scienter, as

10   needed under the False Claims Act, meaning that Dr. Asfora

11   knew or recklessly disregarded the possibility that his

12   surgeries were medically unnecessary.

13          Each of those grounds is independent of one

14   another.  And if one of the three is granted, all claims

15   associated with the medical necessity theory would be

16   dismissed.

17          Now, before I get into more detail, I would note

18   at the outset that the principle under which the first and

19   the third of those arguments are based is not a real

20   principle that the government seeks.  Rather the

21   battleground in this case is whether the complaint's

22   allegations moot that principle.

23          As to the second argument, we do have a

24   disagreement about what the government's legal rule is.

25   Because as I understand the government's position, they're

1     saying that per se a trial court cannot dismiss on a

2     motion to dismiss claims because the allegations are

3     insufficient to demonstrating lack of medical necessity.

4           We disagree with that, based in part on these

5     four cases cited in our brief where other trial courts

6     have dismissed claims for inadequate allegations of a lack

7     of medical necessity of the motion to dismiss.  But we are

8     in agreement on the governing legal principle for two of

9     these arguments, and we dispute it at the third.  So let

10     me just say that at the outset.

11           Moving to discussion, then, of the first legal

12     ground, that there are not sufficient representative

13     examples of a claim that could be false under this theory,

14     within the Eighth Circuit it is well established precedent

15     that the government later has to prove, quote, "some

16     representative examples," end quote, of the violation of a

17     False Claims Act, unless the plaintiff has personal

18     knowledge of the false claim or otherwise the allegations

19     bear sufficient indicia of reliability.

20           This principle indicates back to the *Joshi* case

21     from the Eighth Circuit from 2006 and was reaffirmed as

22     recently as last year in the *Strubbe v. Crawford County*

23     *Memorial Hospital* case.  And the principle is that this is

24     a fraud statute, and under line B you have to plead fraud

25     with particularity.  And as a manifestation of that in the

1     Eighth Circuit, you need to prove some representative

2     examples of a false claim.

3              The government's position here is not that every

4     surgery that Mr. Asfora performed was medically

5     unnecessary, nor that the government and the two relaters

6     were in the surgeries when they were performed so they

7     don't have personal knowledge of this.  Therefore, they

8     are required to follow the representative sample rule that

9     is a requirement in the Eighth Circuit.  And so you need

10    to, when scrutinizing the public's allegations, look for

11    three things, three requirements:

12              One, was the surgery of a federal beneficiary?

13              Two, were there claims for payments put in to

14    the government for that surgery?

15              And three, are they adequately alleging that the

16    surgery was medically unnecessary?

17              If the surgery doesn't check all three of those

18    boxes, it's inadequate to demonstrate a sample violation

19    of the False Claims Act under a medical necessity theory.

20              And so, to try to respond to where I think

21    perhaps, Your Honor, might find this argument of most

22    assistance, we prepared slide four of our set of slides,

23    which is a table that lays out the 21 different patients

24    for whom a surgery is referenced in the complaint.

25    They're listed in complaint number order.

1          And we have in the three red columns to our

2     table, is there an allegation that they're a federal

3     beneficiary, is there an allegation of a claim for

4     payment, and what if anything is said on the issue of

5     medical necessity.

6          And so early in this complaint, the first 260

7     pages -- sorry, paragraphs, that is -- there's lots of

8     references to difference surgeries that were performed on

9     federal beneficiaries for whom claims for payment were

10    submitted to the government.  But not -- for not one of

11    those surgeries is there any suggestion that the surgery

12    was inappropriate or much less that it was not medically

13    necessary.

14          But then there's a pivot in the complaint to a

15    section that tries to leave the impression that there were

16    some surgeries that were performed that were not medically

17    necessary.  And there's really only four surgeries that

18    are alleged where there's any discussion at all about was

19    this a good surgery or not, and that's rows 18 through 21

20    of our table.  And for three of those four, they're not

21    even federal beneficiaries, and there's no reference to a

22    claim for payment.  For all we know they had private

23    insurance and the government had no role in that surgery

24    at all.  Only for patient Bonnie, who's on line --

25          MS. BAILEY:  Your Honor, if I could object?  I

1      would object to Mr. Geyerman using any patient names, as

2      protected health information and in violation of HIPAA,

3      and in particular 45CFR164.514, which does not allow names

4      of patients to be identified.  So to the extent that

5      Mr. Geyerman plans to read patient names in open court,

6      the government would object.

7              THE COURT:  How can she be identified, then?

8              MS. BAILEY:  Well, this individual could be

9      identified if you can connect the individual's name to the

10     complaint, to the date.

11             South Dakota is a small community.  Sioux Falls

12     is a small community.  It's not that difficult to connect

13     the dots.  So I think it's inappropriate to utilize names.

14     And we would prefer that -- excuse me.

15             THE COURT:  Surgeries in Sioux Falls, though,

16     come from a fairly wide area.  We're a major medical

17     center.  We're the major one between Denver, and Omaha,

18     and the Mayo Clinic in Rochester, Minnesota.  So we draw

19     from a big area.  So I don't know that it's that likely,

20     if that's your argument.

21             MS. BAILEY:  Our preference, Your Honor, is that

22     we utilize paragraph numbers from the complaint, and the

23     objection is noted.  But I understand your position.

24             THE COURT:  All right.  Go ahead.

25             MR. GEYERMAN:  Your Honor, I intentionally only

1    used a first name to try to avoid precisely that issue,

2    names in the complaint.  So I will proceed cautiously.

3    But I wanted -- I want us to be able to know that we're

4    talking about the same surgery, so that's why I put a name

5    on it.

6            So we're talking about that one patient's

7    surgery, and she's the only individual for whom she's a

8    federal beneficiary, claim for payment to the government,

9    and there's any suggestion that the surgery is in

10   question.

11           Under the *Frazier* case out of the District of

12   Arizona that we cited in our brief, every other surgery

13   referenced in the complaint is irrelevant to their

14   assertion that there was a violation of a False Claims Act

15   because he was performing medically unnecessary surgeries.

16   They don't check all the boxes.  Those other surgeries

17   don't matter at all.

18           So let's talk about the four patients, then,

19   whose surgeries the complaint does allege some level of

20   criticism about them.  And if you flip in our slides to

21   the next page, slide five, that's a table that drills down

22   in a little more detail about the four surgeries; again,

23   three of whom aren't even federal healthcare

24   beneficiaries.

25           But what's obvious from the table is that we're

1    talking about four surgeries that all involve fusing of

2    multiple levels of the spine.  And this is four surgeries

3    out of approximately 4,800 during the period of the

4    alleged conspiracy that this person performed, that

5    Dr. Asfora performed.  Now that number is not in the

6    complaint; I will admit that.  The government didn't

7    provide any denominator that you can assess how

8    frequently --

9             THE COURT:  Where does the 4,800 come from?

10            MR. GEYERMAN:  Your Honor, it comes from

11   counsel's investigation of the facts.  And I believe that

12   number has been shared --

13            THE COURT:  Well, wait a minute.  This is a

14   motion to dismiss.  This isn't a motion for summary

15   judgment.

16            MR. GEYERMAN:  Understood.  And I guess -- the

17   only point I can make from the complaint, Your Honor, is

18   the government doesn't identify any denominator from which

19   Your Honor could draw a conclusion about how prevalent in

20   terms of how many total surgeries Dr. Asfora performed

21   these four represent.

22            And so the allegation about them is that they

23   were aggressive, or quite aggressive; that the surgery

24   might have been more conservative, or that many surgeons

25   would not have performed this surgery.  But what the

1     allegations do not say is that -- they don't say that any

2     of these surgeries were medically unnecessary.  They're

3     more equivocal, softer conclusions than that.  And

4     frankly, as is evident, this is a debate over how many

5     levels of a spine fusion was appropriate.  Was three

6     appropriate, or was four?  Was four appropriate, or was

7     five?  We are debating a matter of degree in terms of what

8     was the best surgery.

9              But for purposes of false claims liability, the

10    question is not what is the best surgery that should have

11    been performed, but rather was it medically unnecessary.

12    And I'd submit that when you look at the medical necessity

13    cases where a complaint is found to have plausibly

14    alleging a lack of medical necessity, they're not

15    disputing issues that are a matter of degree, but rather

16    there was no medical value at all to the surgery or to the

17    test or to the prescription drug that was at issue.

18             And so one would draw a distinction analytically

19    between the criticisms that are a matter of degree, where

20    there's no suggestions the surgery shouldn't have been

21    performed at all, it's rather how many levels of the

22    spinal fusion were appropriate.

23             And to try to bring this home for Your Honor, if

24    you flip to the next slide, we tried to get as specific as

25    we could about what it is about the nature of these

1   criticisms of his spinal surgeries, his four surgeries

2   that --

3         THE COURT:  Aside from the individual surgeries,

4   what about the fact that the use by Dr. Asfora, according

5   to the allegations, that his use of the bullet cage

6   increased exponentially as time went on?

7         MR. GEYERMAN:  Several responses.  Number one,

8   that is really talking about the other theory of liability

9   that the government is asserting; that he was engaging in

10  kickback schemes and he profited from his sale of the

11  bullet cage.  I -- it's notable on these four surgeries

12  that are alleged to have been medically unnecessary, they

13  don't tell you how many implants were used in those

14  surgeries, nor do they allege under the surgery he should

15  have performed that he would have implanted any fewer

16  implants.

17        Which is to say -- that's a demonstration that

18  there's really no analytical nexus between the complaints

19  they're making about he shouldn't have been operating a

20  medical device company that manufactured devices he used

21  himself.  That's one theory.  And we're going to talk

22  about why they fail to state a claim under the kickback

23  arrangement.

24        But completely independent of that is their

25  assertion in performing medically unnecessary surgeries.

1    In other words, let's take the patient whose name will go

2    unspoken where a four-level fusion was performed on her.

3    The complaint does say that an Aegis screw was used in

4    that surgery.  It doesn't say how many screws were used.

5    And it also says the complaint is she -- you could have

6    performed that surgery with fewer levels of fusion.

7            Okay.  But there's no suggestion that if you'd

8    done three levels of fusion instead of four you would have

9    used fewer Aegis screws.  We don't even know how many

10   screws got used in the first place.

11           Our position is that whether something was

12   medically unnecessary analytically is entirely separate

13   and distinct from the question about what implants were

14   used.  Because they're making a completely different

15   theory of liability on implants, which is a kickback

16   theory of liability.  They're saying it was necessarily

17   tainted because he had an ownership interest in the

18   company supplying devices.

19           And it's only because, quite frankly, the

20   Anti-Kickback Statute is trying to prevent doctors from

21   overprescribing or performing unnecessary procedures that

22   caused them to enact the kickback statute in the first

23   place.

24           But there's no actual nexus here between the

25   surgeries that are alleged to have been unnecessary and

1    his use of more implants than would otherwise had been

2    used had it been the appropriate surgery.

3              So we view these as separate and distinct legal

4    theories.  We think it's important that Your Honor look at

5    them as separate and distinct legal theories.  And we

6    think that it's -- as a pleading and tactical matter,

7    honestly.  It's really where the government has decided to

8    try to blur the lines between those two theories that the

9    complaint sort of gets confusing.  Medical necessity

10   should have nothing to do with whether he owned or didn't

11   own Medical Designs.  He either performed unnecessary

12   procedures, or he didn't.  It doesn't matter what the

13   implants were that were a part of that procedure.

14             So, rooting this in sort of the case law that

15   exists with respect to other cases where lack of medical

16   necessity has been asserted, here's where the complaint in

17   this case falls short:

18             Number one -- this is on slide six where we

19   tried to put citations into other cases and hide them with

20   specific insufficiencies with this one.  Number one,

21   there's no definitive allegation of an absence of medical

22   justification for these four surgeries.  Remember, three

23   of them don't even matter because they're not even federal

24   beneficiaries.  But there's no opinions saying no

25   reasonable surgeon would have performed this surgery.  And

1     again, the standard to have liability for a lack of

2     medical necessity is that there is no medical

3     justification.  So you need something akin to no

4     reasonable surgeon would have done "X."

5            This dispute is a matter of degree.  And so

6     really, the foundations in this case are more like the

7     *McFarland* case out of the Middle District of Florida where

8     there the allegation was that the defendant had prescribed

9     certain medications that were not allegedly medically

10    necessary.

11           And when you scrutinize the complaint, the

12    allegations were that it was highly unlikely that the

13    medication would have some appurtatious benefit for the

14    patient, or it was doubtful that the patient would benefit

15    clinically from the medication.  And the Court said that

16    doesn't rise to the level of showing an absence of medical

17    necessity even if it's questionable, highly questionable,

18    whether there would be some effectiveness.

19           Second, the complaint cites no objective

20    standards underlying the criticisms that are lodged

21    against Dr. Asfora's surgeries.  And that really hits home

22    when you look at the case the government showcases in its

23    brief, the *Polukoff* case out of the Tenth Circuit.  There

24    it was a doctor who was performing a certain heart

25    surgery.  And there was an American Heart Association, an

1     American Stroke Association guideline that said you do not

2     perform this surgery for any purpose other than to cure,

3     essentially, recurring strokes.

4          But the allegation in that case was that that

5     doctor believed that that procedure actually helped cure

6     migraines.  But because insurance didn't cover the surgery

7     when done to treat migraines, he would misrepresent the

8     purpose for which he was performing the procedure.

9          And the reason the allegations plausibly alleged

10    a lack of medical necessity is because there was an AMA,

11    or an American Heart Association, an American Stroke

12    Association guideline.  That guideline had been

13    specifically adopted by the treating hospital as the

14    operative internal guideline.  And their allegation was

15    that, quote, general agreement in the medical community

16    was that that procedure should not be performed for any

17    purpose other than to prevent recurring strokes.

18         That's the kind of concrete, identifiable

19    standard that should exist if you're going to allege that

20    performing a procedure is not medically necessary.

21    Because if you don't have some sort of third-party

22    objective standard against which to measure whether this

23    surgery was or wasn't appropriate, you're really running

24    into the realm of second-guessing clinical judgments.  And

25    the Supreme Court has said that the federal False Claims

1    Act is not meant to be a statute to punish medical

2    malpractice.  It's not meant to be a replacement for the

3    state code that regulates doctors.

4            This is a fraud statute.  And so reasonable

5    differences of medical judgment don't rise to the level of

6    demonstrating a lack of medical necessity.  And so the

7    absence of any objective standard that's alleged in the

8    complaint to show why these surgeries at four levels

9    instead of three were medically unnecessary is a legally

10   significant omission.

11           Number three, the complaint wasn't identified,

12   the details about who the individuals are that rendered

13   these critiques of these surgeries.  We're not given

14   names.  We're not given full credentials.  And it doesn't

15   even -- the complaint doesn't even --

16           THE COURT:  Wait a minute.  Wait a minute.  That

17   seems to be stretching it a bit.  As one of the details

18   you have to have in a complaint, you give the name.

19   That's obviously discoverable, as are the credentials.

20   But to suggest that in the complaint you have to not only

21   name the person that you're quoting, but beyond that that

22   you have to have their credentials, even under a 9(b)

23   standard, which this is, I think that's one that can be

24   required.

25           MR. GEYERMAN:  I'm not trying to set a bright

1      line rule, Your Honor.  Ultimately the standard is have

2      they specifically pled details under the Eighth Circuit's

3      representative sample requirement to sufficiently prove to

4      Your Honor this is a claim that if proven true would be a

5      violation of the statute.

6              And in the absence of a third-party, an

7      objective standard, in the absence of -- in the

8      circumstance here, again, it's a matter of degree.  It's

9      not he should never have performed any surgery on these

10     four people at all; it's that he should have just fused

11     fewer levels of the spine instead of the number of levels

12     that he did.

13             Our submission is from a holistic consideration

14     of how good are these allegations?  Do they warn of chinks

15     going forward into discovery against this defendant?  We

16     submit that the fact that we don't even know who these

17     reviewers are is significant.  And one reason we don't

18     know is we don't even know their name.

19             THE COURT:  Well, you do -- you'll know them

20     pretty soon if the case goes forward.

21             MR. GEYERMAN:  Well, I'll only know them if they

22     tell me or if I ask.  You're right.

23             And the fourth point I would add is that in some

24     cases when a complaint has been found to not plausibly

25     allege medical necessity, the plaintiff went as far as to

1    even attach the underlying report of the surgery or the

2    procedure so that when a court is evaluating on a (9)(d)

3    analysis, are there specific details here:  Is there

4    enough to have this case survive the pleading stage?  I

5    can at least look at the full medical record and report.

6            The complaint here doesn't do that.  Rather --

7            THE COURT:  It was suggestion --

8            MR. GEYERMAN:  -- we only have --

9            THE COURT:  -- can't hear what the -- just a

10   minute.

11           You're suggesting a standard with an attachment

12   of medical reports and so on to a complaint, that even on

13   a 9(b) I think is beyond the requirements of a 9(b), just

14   so you know --

15           MR. GEYERMAN:  Well, again --

16           THE COURT:  -- to be discovered.

17           MR. GEYERMAN:  I'm not advocating or suggesting

18   that a bright line removal be created.  But again, from a

19   holistic evaluation of this complaint, are the allegations

20   sufficiently specific?  The fact that they have shared and

21   served certain quotations -- not even complete sentences,

22   I might add, not even a block quoting.  This is the

23   entirety of the conclusions section.  They've not quoted

24   it.

25           And we obviously know more about these

1    procedures than are in the complaint, and if -- we have a

2    lot to say about this.  But I'm limiting it to this point

3    as to what's in the complaint, and it's not very much, and

4    they're not even attaching the whole medical record.

5              So that's our second basis for dismissal of the

6    medical necessity claims, is that there aren't sufficient

7    allegations to demonstrate these -- this one procedure is

8    in fact medically unnecessary.

9              And with the third and final ground for

10   dismissal of the medical necessity claim is that there are

11   no allegations in this complaint that Dr. Asfora himself

12   actually believed these procedures were medically

13   unnecessary.  And that is a fatal omission to this

14   complaint.  Because the knowing submission of false claims

15   is a prima facia element of a cause of action.  And so not

16   only does the surgery had to have been medically

17   unnecessary --

18             THE COURT:  Just a minute.  Just a minute.

19   Let's touch that a little bit.  Because there's a claim by

20   the defense that says risk assessment, so to speak, is

21   going to 95 percent.  That goes to the top five percent of

22   the risk element.  And so -- that he put in his medical

23   notes, I didn't think this was necessary surgery, he

24   obviously isn't going to do that.

25             So the -- it could be said that the government

1    gets the opportunity to try and show to a jury that, in

2    fact, he didn't or loosely have significant wording that

3    he was going to -- the situation wasn't medically

4    necessary since the score level is so high.

5            And what kind of evidence do you extract for

6    ability to show intent?  Intent is usually shown by

7    circumstantial evidence.

8            MR. GEYERMAN:  It is typically shown by

9    circumstantial evidence.  But they don't have any -- they

10   don't allege any circumstances about him in these

11   surgeries at all.

12           As to the risk score point, that -- there's very

13   little that's alleged in the complaint about what that

14   risk score means.  They call it a risk score, but they

15   don't actually allege very much about that Vanderbilt

16   University scaling score.  What they do allege is that it

17   measures patient satisfaction.  That's the only concrete

18   fact that is alleged in the complaint about what that

19   measures.  And it says that he has a high risk score on

20   a -- on something that leads to customer satisfaction.

21           So in terms of -- I don't think a fair inference

22   can be drawn between him having a high score on that and

23   the fact that he had some reason to believe that a

24   particular surgery was medically unnecessary.  They're

25   certainly drawing no connection between the four surgeries

1    they complain about and that risk score.  There's nothing

2    direct to the complaint to that fact.  And I would say

3    that we've cited cases where the Court, in dismissing at

4    the motion to dismiss stage a medical necessity claim,

5    makes note of the fact that there are no allegations that

6    suggest the defendant believed the surgery was

7    unnecessary.

8             It's a prima facie element.  And we're not

9    asking you to obviously judge any evidence in this case,

10   but we are asking that the plausibility of their

11   allegations be scrutinized.  And even giving them the

12   benefit of all inferences for what they've alleged, we

13   believe that they haven't plausibly alleged any facts on

14   misuse of scienter, because they don't say anything about

15   him and these particular surgeries.

16            I guess I would just note that the government in

17   its brief argues that it's essentially impossible for a

18   defendant to prevail on the argument that allegations in a

19   complaint don't demonstrate medical necessity at the

20   motion to dismiss stage.  And we cited *McFarland*, *Plavix*,

21   the *Health Management Associates* case infringer that all

22   did the exact opposite.  And the conclusion there is not

23   the procedures were medically necessary, but rather the

24   complaint's allegations are not sufficiently plausible and

25   specific to suggest that they're not medically necessary.

1    That's the specific procedural test before Your Honor, and

2    we don't think that they've done it.

3          That -- those are our three points for grounds

4    for dismissal of the medical necessity claim. This is not

5    any -- this is not a medical malpractice statute; it's an

6    Anti-Fraud Statute. And we don't believe that they've met

7    their pleading burden.

8          Unless Your Honor has more questions on that

9    theory, I would turn it over to Mr. Graham to talk about

10   the ownership kickback theory, if Your Honor would like.

11         THE COURT: All right. No, I don't have any

12   further questions.

13         I was obviously concerned about medical

14   necessity. That's one of the reasons I keyed it up for

15   people to argue. I'm not so concerned about the owner

16   kickbacks, so we'll see how your partner does on that.

17         MR. GRAHAM: Thank you, Your Honor. This is Ben

18   Graham from Williams and Connolly. I'll be addressing the

19   second theory that is raised in the complaint, which we

20   have described as the ownership kickback theory.

21         Now, I'd like to be clear at the outset about

22   what the government's theory of the case is here. On the

23   government's view as expressed in the complaint and the

24   opposition brief, any time a doctor wholly owns a medical

25   device company, uses a device from that company in one of

1   his surgeries, and then receives his ordinary profit

2   distribution from that company, the government believes

3   that doctor has committed a crime in violation of the

4   Anti-Kickback Statute.

5            That is a novel and sweeping theory of

6   liability, and it should be dismissed for any one of three

7   reasons that you identified, both in the slides we handed

8   up this morning and also the briefs from this case.

9            The first reason applies generally as a matter

10  of law.  There is no kickback.  The complaint fails to

11  even -- does not allege and pursue a cognizable theory as

12  a general matter under the Anti-Kickback Statute.  That's

13  true in this case and in every other.

14           The second theory is more particular to the

15  allegations about Dr. Asfora and Medical Designs in

16  particular.  And the second ground is that as applied to

17  Dr. Asfora and his company, the complaint does not

18  adequately allege scienter.  The AKS, as you know, is a --

19           (Static and sound distortion.)

20           (Reporter asked for clarification.)

21           MR. GRAHAM:  The second ground, Your Honor, is

22  scienter; that under the AKS, that's a heightened mens rea

23  burden, and the government must allege that Dr. Asfora and

24  his companies knowingly and willfully engaged in the

25  unlawful conduct.

1          And the third ground is that the complaint for

2   similar reasons does not allege materiality, which is a

3   necessary element under the False Claims Act.

4          Now, I'd like to go through those in order, and

5   I'll try to do so briefly.

6          So the first is the very nature of this

7   ownership kickback theory.  Now under the Anti-Kickback

8   Statute, it criminalizes behavior where two actors

9   exchange financial incentives to encourage the other actor

10  to shift government beneficiaries towards the first's

11  services or medical -- medical services.

12         Now, the government here in this case is

13  pursuing a novel theory:  That a doctor who wholly owns a

14  medical device company kicks back to himself by receiving

15  profit distributions.  To our knowledge and based on

16  everything that the government has attempted to put in in

17  the opposition, no court has ever held that that was a

18  viable theory.  No agency guidance from HHS has ever

19  reached so far.  And indeed, based on the government's

20  complaints that are reached for as attachments to its

21  opposition, it doesn't even appear that the government

22  itself has ever brought a case on that theory, targeting a

23  doctor who wholly owns a medical device company.  And

24  that's for good reason.

25         The AKS focuses on inducement, as the efforts of

1    one actor through financial incentives to change the

2    behavior of another.  The cases we cited to Your Honor say

3    that's the gravamen of Medicare fraud.  Here, the AKS

4    violation is inducement.

5              And I think the clearest case to explain this

6    standard and the structure that we care about when looking

7    at kickbacks is probably the *Patzer* case, from the Eastern

8    District of Wisconsin.  We cite that on page 14 of the

9    brief.  And I'll just quot a couple of sentences from it,

10   because I think it encapsulates the core of our defense

11   and it's one to which the government has not offered a

12   response.

13             "The very definition of kickback requires that a

14   person provide something of value; one, to another person;

15   and two, to improperly obtain or reward favorable

16   treatment."

17             Now those two elements are the very elements

18   that are lacking here.  There are not distinct people, and

19   nothing was offered to induce or to change the behavior of

20   the other.

21             The Court in Pastor continues to say, "Implicit

22   in this definition is the idea that each party of the

23   kickback transaction is acting independently and can

24   choose or could have chosen not to deal with the other.

25   If such independence is lacking, then one party who is

1    providing something of value for another could not be

2    viewed as incentive."

3              THE COURT:  Let me ask you a question.

4              MR. GRAHAM:  Yes.

5              THE COURT:  According to the allegations, again,

6    Dr. Asfora approached other physicians in saying if you

7    use my bullet, then I'll kickback, frankly, "X" number of

8    dollars for every one that you used.  And according to the

9    allegations again, they said I can't do that, that's

10   illegal.

11             But how is that different than if you consider

12   his corporation to be a separate entity, how is it any

13   different than when Dr. Asfora winds up getting, in

14   essence, a sum of money separate and apart from the

15   surgery that he performed, for doing it?  How's that any

16   different from what he offered to do with some other

17   surgeon who turned him down?

18             MR. GRAHAM:  Your Honor, two responses to that.

19   The first is that the alleged payment and his consulting

20   fees to other physicians and other surgeons, those aren't

21   part of this case, because those are investigated and

22   settled and released as part of the DuBay investigation,

23   (indiscernible) 2011 to 2013.

24             Now as to the hypothetical Asfora approaches

25   another doctor and offers to pay them --

1           THE COURT:  We've got an audio problem a little
2      bit.  You're getting scrambled.  Let's do a testing.  One,
3      two, three, four.
4           MR. GRAHAM:  One, two, three, four.
5           THE COURT:  That was clear.  So I think maybe --
6      Misty?  Maybe a little more slowly.  You weren't speaking
7      that fast, but it was getting a little bit garbled here.
8      So go ahead.  Not that what you're saying is garbled at
9      all, but the way it was coming was garbled, okay.
10          MR. GRAHAM:  I'll ask my computer to be a better
11     messenger.
12          So the difference is, Your Honor, I think is on
13     a couple of fronts.  One of those is that in that context,
14     there is a different actor.  And in that allegation,
15     Dr. Asfora alleged to be offering remuneration to a third
16     party for purposes of directing patients towards devices
17     from his company.
18          In the context of Dr. Asfora and his company
19     directly, you have to look at the verbs in the statute.
20     There is no "offer."  There is no "inducement."  The there
21     isn't a "solicitation."  Dr. Asfora does not need to
22     solicit his profit distribution from his company.  His
23     company does not offer the profit distribution to
24     Dr. Asfora.  Those terms don't even apply in the context
25     of a wholly owned medical device company; which sets this

1    apart from all of the other cases the government would

2    like to discuss about the doctor-owned distributorships.

3              And I think those cases are instructive on this

4    point.  Because if you look at the HHS guidance and the

5    special fraud alerts, what they say is that a company that

6    is owned by a physician is not unlawful, but it should be

7    subject to scrutiny.

8              THE COURT:  Well, one of the companies was owned

9    by the physician and his wife.  The other one was owned by

10   him solely.  Isn't that the case?

11             MR. GRAHAM:  That's right, Your Honor.

12             THE COURT:  What about this one that was with

13   the physician and his wife?  Even if you take your theory

14   that he can't solicit himself, what about the fact that

15   there's a third party involved with regard to at least the

16   conspiracy claim?

17             MR. GRAHAM:  So in this context, and under the

18   statute, a physician and his wife are treated as one in

19   the same purposes, one in the same person.  The government

20   disregards the distinction between them for the ownership

21   interest.  The so that's why I refer to them as wholly

22   owned.

23             In our opening brief we cited statutory

24   authority for that, which I can flip back to in a moment

25   and probably forward you in response.  So there is for

1    this only one owner, and that is the married entity, and

2    it disregards payments to a spouse.

3            So in both Medical Designs and in Sicage, for

4    purposes of this statute and for the healthcare laws,

5    there is one owner in both.

6            And that sole ownership is a distinguishing

7    factor in this case from the others in which the

8    government has pursued claims against entities that have

9    physician owners.

10           Now, in those cases, Your Honor, I would

11   actually just direct you to the ones the government cites

12   in their brief.  If you read those cases, in each of them

13   the entity that was at issue, the pod or physician-owned

14   distributor, was generally a new entity that was created;

15   It was one that solicited investments from multiple

16   different doctors explicitly for the purpose of demanding

17   that they make referrals through that entity, and then

18   siphoning money back through it to disguise cash payments.

19   And the hallmarks of fraud are all over those entities.

20           For example, in the *Iqbal* case from the Eighth

21   Circuit, someone approached for a business relationship --

22   the defendant approached another entity for a business

23   relationship where he would direct referrals to that

24   company and demanded a share of the proceed in return.

25   And to get that off the ground, they created, quote, bogus

consulting agreements.

In the *Bruno v Schaeffer* case, also in the government's brief, positions were offered for investments in laboratory entities, but, quote, existed in name only and didn't physically exist and were not licensed labs.

By contrast to all of those cases, there is a sole owner who is a real doctor, who created real companies for the purpose of making real products. Medical Designs was founded in the nineties, so that Dr. Asfora could create his bullet cage, patent that product, get FDA approval for it, and then use it in his operations. That's a far cry from the abusive fraud tactics that are at issue in the other cases the government cites.

And still, in none of those cases has the government sought to bring a charge against a sole owner of a medical device company. That's why this theory in this case is novel and would sweep far too broadly and, frankly, wreak havoc across the entirety of the medical industry. And it has bad policy outcomes, too.

We want expert physicians like Dr. Asfora, who is one of the best and most renowned physicians practicing in the Midwest, to be able to develop products for use in these complex surgeries.

Your Honor, I'd also like to touch briefly on

1      the second two grounds for why this ownership kickback

2      theory would have to be dismissed in relation to

3      Dr. Asfora in particular.  As I said, the AKS is a

4      criminal statute.  Under Eighth Circuit law there's a

5      heightened mens rea burden.  And under the *Jayne* case what

6      it means is the government has to show that conduct was,

7      quote, obviously evil, or that Dr. Asfora intended to

8      engage in unlawful conduct.

9             Now, as Your Honor pointed out, mens rea can be

10     established through circumstantial evidence, but there are

11     precisely no allegations in the complaint that Dr. Asfora

12     believed that this was unlawful conduct.  There are

13     allegations about what other people said, to be sure.  And

14     it's also the case that other companies and other

15     hospitals didn't want to do business with physician-owned

16     entities because they were concerned about precisely this

17     situation.  The government has been very aggressive in

18     pushing these theories.  There are trouble indicatives

19     under the FCA, and there's good reason why someone in

20     business might want to avoid this as a prophylactic

21     matter.  But that doesn't mean that it's unlawful.  And in

22     fact, Dr. Asfora had very good reason to believe that his

23     ownership structure was lawful.

24             The DuBay investigation revealed that he was the

25     owner of Medical Designs, that he was using Medical

1    Designs for products in his surgeries, and that he was

2    receiving profit distributions from Medical Designs.

3              The government received that information in a

4    complaint from a relater.  HSS, the Office of Inspector

5    General, the very agency responsible for paying Medicare

6    claims, issued subpoenas and investigated the matter and

7    reached resolution.  And they did not pursue a claim that

8    the ownership structure was a violation of the AKS.

9              So in contrast to every other actor who might

10   tread lightly in this area that might be concerned about

11   government overreach, Dr. Asfora had already been through

12   this investigation, and the government had not made a

13   claim on the basis of his ownership structure.

14             That is the same ownership structure under the

15   entirety of the ownership kickback theory.  They believe

16   that the mere fact of ownership, use of the product, and

17   receipt of product distributions violates the AKS.  When

18   Dr. Asfora had very good reason that that was not the

19   case, because all let it passed on the very claim.

20             Now the --

21             THE COURT:  Just a minute.  Just a minute.

22             Now you're saying that because of the DuBay

23   case, that Dr. Asfora has reason to believe that what he

24   was doing was fine?  Is that what you're saying?

25             MR. GRAHAM:  Yes.  Yes, Your Honor, we are.

1          THE COURT:  So why did he pay $650,000 in

2     settlement?

3          MR. GRAHAM:  Over a different allegation than

4     DuBay, Your Honor.  The one allegation was that Dr. Asfora

5     was paying cash payments through the closing agreements to

6     other doctors.  That was one of the allegations in DuBay.

7     DuBay overrid the allegation that Dr. Asfora himself was

8     using these products and receiving a product fee.  Those

9     are in the complaint.  Those are the kinds of information

10    that were sought by the subpoena.  And then the actual

11    settlement agreement did not raise as misconduct the

12    receipt of profit distributions.  The settlement only

13    focused on the cash payments to other doctors.

14          And as we discussed earlier in the hypothetical

15    that Your Honor raised, payments to other parties, to

16    third parties, is the kind of thing that creates AKS

17    liability.  And in the settlement Dr. Asfora of course

18    admitted -- (sound distorted) -- but the prevailing part

19    is that the government did not pursue a claim in that case

20    that the ownership and profit distribution was also an AKS

21    violation.

22          So after being sent through the wringer with the

23    government and sitting through subpoenas and with

24    negotiating the settlement with the government, Dr. Asfora

25    had good reason to believe that the ownership part --

```
1           THE COURT:  Wait a minute.  Wait a minute.

2           The settlement wasn't actually with the

3    government, because the government declined to undertake

4    the case.  And so the other parties received it.  And

5    under the (sound garbled) proceedings, the government has

6    to give notice of it in case they're going to intercede in

7    order to object to the settlement.  So the settlement

8    wasn't with the government.  Right?

9           MR. GRAHAM:  Two points, Your Honor.  The

10   government -- in false claims cases has right of approval

11   for settlement agreements and can intervene at any time.

12   The government did decline to intervene.  But the

13   government also played an active role in that case when it

14   issued the subpoenas and received information about Dr.

15   Asfora's ownership.

16          THE COURT:  Right.  But the Anti-Kickback Act

17   requires that they receive the information during the

18   proceedings.  But when you look at the pleadings in the

19   case, there wasn't anything in the pleadings.  No

20   discovery was reflected.  There's not even an answer

21   reflected.

22          MR. GRAHAM:  Well, Your Honor, the discovery

23   happens before the complaint is unsealed.  So when the

24   complaint is filed or (indiscernible) files it under seal,

25   the government gets the notice and the government issues
```

1     subpoenas, conducts a thorough investigation, and then

2     will make a decision whether or not to intervene before

3     the case --

4             THE COURT:  Yes, I'm familiar with that.

5             MR. GRAHAM:  As you may know from this case, if

6     not from others, the government was involved in that

7     investigation.  The subpoenas that we attached to our

8     motion to dismiss, Your Honor, I believe it's ECF number

9     74-2, is a subpoena issued by HHS which they --

10            THE COURT:  What do you have to say then about

11    even the warnings that he got from his own lawyers that he

12    shouldn't -- you can't do this?  What about that?

13            MR. GRAHAM:  Well, Your Honor, the lawyers, as

14    you know, are notoriously risk averse.  And Dr. Asfora's

15    counsel advised him that there were risks associated with

16    some of the transactions he was contemplating agreeing to

17    with these other third parties and the licensing

18    arrangements.  But they also said that it would expose

19    Dr. Asfora potentially to a qui tam action, could expose

20    him potentially to an action by the government, but that

21    there would be defenses.  Dr. Asfora's counsel never told

22    him that this was illegal or unlawful.  They did counsel's

23    job and advised him of the risks.

24            And that advice ended up being correct in that

25    respect.  The government has pursued a claim, and it has

1    led to the result of Dr. Asfora suffering tremendous

2    economic harm.  That doesn't change the fact that under

3    the scienter standard, materiality standard, or the basic

4    nature of an ownership kickback, there is no liability

5    under the AKS, despite the government pursuit of it.

6            And, Your Honor, speaking to the government's

7    role in the DuBay investigation as well, that underpins

8    the third reason for dismissing the ownership kickback

9    theory.  And I think it's under the False Claims Act

10   there's a materiality requirement.  And under the Supreme

11   Court's reasoned decision in *Escobar*, that is a rigorous

12   standard and it's one that should be enforced on a motion

13   to dismiss.

14           And here's the issue:  Under *Escobar*, if the

15   government is aware of what it perceives to be predicate

16   facts that would indicate that there was an HHS violation,

17   and it does nothing for years and continues unabated to

18   pay the claims that Dr. Asfora submits under that same

19   very ownership structure that the government was on notice

20   of, then under the Supreme Court's holding in Escobar,

21   that is strong evidence that there is no materiality.

22           In other words, if the government is correct on

23   the first hand that there is this broad, sweeping

24   liability under the ownership kickback theory -- which we

25   contest but they seem to believe there is -- they knew

1     every predicate element --

2               THE COURT:   (Static and garbled sound.)

3               MR. GRAHAM:   I'm sorry, Your Honor?

4               THE COURT:   Strong evidence.   Not that this

5     evidence is strong and this is enough to kick out the

6     claim and so on.   Strong evidence doesn't sound like

7     something that a court should be considering in its ruling

8     on the 12(b)(6) motion as opposed to a summary judgment

9     motion.

10              MR. GRAHAM:   Your Honor, courts do dismiss FCA

11    claims on the grounds of materiality on the pleadings.

12    And we're not asking Your Honor to balance the evidence.

13    But the government does have a burden under Rule 8(a) and

14    12(b)(6) to name plausible inference of a materiality

15    theory, and the Supreme Court emphasizes that this is a

16    rigorous standard.

17              It's the kind of bait and switch that *Escobar*

18    was trying to prevent.   The government knew that

19    Dr. Asfora owned this company and was using these devices.

20    It was front-page news for years.   And they allowed him to

21    continue making a claim for payment and paying them.   HHS,

22    the same entity that investigated the allegations in

23    DuBay, continued to make those payments .   And what the

24    government is not allowed to do under the *Escobar* standard

25    is to lead an doctor down the garden path and then years

1    later turn around and sue for liability.  It's unfair, and

2    it is dismissible under the *Escobar* standard.

3           So, Your Honor, for any of these three reasons,

4    because the ownership kickback theory at large does not

5    constitute a kickback, because there was no plausible

6    allegation of scienter, even when investigated before, and

7    because the government continued to pay without raising

8    the issue for nearly a decade, each of which is an

9    independent reason that we think the ownership kickback

10   theory should be dismissed.  Thank you.

11          THE COURT:  Thank you.  I'll hear from the

12   government.

13          MR. GEYERMAN:  Your Honor, before the government

14   starts -- I would just add there are several sort of

15   secondary claims brought for conspiracy, payment by

16   mistake, and unjust enrichment.  We're happy to rest on

17   the papers on that, unless Your Honor has questions.

18          And because Your Honor asked specifically about

19   the settlement agreement from the DuBay case, I direct you

20   to docket number 743.  The settlement agreement from DuBay

21   is in the record on the motion to dismiss, and the

22   government is a signatory to that settlement agreement.

23   And a Sanford hospital paid one hundred percent of the

24   settlement payment.  There was no payment by Dr. Asfora.

25          THE COURT:  Except that I have the settlement

1    agreement right here with me, And there's nothing in the

2    record that says that Sanford paid a hundred percent.

3            MR. GEYERMAN:  That part is true; that is not in

4    the record.  But I am representing that that is true.

5            THE COURT:  I don't question your

6    representation.  I just point that out, you know.  Because

7    this is kind of an unusual 12(b)(6) hearing because we're

8    talking about a lot of things, some of which aren't in the

9    record.  That's why I make the point.  I don't question

10   your representation; on the other hand, I don't accept it

11   as being a part of the record before me.

12           All right.  With regard to the other claims, the

13   unjust enrichment and the other things, the duplicate

14   recovery and all that, you've briefed all that, so I don't

15   have any questions with regard to those.

16           I pointed counsel specifically to the things I

17   was especially concerned about, which you've covered well

18   in your briefs as well as here.  And the other things have

19   been covered adequately already.  Well, as to those two

20   issues too.  But I'm obviously interested in hearing on

21   the two issues I specified not only from you, but likewise

22   from the government, because those are ones that you've

23   put forward forcefully in your briefing.

24           All right thank you, then.

25           Let me hear from the United States.

1          MS. ROCHE:  Thank you, Your Honor.  This is

2     Megan Roche, speaking again after you requested that we

3     identify ourselves.  Can you hear me okay, Your Honor?

4          THE COURT:  Yes.  Go ahead.

5          MS. ROCHE:  Thank you.  And may it please the

6     Court, counsel.

7          The United States respectfully requests that the

8     Court deny defendant's motion to dismiss United States'

9     complaint in intervention.

10          THE COURT:  Just a moment.  I've lost my

11     realtime.

12          (Off the record to resolve technical issues.)

13          MS. ROCHE:  As I was saying, the United States

14     respectfully requests that the court deny defendant's

15     motion to dismiss.

16          The United States' complaint in intervention,

17     the United States has met the necessary standard in

18     Federal Rule of Civil Procedure 12(b)(6) and then has

19     stated sufficient factual matter.  It's well pleaded and

20     accepted as true that the stated claim for relief is

21     plausible on its face.

22          The United States has acknowledged, just as

23     defendants have already stated, that 9(b) is, of course,

24     at issue in this case as we are discussing matters under

25     the False Claims Act.  And so the United States does have

```
 1      to state with particularity the circumstances constituting
 2      fraud.  The defendant has already established there are
 3      essentially the two theories of the case:  The medical
 4      necessity claims, and the Anti-Kickback Statute
 5      violations.  As the Court has suggested it's more
 6      interested in the medical necessity claims, there's where
 7      I will begin and attempt to respond to the arguments
 8      that --
 9              THE COURT:  Let me ask you -- just a moment.
10              On the medical necessity claim, in this
11      complaint there's less detail with regard to specific
12      cases than there was originally.  Isn't that correct?
13              MS. ROCHE:  You mean by originally the
14      difference between relaters' complaint and the United
15      States' complaint?
16              THE COURT:  Yes.
17              MS. ROCHE:  Yes, that's a fair -- as far as
18      discussing specific procedures and attacking medical
19      judgment and medical choices and procedures, that's a fair
20      assessment.  There was a number of discussions of specific
21      provision violators in the complaint.
22              THE COURT:  Hum.  They told us -- (sound
23      garbled).
24              MS. ROCHE:  What's that?
25              THE COURT:  That was the reason for calling
```

1    some -- for removing some of the detail, culling some of
2    the detail.
3            MS. ROCHE:  Right, Your Honor.  And I'll get to
4    that, as to what I think that the United States' pleading
5    requirement is under 9(b) as to what needs to be pleaded
6    for 9(b) to be satisfied for the medical necessity claim.
7            And so just a quick snapshot and some background
8    information, considering we've talked about what
9    constitutes medical necessity as defendants began arguing.
10    And of course Medicare and Medicaid only cover services
11    and items that are reasonable and necessary for the
12    diagnosis or treatment of illness or injury.
13            Of course as the parties already have briefed
14    that if there's a nonreimbursable claim that's submitted
15    to federal healthcare programs, that claim is false.  And
16    if a claim is not medically necessary, that is also false.
17    I don't think there's any disagreement about that.
18            But the defendants have already discussed sort
19    of this degree of difference between medical judgment and
20    that information.  I'll get into that a little bit further
21    here.  But we did want to discuss in the *Polukoff* case, a
22    Tenth Circuit case, that case -- and we cited it in our
23    briefs -- specifically said that to be reasonable and
24    necessary a procedure must be among other things
25    appropriate, and that includes the duration and the

1    frequency, and furnished in accordance with accepted

2    standards of medical practice.  And then finally, meets

3    but does not exceed patient's medical need.

4              And that's just one case, *Polukoff*, and it's

5    cited in the brief.  And that's something to just keep in

6    mind as I guess into the next argument about what the

7    standard is in the Eighth Circuit as to what the United

8    States has to show under 9(b) at this stage of the

9    litigation regarding the medical necessity claim.

10             So the defendants have asserted at this stage

11   that it's imperative that the representative sample, the

12   representative or example patient be pleaded at this

13   point.  And we would actually disagree with that at this

14   stage and based on the law in the Eighth Circuit.  Of

15   course the parties talked about *Joshi* a fair amount, and

16   in the pleadings and also here in argument today, but the

17   Eighth Circuit has a different test.  And it was briefly

18   mentioned, but I don't think it was highlighted enough.

19   And that's discussed in the *Thayer* case, the *Thayer versus*

20   *Planned Parenthood*.  And that was cited in our opposition

21   brief.  And in *Thayer*, the Court there noticed -- it's a

22   Judge Wollmann opinion -- a party can satisfy Rule 9(b)

23   without pleading representative examples of false claims

24   if the party can otherwise plead that the particular

25   details of a scheme to submit false claims paired with

1    reliable indicia that lead to a strong inference that

2    claims were actually submitted.

3             And so that was a case, *Thayer*, that essentially

4    said *Joshi* always saying there must be a representative

5    patient example is not the law.  And *Thayer* was a little

6    bit different in the fact that there was a pretty wide

7    Circuit sweep and a Circuit analysis.  And I think that

8    *Thayer* discussed or cited at least seven but probably

9    eight other sister Circuits that also talked about the

10   reliable indicia test under *Thayer*.

11            And so in examining that is sort of where

12   defendants have said that the lines get blurred.  And in

13   this instance we do believe that in some respects the

14   lines should get blurred.  Because if you're talking about

15   all of the specific and the particular details that are in

16   the United States' complaint, it covers the majority of

17   all the paragraphs in that complaint, a lot of which is

18   talking about the ownership interest, the ownership

19   theory, the alleged kickbacks, the structure and

20   arrangement of the types of distributions that Medical

21   Designs was engaged in, that Sicage was engaged in, that

22   Dr. Asfora was engaged in.

23            And so to talk about the particular details of

24   the scheme for the whole -- the entirety of the United

25   States' claim, we have to talk about all of the things

1    that were alleged and what schemes were alleged.

2         The schemes that were alleged are more

3    specifically talking about what was Medical Designs doing,

4    what was Dr. Asfora doing, what was Sicage doing, how are

5    the arrangements starting?  Talking about the bullet cage.

6    Although the bullet cage was FDA cleared long ago, it was

7    substantially equivalent to other things.

8         And so like Your Honor has suggested earlier

9    with questions, at that time Medical Designs was not

10   finding very many users for the bullet cage.  And so

11   Dr. Asfora, as an owner and also as an agent, approached a

12   number and a varied amount of other people, including his

13   coworkers at Sanford, and also including just a random

14   surgeon, a random neurosurgeon in the Dakota Dunes and

15   expressly said I will give you "X" amount of money simply

16   for you using this device.

17        And so that was alleged with particularity, and

18   there was sufficient details of that whole theory of the

19   case just talking about the bullet cage, in talking about

20   Medical Designs, in talking about how money flowed

21   between -- if Dr. Asfora is going to order a product that

22   Medical Designs manufactures, like the bullet cage, he

23   says I have a surgery on this date and I need "X" amount

24   of screws, I need "X" amount of cages, and submits for --

25   you know, basically submits to Medical Designs this is

1    what I need, and those -- you know, the Medical Designs

2    then bills Medicare for all of those devices, and

3    eventually throughout the process distributes those

4    proceeds back to Dr. Asfora.  That's exactly the sort of

5    harm and concern and the corruption of medical judgment

6    that the Anti-Kickback Statute is intending to reach.

7            And so it's not just that; it's all of the

8    schemes.  It's about the bullet cage.  It's about the

9    SAMBA screw.  It's about Sicage and how Sicage was created

10   essentially to be a replacement billing source for

11   Dr. Asfora, because he could no longer distribute -- or

12   Medical Designs could no longer distribute the SAMBA screw

13   because it was sold to Orthofix.

14           And so it really is sort of -- if we're talking

15   about all of the schemes that the government has alleged,

16   it has to be the entirety of the complaint and not just

17   the medical necessity claims, which we'll get to.

18           And I can talk about, you know, the -- a lot of

19   the really concerning evidence in those schemes.  Not just

20   those was kickbacks that we already discussed, where

21   Dr. Asfora offered physicians money to use Medical

22   Designs' products.  But other things:  A lot of secretive

23   and furtive behavior as far as what Dr. Asfora told

24   Sanford, what Dr. Asfora told CMS, what Dr. Asfora told --

25   through various forms and things like that.

1           But also Orthofix is a very big and important

2    scheme that's discussed with extensive paragraphs in the

3    complaint.  And part of the reason that Orthofix is so

4    concerning, Your Honor, is because Dr. Asfora, in that

5    instance, had innovated, and he had brought something to

6    market that other users besides himself were using -- the

7    SAMBA screw -- to the point where it was sold to another

8    distributor who wanted to distribute that product.  And

9    there was a lot of back and forth during the negotiation

10   that's discussed in the complaint in detail and with

11   particularity, and discusses throughout that whole process

12   that Dr. Asfora's continuing to negotiate on behalf of

13   Medical Designs, back and forth, back and forth.  He

14   wanted to be able to make money when he, himself,

15   Dr. Asfora the physician, used the SAMBA screw at Sanford,

16   at the Sioux Falls Specialty Hospital, and other places.

17   And Orthofix had to come back repeatedly and say you can't

18   get royalties off of your own use of the device.  You

19   don't want to violate the anti-kickback laws.

20           And there was this tension of continually going

21   back and forth, continually going back and forth.  And

22   eventually there was a transfer in who could distribute

23   the SAMBA screw, and Orthofix became the licensee or the

24   distributor of that device.  And still Dr. Asfora is

25   constantly asking, I want Medical Designs to get it back,

1   just for my practice.  I want to get it back, just for my

2   practice.  And to the point where he's saying again and

3   again, I'm motivated to market my SI practice.  I'm

4   motivated to do more surgeries.  And that's going on back

5   and forth.  And he's getting all these warnings for

6   Orthofix.

7            And so all of these -- all of these allegations

8   are viewed together about what's in Dr. Asfora's mind,

9   what's happening between the business decisions of Medical

10  Designs and Sicage with Dr. Asfora as an owner or agent,

11  versus Dr. Asfora as the surgeon.

12           And so we've got the bullet cage instances.

13  We've got the Orthofix instances, where eventually even

14  though Medical Designs was not the distributor of SAMBA

15  screw, Medical Designs continued anyway to distribute the

16  SAMBA screw when Dr. Asfora was utilizing the SAMBA screw

17  in a procedure and didn't tell Orthofix about that.

18           And thus he con -- Medical Designs continued to

19  attempt to make money; and thus Dr. Asfora, in the

20  process, continued to make money on a device that he had

21  already sold.

22           And additionally with the Sicage, that's another

23  variation, I suppose, on the kickback and ownership theory

24  as it's discussed.  Because Sicage was another example

25  where it's an SI screw substantially equivalent to the

1    SAMBA screw that was sold to Orthofix, and Sicage was

2    essentially a Dr. Asfora and Medical Designs, essentially

3    Medical Designs as a distributor, can no longer catch the

4    proceeds from utilizing an SI screw it developed, Medical

5    Designs and Dr. Asfora developed, a substantially

6    equivalent product.

7         And so then Medical Designs, which became

8    Sicage, which is another sort of thing, Sicage was created

9    as a separate LLC but it has a nearly identical address,

10   the same employees, Dr. Asfora as the sole owner.  But

11   it's a separate entity.  We'll admit that.

12        But that entity was created essentially, we

13   believe the evidence shows and we've alleged and we've

14   pled with particularity that for the purpose of

15   Dr. Asfora and Medical Designs wanting to be able to

16   capture the proceeds from his use of an SI screw at

17   Sanford.

18        And so that sort of furtive and behavior of

19   creating a new entity, depending on what was happening

20   with the Orthofix agreement about the SAMBA screw, but

21   this new entity and creating it to allow Sicage to

22   distribute this SI screw for Dr. Asfora's use at Sanford.

23        So there's a lot of these sort of -- all these

24   things are swirling together and I don't think can be set

25   aside, especially when *Thayer* tells us what are the

1   particular details of the scheme?  And that scheme

2   includes the kickback theories, and that scheme includes

3   the medical necessity claim.

4         But the second part, not just of the particular

5   details of the scheme in *Thayer*, is we're talking about

6   the reliable indicia.  And so reliable indicia, in at

7   least one case that's already been discussed today here

8   where a court has decided what has constituted reliable

9   indicia is that *Polukoff* case out of the Tenth Circuit.

10  In there the Tenth Circuit found that the relater, who is

11  the relater not the government in that case, had stated a

12  claim where among other things that surgeon had allegedly

13  performed an unusually large number of procedures; that

14  other physicians had object the to the surgeon's practice;

15  and procedures violated industry and hospital guidelines,

16  which was discussed to some degree earlier here today.

17        And the government would suggest that the

18  reading of the complaint at the pleadings stage, the

19  reliable indicia that you have to look at and you have to

20  consider is exactly that PARS data that Your Honor has

21  already raised where as alleged in the complaint Sanford

22  is giving Dr. Asfora essentially his risk score for the

23  years of 2008 to 2014.  And as we noted in the complaint,

24  that risk score increased each year.  I think during that

25  period it doubled, various times, as we allege in the

1    complaint.

2            Eventually, in that last reporting year in 2014,

3    Dr. Asfora was in the top .5 percent of all physicians,

4    and I think was the 12th neurosurgeon among all

5    neurosurgeons in the United States.  And that's for his

6    specialty.  Neurosurgery is a high-end surgery.  It's

7    risky.  You're in brains.  You're in backs.

8            And so that's particularly relevant, I think in

9    this case, when we're talking about the statistics or

10   items like that, that the *Polukoff* court may have

11   considered.

12           The physician complaints are particularly

13   important in this case.  Your Honor has already addressed

14   that the relaters themselves -- one is a neurosurgeon; one

15   is an orthopedic surgeon -- but both had overlapping

16   practices with Dr. Asfora.  And we can assume, I think, at

17   this stage and based on all of the allegations in the

18   complaint, there was a sharing of patients.  And I think

19   it was noted in the complaint that Dr. Bechtold is a

20   specialist in hip procedures, and the hip is very close to

21   the SI joint for the SAMBA screw that Sicage.  And of

22   course Dr. Roman, the other relater, is a partner or was a

23   partner, neurosurgeon doing a lot of the same spine work.

24           But to be honest about the complaints that are

25   specifically alleged in our complaints, the United States,

1    the controlling complaint, there was a Sanford

2    physician -- and we've talked about that in the complaint

3    at paragraph 133 -- that specifically said and was

4    concerned that Dr. Asfora owns the company that makes the

5    bullet cage, he has an income from his use of the cage.

6    After the cage was FDA cleared he was using the cage also

7    exclusively.  He's doing a large number of multiple-level

8    spinal fusions.  And specifically this physician used the

9    word "outlier."

10              And so that was particularly relevant and very

11   specific, very detailed, talking about the owners with

12   interest that we've already discussed, talking about the

13   potential harm to patients as far as solely using just one

14   device in which he has an ownership interest and receives

15   money, doing a large number of multiple-level spinal

16   fusions, which as you'll see in a lot of the external and

17   internal peer reviews alleged in the complaint are called

18   extremely rare in various circumstances.  And we'll also

19   see in those peer reviews that many are noted to be very

20   dangerous to the patient, depending on the patient's

21   characteristics.

22              And I'll get into those in the peer reviews.

23   There were some internal peer reviews that we noted in the

24   complaint.  And there was one case in that instance, it

25   was a five-level fusion; internally the committee that

1    reviewed it, there was eight Sanford surgeons that

2    reviewed that case, and that was a specific instance where

3    five bullet cages were used.  Obviously we know Dr. --

4    Medical Designs and Dr. Asfora had an interest in bullet

5    cages.  That committee found that that procedure was

6    aggressive in the situation -- that's at complaint

7    paragraph 272.  It varied from the standard of care.  It

8    was a lengthy procedure, meaning it may have been more

9    expansive than necessary than what the patient's need was.

10            THE COURT:  That's a -- just a moment.  Just a

11   moment.  "Varied from the standard of care," well, that's

12   the sort of thing that you hear in medical malpractice

13   cases.  But how much does that help you where we've got a

14   fraud case?

15            MS. ROCHE:  No, I think that's right, Your

16   Honor.  And we don't disagree that the standard is not

17   whether somebody was negligent.  I think the reason that

18   we're using a lot of these -- a lot of these peer reviews,

19   especially, is because they're independent at this point,

20   and it's not the government's expert telling everyone that

21   this is a medically unnecessary procedure.  These are

22   independent parties.  And if we're talking about something

23   to the effect of the degree to -- which we touched upon

24   earlier, the *Polukoff* case did say that whether or not a

25   specific procedure or -- is reasonable and necessary, you

1    can consider the appropriateness of the procedure, the

2    duration and the frequency.  Also, one that itemizes that

3    the procedure be one that meets but that does not exceed

4    the patient's medical need.

5           And so I think especially when you're dealing

6    with the spine and levels, it is sort of a unique

7    situation in comparison to stents or things like that,

8    just because there are so many levels.  And it's just a

9    sort a different animal.

10          But we think all of this information is

11   certainly relevant and is something that should be

12   considered when we're talking about reliable indicia, when

13   we're talking about schemes, when we know that Dr. Asfora

14   has that ownership interest.  And so a lot of these peer

15   reviewers are saying why is there no documentation about

16   why these two extra levels were done?  Well, why -- why is

17   this physician so aggressive?  Or this sort of case would

18   go to review in my hospital for analysis of what was done

19   here.

20          And it's really to understand exactly what the

21   government's concern here is that Dr. Asfora was motivated

22   by greed and was motivated by making money.  And at this

23   stage the degree matters, I think, in the spine.

24   Especially in some of these cases where the reviewers

25   found that there was harm as a result of a procedure being

1   too long or being too aggressive.  Because I think in one

2   instance, at least, there was paraparesis; and I think

3   that's the case that we're talking about presently, the

4   internal purity case, the five-level fusion, and patient

5   harm.  And I think there was also the discussion of

6   increase in surgical time.  That can have dramatic harm on

7   patients.  The but that's just one of the examples.  And

8   that's with eight physicians reviewing it and coming to a

9   consensus.

10         The external peer reviews we find are even more

11   stark and even more helpful.  Because -- you know, the

12   common lay person may not know how often an internal

13   purity process may happen.  But an external purity

14   process, you know, for the most part at this point, it's

15   either eventually the government's expert that's talking

16   about medical necessity, but here it's independent

17   physicians with no stake in the outcome in this matter,

18   and they're not being paid -- well, they're being paid,

19   but not for the specific purpose of a litigation.

20         And there's this sort of distinction between

21   whether or not the government can rely on these other

22   cases if there's not a medical beneficiary.  But again, we

23   think it goes back to the way in which that we had to

24   plead with particularity the scheme itself.  And the

25   scheme itself definitely involves how many devices

1    Dr. Asfora was using in a procedure, you know, for those

2    20 patient examples that was listed in the chart here, the

3    defendants put up.  We still think that those are

4    relevant, especially understanding the ownership

5    interests.

6           It's important for the Court to know, and it's

7    relevant under the scheme as indicia how much money are we

8    talking about here.  Because in the response brief

9    defendants routinely say things like Dr. Asfora wouldn't

10   do something for a couple hundred dollars or, you know,

11   thousands of dollars, or whatever.  But there's some very

12   high dollar amounts in those instances, and there's a lot

13   of overlap between the products that Dr. Asfora has an

14   ownership interest.  So in a lot of cases there's SAMBA

15   screws, there's bullet cages, there's Aegis screws,

16   there's a surgical plate onto other devices that Medical

17   Designs distributes.  And so all of that is relevant.

18          While it may not be something that was actually

19   submitted to Medicare or to a federal payer, it's still

20   relevant when discussing *Thayer* in this larger idea of

21   what's the scheme and what's the reliable indicia under

22   *Thayer*.

23          And so the other two cases here, there's some

24   really, really good language about -- at least in one case

25   in the external peer review, it's a four-level fusion from

1    2012.  And that was -- and in that instance Life Spine

2    product was used.  And in the previous case there was

3    bullet cages used.  And in the next case Life Spine

4    products were used.  And that's in the complaint in

5    paragraphs 275 and 281.  In there the reviewer found

6    that the additional two --

7            THE COURT:  Ma'am, whoa.  Whoa.  Two different

8    cases, and I don't know what you're looking at.  What are

9    you talking about?

10           MS. ROCHE:  I'm sorry.  So we're talking about

11   the four representative cases that the defendants have

12   been discussing this their chart At the end of their

13   complaint.  There's three external peer review patients,

14   essentially, that are discussed in the complaint.  So the

15   first one that I'm talking about is discussed in the

16   complaint at paragraphs 275 and 281.

17           And it's really just to say to the Court that

18   the reviewer there found that Dr. Asfora was aggressive,

19   and that going additionally above two levels and adding

20   two levels in a spinal surgery went against conventional

21   neurosurgical teaching and practice.

22           But essentially at this point, I've been talking

23   for a long time about it, but I think the important thing

24   to note here is just that most of the -- the four example

25   cases that we have, one that was an internal peer review

1     and three that were external peer reviews, are relevant to

2     the analysis under *Thayer*.  The 20 surgeries that were

3     discussed in the complaint, and also that the defendants

4     put on their example here in the slides, are all relevant

5     and should be considered as far as what was motivating

6     Dr. Asfora to do a lot of these surgeries.

7          And so I think *Thayer* tells us that the

8     government's detailed recitations of the schemes involved

9     here, with extensive allegations and extensive details

10    about the scheme, and the reliable indicia that we just

11    talked about and that Polukoff discussed are sufficient on

12    their own to satisfy Rule 9(b) in this instance.

13         But as is sort have been alluded to here in the

14    alternative, the government does have a representative

15    example case.  It is the case whose patient's name we will

16    not say.  But --

17         THE COURT:  What paragraph are you looking at

18    now?

19         MS. ROCHE:  Yes, sir.  Absolutely.  So first we

20    would be looking at in the complaint, this patient would

21    be discussed at paragraph 282.  And paragraph 282 notes

22    that this patient was a Medicare beneficiary and has the

23    date of birth year as 1942.

24         And then there's a discussion about in 287 and

25    288 of the complaint about the ways that a reviewer found

1    that the procedure discussed was aggressive, more

2    specifically in the language that was actually used that

3    this was a four-level fusion.  And the reviewer noted that

4    these are rare surgeries performed in a patient without

5    spinal cord compression.  The reviewer also noted here in

6    287 that the patient's complaints of mostly neck and arm

7    pain could have been addressed with fewer levels included

8    in the surgery.  In 288 the reviewer also alleged that

9    Asfora did not document in any of the paperwork associated

10   with surgery or post-op care why he had extended the

11   fusion into the upper thoracic spine.  And the reviewer

12   noted that they can be dangerous and rarely are performed,

13   particularly in the case of the patient here.

14          And again, this is where the reviewer said that

15   this case would be subject to peer review --

16          THE COURT:  Excuse me.  Let me ask a question.

17   With regard to 288, you know, it says it would be -- such

18   fusions can be dangerous and normally aren't performed

19   particularly in degenerative spine cases like patient

20   blank.  In conclusion, the reviewer warned that in an

21   academic medical center with peer review and other spine

22   surgeons, such a case would quality for a morbidity and

23   morality discussion.

24          What does that mean, a morbidity and morality

25   discussion?  I think that's code for -- what?

1          MS. ROCHE:  I can't say that I know.  I would

2     just assume that it would be sort of round-tabled on what

3     was done wrong, what was done right, correct or incorrect.

4     But that's just me speculating at this time on that.

5          But I think the important part of that paragraph

6     is that what was done was dangerous and rarely are

7     performed, especially in this instance, talking about

8     potential patient harm and also talking about going above

9     and beyond what was necessary and reasonable for this

10    patient based on this patient's symptoms and history and

11    whatever the case may be.

12         And then importantly, as well, in the next

13    paragraph, which is 289, the government alleges that then,

14    thereafter, Sanford submitted those claims to Medicare for

15    payment.  And it was the amounts that were paid for the

16    claim.

17         And also relevant is paragraph 38 of the

18    government's complaint where the government alleges that

19    for all of the complaint discussed in the complaint,

20    meaning the specific patients, Dr. Asfora was certified to

21    CMS that what we've done was reasonably and medically

22    necessary.

23         THE COURT:  Let me go back to 277, make sure you

24    covered that.  277 where it say reported that the patient

25    presented with no signs or symptoms of neurologic

1    dysfunction and had a normal EMG with no evidence of

2    myopathy.  To me, to the lay person, that means there

3    wasn't a reason to operate on them.  Am I misreading that?

4                MS. ROCHE:  Are you in 287?  Or 277?

5                THE COURT:  277.

6                MS. ROCHE:  Oh, just one moment.  Yes, I would

7    agree with your lay interpretation of that, especially at

8    the pleadings stage, which we don't yet have an expert.

9    We will get an expert.  Defendants will get an expert.

10   Discovery where everyone will go through all of these

11   medical records line by line and talk about what

12   indications were there for surgery, what the history was,

13   did they try any alternatives.  Were there -- did they try

14   therapy, did they try shots, did they try this, did they

15   try that.

16               But I agree with Your Honor's assessment in this

17   instance.  And I think at least in one instance these

18   reviewers would say things like, "if any procedure was

19   necessary at all," or something, some qualifying language

20   to that.  And I would say that -- I would imagine that

21   reviewers in the peer review setting are more -- withhold

22   or use appropriate language more so than experts for both

23   defendants and for the government would use when analyzing

24   a case like this.

25               But yes, I agree with the Judge's assessment in

1    277.

2            All right.  So as we just discussed in the

3    representative example of the patient who will not be

4    named, but at least in the information the Court is aware,

5    and there's also as was discussed, essentially the United

6    States has met its burden under 9(b); under either the

7    *Thayer* test that we just discussed or the records of the

8    example that was pleaded with particularity regarding that

9    it was excessive care of this patient's procedure, that it

10   was submitted to Medicare.  It's also important that it

11   involved an implant in which Medical Designs distributed

12   the device and Dr. Asfora got monetary payment as a

13   result.

14           So the next --

15           THE COURT:  Let me ask you, let me ask you --

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  If you -- hypothetically, if you

18   haven't shown enough under 9(b) for pleading medical

19   necessity, just hypothetically assume that, then why, in

20   your lawsuit?

21           MS. ROCHE:  Well, in theory what the kickback

22   violation -- because we've claimed two varieties of

23   falsity under the False Claims Act.  And so the first

24   version of the falsity, the ownership -- you know, the

25   ownership theory or basically the violation of the

1     Anti-Kickback Statute remains.  So that would be the stage

2     unless there's an amended complaint in the future.

3            THE COURT:  All right.  Go ahead.

4            MS. ROCHE:  All right.  The next argument that

5     defendants raise is sort of a blurring, talking about an

6     objective standard or the need for sort of more of a

7     bright line standard on what sort of -- and a type, I

8     guess, of procedure.  It's really talking about the degree

9     sort of incident, again.

10           But I think this really goes to a broader sort

11    of interpretation of objective falsity or whether or not

12    medical necessity claims can be false, because medical

13    judgments cannot be false.  Which that theory should be

14    rejected.  That is not the clear law.  The clear law is

15    medical opinion can be false and are not shielded from

16    scrutiny under the False Claims Act.  And that's the

17    *Polukoff* case.

18           And we're going back and forth talking about

19    medical necessity claims and who's arguing which cases

20    they didn't control.  And this party is arguing that other

21    cases control.  But at the end of the day, all the parties

22    can see that there are instances of medical necessity

23    claims -- that in fact have survived the pleading stage of

24    litigation, and have proceeded to discovery, have

25    proceeded to trial, and have gotten past this point.

1          As far as I know, nothing in the case law

2     suggests that there has to be this objective standard or

3     that it has to be so clear-cut.  I think the more helpful

4     analysis when talking about what should be considered as

5     far as medical judgment is really that medical opinions

6     may trigger liability for fraud when they're not honestly

7     held by their maker.  And that's from the *Paulus* case,

8     P-A-U-L-U-S, cited in our brief.  Or when the speaker

9     knows of facts that are fundamentally incompatible with

10    his opinion.  And that's, again, a Sixth Circuit case

11    talking about medical judgment and opinions and when and

12    how those should be sort of parsed.

13          And I guess it's really -- what we're saying

14    sort of at this stage is really -- this isn't an

15    appropriate determination to be making at the pleading

16    stage, talking about who did what and who views what

17    as being correct or incorrect or was standard for spinal

18    surgery is the standard.  And that's just really not what

19    the law says or what we're required to do at the pleading

20    stage.  It clearly does much more.

21          If we get into discovery and are able to depose

22    Dr. Asfora about specific surgeries and what was in his

23    mind, what was not in his mind, and I think the *Paulus*

24    case where it says opinions may trigger liability for

25    fraud when they are not honestly held by their maker.

1    Considering the fact that Dr. Asfora has this financial

2    incentive in the back of his mind for every procedure that

3    he's doing, it can lead to the conclusion or the inference

4    at this stage, based on the facts alleged in all the

5    schemes, that his belief may not have been honestly held

6    that all of the levels were necessary for the patients

7    discussed in the complaint.  But that's an issue for

8    discovery.  That's an issue for once the experts are

9    involved and the medical records are discussed.

10             THE COURT:  Just --

11             MS. ROCHE:  I would also like to note --

12             THE COURT:  I have a question.  I have a

13   question.

14             What about if Dr. Asfora with the same setup

15   that he has with actually two corporations, what about if

16   he would have not profited, but simply had office overhead

17   for the two women that he had working in the office and

18   the rent for the -- well, there were two offices, one

19   right next to each other, I guess.  And let's say that he

20   didn't make a dime out of it and he was just -- you know,

21   for whatever reason wanted to see his patented products

22   all involved and in his patients.

23             If that were the case, would we have a violation

24   under any theory?

25             MS. ROCHE:  I don't know if I want to make a

1    bright line assertion on that step.  But I do think that

2    was -- that's the alternative for innovation.  And that

3    was the advice that he was given at the time of the Aegis

4    agreement, essentially.  You can do it if you want to, but

5    make no profit, or don't make any money off of this

6    because then you're not incentivized by your own surgical

7    procedures.

8          So I think, you know, not locking in the

9    government with that specific fact of Aegis, with the

10    markup and -- again, depending on the facts.  Because in

11    the instance of Aegis, there were two other distributors

12    in the Sioux Falls area that easily could have sold that

13    product outside of Medical Designs.  And Dr. Asfora and

14    Medical Designs aren't involved in that transaction at

15    all, and so there's no concern whatsoever rather than

16    being smack dab in the middle of it.

17          But I would say for the most part that's

18    definitely better; that's definitely closer to the true

19    purpose of innovation and trying to make the medical field

20    better.  But it's not to say that physicians can't profit;

21    it just has to be done more in line with the situation

22    like the Orthofix agreement where there's royalties, and

23    the physician continues to use that product in his or her

24    practice as they normally would, understanding that

25    they're not profiting off of it.  Any royalties that that

1    surgeon makes from that legitimate innovation that's used

2    by other people across the United States and maybe the

3    world is that they make money off of the broad usage

4    across the United States, and they don't make any money on

5    their own use of the product.  This is exactly what's at

6    issue here.

7         And so I think it's hard to sort of step through

8    a lot of those issues.  But Aegis is a little bit

9    difficult because, like I said, there was two other

10   representatives that are discussed in the complaint, Pete

11   Sanchez and Jesse Talcott, that were capable of

12   distributing Aegis products without Medical Designs being

13   in the middle.

14        And the bullet cages is different.  The bullet

15   cage is different because there's not really any other

16   users of that product whatsoever, across the United

17   States; which I think that's more appropriate for a trial

18   argument or for discovery.  But we do allege that it was

19   essentially just Dr. Asfora after a certain time period

20   that was utilizing the bullet cage.

21        And so the "take no profit" is much better, Your

22   Honor, but just with those items that I noted as far as

23   there was already distributors for Aegis, and that

24   Dr. Asfora knows how to innovate and knows how to sell an

25   invention to another company for the company to

1    distribute.  And then he can still utilize the product and

2    does not make a profit off of it.

3         THE COURT:  Let me ask you another hypothetical.

4    Let's assume, once again, that Dr. Asfora isn't making

5    anything himself, it's just meeting the overhead on the

6    selling of these devices, whichever device we're talking

7    about.  But let's assume further, though, that Dr. Asfora

8    likes to operate, and he wouldn't normally make any money

9    off of inserting any of his devices; nonetheless, he

10   engaged in medically unnecessary surgery, for which he

11   would have been paid his surgical fee but nothing more

12   than that.  Then would that then be a violation of --

13   under either of your theories?

14        MS. ROCHE:  Yes.  That would be a violation of

15   the medical necessity theory.  We wouldn't necessarily be

16   able to establish that the claim was tainted by kickbacks,

17   which is the first falsity argument.  But the medical

18   necessity concerns about being overly aggressive, billing

19   Medicare as a result, providing more procedures or more

20   extensive procedures than the patients need demanded, and

21   we had similar sort of the indicia that we've talked about

22   here.  Maybe there's complaints, maybe there's -- maybe

23   there is a standard that he's violating in spinal surgery

24   as a result.  But yes, I think that a plausible medical

25   necessity claim, more likely than not, not a kickback

1   degree claim.

2           THE COURT:  All right.  You can go ahead.

3           MS. ROCHE:  Furthermore, Your Honor, we're also

4   talking about sort of a medical judgment question.  And

5   really I think that the *Palin* case, P-A-L-I-N, we cited in

6   our brief is also relevant to the facts here, knowing that

7   Dr. Asfora is profiting personally off of surgeries.  In

8   *Palin*, there a reasonable jury could find that defendant

9   ordered the tests that were relevant in that case to

10  generate income for themselves.  I think based on all of

11  the evidence that we've alleged in the complaints as far

12  as generating income, interests in devices, and the amount

13  of devices that Dr. Asfora implanted in patients, that the

14  same result could be true; that a jury here could also

15  find that the reason in part, in whole or in part, that

16  Dr. Asfora performs at least the example case and any

17  other cases that are found to be medically unnecessary in

18  the discovery process, the jury could find that he

19  performed maybe an entire surgery or more extensive

20  surgeries than necessary; based on the fact that he was --

21  in whole or in part that he was making money off of those

22  surgeries.  So we think that *Palin* is also relevant there.

23          All right.  The next allegation is talking about

24  Dr. Asfora's knowledge about what he knew regarding

25  whether or not certain of these claims alleged in the

1   complaint were medically unnecessary.  Again, what

2   Dr. Asfora knew will be determined more extensively after

3   the pleading stage in discovery.  But at this point -- at

4   this point in the -- the *Reliance* case, which I think is

5   helpful for the fact pattern here of where we are, the

6   *Reliance* case is the Central District of California

7   pleading, a case from 2014, cited in our brief.  In there

8   the Court found that if the United States is successful in

9   proving that the physician investors received unlawful

10  kickbacks for their use of certain devices, it is

11  plausible to infer that defendants, those that offered the

12  kickbacks or were the distributor of the device, knew that

13  the physicians would do whatever it took to continue

14  receiving such large kickbacks, including performing

15  unnecessary or more extensive than necessary surgeries.

16          And so I think that *Reliance* could apply not

17  just to Dr. Asfora, but could apply to Medical Designs and

18  could apply to Sicage for the assumption that if kickbacks

19  were involved, and I think if we've sufficiently pleaded

20  at this stage, but further on if we prove that Dr. Asfora

21  was receiving kickbacks from Medical Designs and some from

22  Sicage, then it also leads to the inference that those

23  folks would know that the doctor would do whatever it took

24  to continue making money.

25          And also Dr. Asfora, you know, he -- it's all of

1    the things that we discussed earlier about all of the

2    different learnings and all of the different things that

3    folks have said that he, himself, was privy to as far as

4    multi-level surgeries being too aggressive, his spinal

5    surgeries being too extensive.  I don't know any of those

6    things standing alone is enough; but all of those things

7    together, all of nine various warnings, the peer review

8    processes, Dr. Asfora received all of the final findings

9    of the internal peer review processes.  That's alleged in

10   the complaint.  He saw the external peer reviews and has

11   had access to the external peer reviews prior to this

12   lawsuit.

13          So considering that the knowledge of what his

14   partners thought and the relaters thought and the folks --

15   the physicians that complained about Dr. Asfora's practice

16   and how it had changed, coupled with their viewing of the

17   internal peer review, the external peer review, I think

18   that leads to a plausible conclusion that Dr. Asfora knew

19   that he was performing unnecessary medical procedures.

20   And certainly, again, if you consider the kickback, that

21   allegation being thrown in the mix, and looking at the

22   *Reliance* case and understanding the plausible inferences

23   from a kickback and leading to medically unnecessary

24   procedures, I think we've satisfied that final element or

25   that final argument that defendant's discussed on

1    Dr. Asfora's knowledge on medically unnecessary claims.

2         I just want to be sure, do any of my colleagues,

3    did I leave anything out on the medical necessity piece or

4    does the Court have further questions on the medical

5    necessity piece?

6         THE COURT:  No.  I don't have any further

7    questions.  Thank you.

8         Does the defense have any rebuttal it wishes to

9    make?

10        I've read a fair number of -- not all, but a

11   fair number of the cases that were cited, but I'm not on a

12   first-name name basis.  And as you were going through,

13   sometimes you would say this case or that case, you know,

14   without citation, and only one name.  Well, I'm not that

15   familiar with the cases generally.  So I would ask that

16   you -- even though they're cited in your brief, with

17   regard to the cases that you specifically referred to in

18   your argument, send me a letter with a copy to the

19   defendant that such was the case name in full and the

20   citation to the case.

21        MS. ROCHE:  Yes, Your Honor.

22        THE COURT:  All right.  Let me hear from the

23   defense.

24        MR. GEYERMAN:  Thank you, Your Honor.  There's a

25   lot there.  But let me try to step back and map it out for

1    you as to how we see the claims are asserted and the

2    doctrine fitting into the six dismissal arguments that

3    we've asserted.

4         Early on in the presentation the government

5    referred to there's many schemes, they're all swirling all

6    around, it was this sort of big mass of different theories

7    of a lot of different thing that were done wrong.  But I

8    think ultimately, and frankly in response to Your Honor's

9    very good question, it became evident that they have two

10   separate and distinct theories of liability.  Because when

11   you said if I dismiss the medical necessity theory, what's

12   left?  And they said, I have my ownership kickback theory.

13        They are asserting that there is an ownership

14   kickback violation, and therefore a False Claims Act

15   violation, whether or not there was any medically

16   unnecessary surgeries performed.  Analytically these are

17   two separate and distinct theories.

18        So, on the ownership kickback theory -- and not

19   to step on my colleague Mr. Graham's toes, but I think --

20   there's a couple of real big picture points that frankly

21   the government can't contest, and we would submit are

22   really the underlying point of our dismissal argument.

23        Number one:  The government has never said that

24   it is a violation of the Anti-Kickback Statute to own a

25   medical device company, use that company's devices in your

1    surgeries, and three, take a profit distribution because

2    you are an owner.  That -- those are the three basic

3    elements of their ownership kickback theory here.  And

4    yet, there is not a single case guidance from the

5    Department of Health and Human Services or the Department

6    of Justice that has ever said when those three conditions

7    are satisfied, you have an Anti-Kickback Statute

8    violation.  Point one.

9            Point two:  Dr. Asfora lived through the DuBay

10   investigation.  And coming out of that investigation it

11   was known he owned Medical Designs, that he used products

12   that Medical Designs manufactured in his surgeries, and

13   that he took a profit distribution because he owned the

14   company.

15           Those are the three basic facts that the

16   government says are sufficient for them to make out a

17   violation under their ownership kickback theory; and yet,

18   they're the very facts that have never been found to be

19   sufficient to state a claim, and they're the very facts

20   that nobody ever told Dr. Asfora after the DuBay

21   investigation created a problem.

22           So where there's all of these allegations in the

23   complaint about this person told Dr. Asfora this might be

24   risky, or this person told Dr. Asfora don't do that, at

25   the end of the day, all they're suing him on under the

1    ownership kickback theory is owning a device company,

2    using that device company's products, and taking a profit

3    for distribution.  Nothing else.  Nothing else matters.

4    And there's no well-put allegation in the complaint that

5    would show that Dr. Asfora thought coming out of the DuBay

6    investigation that it was inappropriate in any way for him

7    to keep using product from his own company.

8         So those are big picture points on the ownership

9    kickback theory; and nothing that the government said to

10   you in that long presentation undermines any of those

11   points, I would submit.

12        Now let's pick for the moment to the medical

13   necessity theory.

14        THE COURT:  You're putting -- wait a minute.

15        Let's talk about the DuBay case and the spin

16   that you put on it, which in all -- I'm looking at the

17   judgment on the pleadings.  And I'm looking at a summary

18   judgment motion.  And I think it would be fair to say from

19   my point of view that you're putting absolutely the best

20   spin on the DuBay settlement possible.  And I don't think

21   that I look -- I should look at it in that manner.

22        Because it seems to me it actually required

23   quite a bit of chutzpa to say that he comes out of that

24   and he thinks that what he's doing is okay.  I think the

25   contrary is probably true.

1         But in any event, I can't see that on a motion

2    for directed verdict -- or excuse me -- a judgment for

3    judgment on the pleadings, that I should adopt your

4    reading of DuBay.

5         MR. GEYERMAN:  I would respond this way, Your

6    Honor.  Number one, the statute that's allegedly violated,

7    the Anti-Kickback Statute, which requires a knowing and

8    willful violation of the law -- so it's an even higher

9    mens rea standard than it is a violation of the False

10   Claims Act itself, which is a mere knowing violation of

11   the law.

12        So number one, it's about the highest mens rea

13   standard that you can get --

14        THE COURT:  Just a second.  Wait a minute.  Wait

15   a minute.

16        It seems to me that we're talking about a jury

17   question.  The claim is in the -- among other things in

18   the complaint -- that he said now let's be quiet about

19   this, let's do this undercover, and so on.  That's what

20   they're claiming.  And that sounds to me like a jury

21   question as to what is this fellow 's -- Dr. Asfora's

22   state of mind when he tells this to people?  He can say

23   well, I didn't want the hospital people to think I'm

24   making a lot of money, or whatever.  We can have his

25   explanation.

1          But we're talking about a fact question here

2     with regard to somebody's state of mind, with regard to

3     his scienter, and that isn't something that can be

4     appropriate or that can be determined in a motion for

5     judgment on the pleadings.

6          MR. GEYERMAN:  Your Honor, we're simply asking

7     you as the reader of this complaint, you believe they've

8     asserted a plausible basis for all prima facie elements of

9     the point.  And where one of those prima facie elements is

10    a knowing and willful violation of the Anti-Kickback

11    Statute.  And where it is an undisputed allegation that he

12    lived through the DuBay investigation, and it's also

13    undisputed that DuBay did not say it is impermissible to

14    be an owner of Medical Designs and keep using your bullet

15    cage, which is a product the patent of which is owned by

16    Medical Designs, there's no allegation we submit anywhere

17    that a reasonable person would infer from it, jeez,

18    Dr. Asfora thought it would not -- he couldn't use the

19    bullet cage and take profit distribution from Medical

20    Designs.  We just don't think that's in there.

21          Now, if you want to parse out some allegations

22    about different products, you know, they did at one point

23    in their complaint say there's six different schemes here,

24    and they defined the schemes by different products -- you

25    know, bullet cage is one, Life Spine product is another --

1    each of those different products might have a little bit

2    different story that comes with it.

3              But the biggest one and the lead one they start

4    with is the bullet cage, which was the entire focus of the

5    DuBay investigation.  And Medical Designs manufactures it,

6    he uses it in his surgeries, and because of that in part

7    Medical Designs takes a profit.  Nobody told him that was

8    inappropriate, and there is no allegation in the complaint

9    that he ever thought that it was.

10             THE COURT:  Wait a minute.  Nobody tells him

11   it's inappropriate?  His own lawyer did, apparently.

12             MR. GEYERMAN:  That allegation applies to only

13   one of the two license agreements that happened years

14   later.  It doesn't have any application to deal with, I

15   believe, five out of the six products in the complaint.

16             So the government wants to have its cake and eat

17   it too here.  In many respects they are saying there's

18   multiple schemes because there's multiple products, and

19   they're cherry-picking facts from one business deal and

20   trying to imply that that suggests a belief in someone's

21   mind that there is a kickback problem as to all six

22   products.

23             If Your Honor thinks that that is a relevant

24   fact for purposes of evaluating the plausibility of the

25   claim, then we would submit the allegation goes no further

1    than its need; which as to the one license arrangement

2    that that legal advice came in the context of.  It has

3    nothing to do with the other five products or five

4    (indiscernible).  That's my only point.

5              I think it has become apparent that analytically

6    ownership kickback theory is to stand independent of a

7    medical necessity theory, as Your Honor's really pointing

8    question, and good questions, fleshed out for the

9    government.

10             So now we'll talk for a moment about the medical

11   necessity theory.  First is the government spent a lot of

12   time the proposition that under Eighth Circuit precedent

13   they have to prove a representative example.  The

14   government reads *Thayer* as standing for the proposition

15   that they don't have to.  We actually believe that *Joshi*

16   and both *Thayer* cases stand for the proposition that they

17   do.  If Your Honor thinks that that is a material dispute

18   of law point, we would be happy to submit some additional

19   briefing on that issue, if Your Honor would like.  If the

20   respective sample rule applies, we win.

21             They haven't alleged more than one patient here.

22   And the rule is some repetitive examples, plural, not one

23   example.  And that one patient that they have where they

24   critique the quality of the surgery, and is the federal

25   issue, that's all thief got.

1            Your Honor asked a good question about how come

2    in the prior complaints in this case there was a lot more

3    information and search about unnecessary surgeries that

4    for some unknown reason don't make it into this complaint.

5    I'll draw my inferences, as others will about that, but

6    we're left with one surgery for a federal beneficiary

7    where they are making some critique on the quality of

8    care.

9            Even if, however, Your Honor disagrees with us

10   that they don't have to prove representative samples of a

11   surgery that was medically unnecessary, we still have two

12   different grounds on which you can dismiss the entire

13   medical necessity claim.

14           Number one is that the nature of the allegations

15   don't rise to the level of asserting a plausible medically

16   unnecessary procedure.  And we have on our slides, at

17   least, put forward the full pleading on slide six of what

18   we would say are, frankly, the four best cases --

19           THE COURT:  Just a minute.  Just a minute.  Let

20   me ask you specifically with regard to paragraph 277 in

21   the complaint, where board certified neurological surgeon

22   says that the patient presented no signs or symptoms of

23   neurologic dysfunction, had a normal EMG with no evidence

24   of myopathy, that indicates to me there wasn't any reason

25   to operate on him.

1          MR. GEYERMAN:  Well, Your Honor, that's not what

2     the -- that's not the language that they used.  And I'm

3     not a doctor, so -- but the government didn't really know

4     how to answer that question.  And I submit we shouldn't be

5     guessing about what that means from a medical perspective.

6          If you look at paragraph --

7          THE COURT:  That wasn't the paragraph where I

8     was at.  I asked about -- but then I asked about another

9     one was -- just a minute.

10         MR. GEYERMAN:  I know.  Actually, before you

11    move off of 277 --

12         THE COURT:  277, I don't believe, is what I

13    asked a question about.  I asked a question about 288

14    was -- the review in an academic medical center peer

15    review from other spinal surgeons, such a case would

16    qualify for a morbidity and morality discussion.

17         That sound ominous to me, but I don't know in

18    medical code what exactly that means.  It sounds like

19    morality?  Morbidity?  That's death.

20         MR. GEYERMAN:  They certainly cast it with the

21    intent that the reader is going to imply that it's

22    something ominous.  But that's my point, is to if they had

23    attached the entire report that was provided by this

24    reviewer, it would give the Court on a Rule (9)(d)

25    analysis a chance to look at a much more bigger picture

1    and see it in context, what is this actually saying?

2         Now, I wanted to address 277 and 278 in

3    particular, because that was another one of the paragraphs

4    that you asked counsel what does this language mean?  And

5    then your reading of the last sentence of 277 was like

6    there's nothing wrong with this patient, so why would you

7    operate at all on them?  If you look at the very next

8    paragraph, 278, the thrust of the further commentary on

9    that surgery seems to be -- it was appropriate to operate

10   on vertebra C5-C6 and the C6 and 7 levels, but adding two

11   more levels on top of that is what the reviewer took issue

12   with.

13        So 278 may seem in conflict with 277, which may

14   say this person had nothing wrong at all and therefore no

15   surgery at all should have been performed on them.  The

16   allegations are in conflict with one another insofar as

17   278 suggests there was some amount of the surgery that was

18   okay and it ended up what was done was just too much.

19        And as to 288, I would point you to the

20   paragraph 287 immediately above that, which is about the

21   same patient.  And it's -- and there the comment is that

22   the surgery that was performed is a rare surgery.  It's

23   not saying it's unprecedented.  It's not saying no

24   reasonable surgeon would have performed it.

25        And the last sentence of 287 is saying that the

1   doctor -- or that this reviewer thought that the symptoms
2   could have been addressed with fewer levels.
3           Now, are we quibbling about what this means?  We
4   are.  However, the standard for asserting plausity of lack
5   of medical necessity is very high.  It's not enough to say
6   different surgeons would come to differing conclusions.
7   That's just sort of your traditional debate about experts.
8           Medical -- lack of medical necessity means there
9   was no medical justification, period; no reasonable
10  surgeon could make the medical decision that this surgeon
11  did.  And we have cited four cases at the motion to
12  dismiss stage (indiscernible) the nature of the
13  allegations did not rise to the level of saying there was
14  no medical justification at all.
15          And we would be happy in a nice pithy letter to
16  send those citations to you, because they're obviously
17  intermixed with our much longer brief, after this
18  argument.
19          But I think we need to keep in mind just how
20  difficult it is to assert plausibly a claim for lack of
21  medical necessity.  If you are using a surgery for a
22  purpose that the medical community universally says it
23  should not be used for, it could have said (indiscernible)
24  this:  If you are using a surgery that is shown to have no
25  medical value at all, cases have said that's enough to

1    reach a motion to dismiss.  But we have yet to see a case

2    where allegations that are about this incremental of a

3    disagreement, how many different levels of a spine fusion

4    is too many, that is the proper basis.

5            The last two things I'll make, and then I will

6    stand down.

7            There's two cases that the government's talked

8    about.  One was the *Palin* case, and they cited it in her

9    argument for the proposition that it shows that -- how

10   much this is a jury question.  Respectfully, we think that

11   the more appropriate cases to look at are motions to

12   dismiss cases.  Because those are the cases that are

13   applying the standard that Your Honor has to apply right

14   now, which is what allegations in a complaint meet a

15   plausibility standard.

16           Once this case gets past the motion to dismiss

17   stage and past the summary judgment stage, then when the

18   jury returns a verdict, to overturn that verdict is going

19   to be a no-reasonable-juror-could-find standard.  And

20   that's what *Palin* was applying, which is not the same

21   standard that a court on a Rule 12 and 9(b) motion is

22   considering.  So I don't think *Palin* is the right standard

23   to look at, because it's really in a different procedure

24   posture, and therefore it's confusing.

25           Finally, as to the *Reliance* case out of the

1    Central District of California, the *Reliance* defendants

2    did not include the defendant surgeon.  And in that case

3    the defendants were investors in a medical device company

4    who are asserting that there were no plausible allegations

5    of scienter.  They were not making the additional argument

6    that Dr. Asfora is making in this case, which is the

7    allegations were insufficient to suggest that the surgery

8    was unnecessary in the first place.

9            So we submit, quite frankly, this issue was

10   given pretty short-shrift in the *Reliance* case.  We felt

11   very clearly as to making one argument as to the

12   sufficiency of a lack of necessity allegations, which goes

13   to falsity.  And separate and apart from that, we're

14   making allegations about the sufficiency of his supposed

15   scienter, which is a separate and independent ground that

16   a case could be dismissed on -- at the motion to dismiss

17   phase.

18           And with that, I will stand down unless my

19   colleague Mr. Graham has anything more to add.  I

20   appreciate your time.

21           MR. GRAHAM:  Nothing at all.  Thank you, Grant.

22           THE COURT:  All right.

23           MS. ROCHE:  Your Honor, can I just ask a quick

24   question?  I don't mind to interrupt you while you're

25   thinking.

```
1              THE COURT:  Beg pardon?
2              MS. ROCHE:  I don't mean to interrupt you while
3     you're thinking.  Is it okay if I just ask one clarifying
4     question?
5              THE COURT:  Clarifying question of who?
6              MS. ROCHE:  Of you.  I was just going to say, we
7     responded on medical necessity and got into the
8     Anti-Kickback Statute violation somewhat in the middle of
9     that.  But if there's any other questions the Court has
10    for us on DuBay or about anything else that was raised
11    more close to the ownership theory that I haven't had a
12    chance to respond to, I'm happy to answer those questions.
13    But I also know we've been sitting here a long time and
14    the Court has very thoroughly reviewed everything and
15    asked great questions.  But I just didn't want you to
16    think that we've waived any of those arguments by --
17             THE COURT:  I have no illusion that you've waved
18    anything, I'll tell you that.
19             MS. ROCHE:  But otherwise I'll be quiet unless
20    you think of something you want me to answer for you.
21             THE COURT:  No.
22             Well, the case is going -- I'm going to look a
23    little more at the medical necessity pleading, because I
24    think it's thin.  Whether it's nothing -- I know, I spent
25    plenty of time on this thing.  But I wanted to hear
```

1    argument to see if it would help me.

2           And, you know, it's a 9(b) pleading.  And I have

3    to look to see if, you know, as the government in essence,

4    it seems to me, urges that cumulatively is enough.  And I

5    want to, frankly, re-review things in light of argument on

6    medical necessity.

7           On the kickback theory, the motion is denied.

8    The cause of action stated that the only thing that I'm

9    looking at -- and that's true, denied too, is the other

10   alternate theories that were pled.

11          But on the medical necessity theory, I want to

12   consider that further.  I'll rule subsequently on the

13   medical necessity theory.

14          Now, we have everybody together so I wanted to

15   talk to you a bit about -- assuming just for purposes of

16   discussion that this case survives summary judgment, then,

17   you know, in scheduling I'm going to have to set time

18   aside for the trial, assuming it gets to trial.  So I

19   realize it's very, very preliminary to be asking anybody

20   anything, because we don't even have an answer yet.  And I

21   haven't ruled yet on the medical necessity theory.

22          But if that claim ultimately goes ahead, that

23   would involve some evidence that won't be otherwise in the

24   case, I think.  But recognizing those limitations, while

25   talking about it just generally, I wanted to know how long

 1      the parties thought trying this case would last.

 2              Some of you are familiar with me in trial; some

 3      of you aren't.  I start at 9:00 in the morning and go to

 4      noon, starting usually at 1:00 and going until 5:00.  And

 5      I don't set any time restraints upon anybody.  The

 6      lawyers, if they're going to bore the jury, that's their

 7      risk.

 8              And I have counsel approach the bench if there's

 9      something that -- for instance you think something should

10      be coming into evidence and it isn't.  I keep on

11      sustaining an objection.  I'll allow counsel to approach

12      the bench, and I'll tell you what your problem is.  You

13      might be able to solve the problem, or it might be a dead

14      duck on the issue.  But at least we have them without

15      having to send the jury out, and so on.  But that doesn't

16      mean I want people traipsing up to the bench all the time.

17      But in order to facilitate evidence coming in, I'll do

18      that.

19              And with regard to the jury, unless the COVID-19

20      pandemic is gone or substantially gone by the time we try

21      this, instead of using a 12-person jury, which I would

22      prefer, I would use an eight-person jury.  I don't prefer

23      those, because I think it's easier to get an unusual

24      result.  I think the 12-person has a leveling effect.

25              But we can't try -- well, we could try -- we can

1    try with as few as six, civilly.  But I want to have

2    alternates in case that we need them.  So the eight will

3    decide if they're there at the end of the case, of course.

4    But if we lose one or two during the case, six can still

5    decide the case.

6         So I know this is very preliminary, but I have

7    to look at, at some point, in setting some time aside for

8    this.  So how long does the government think this case

9    would last?

10        MS. ROCHE:  It's hard to know, Judge, when we

11   don't know if medical necessity -- like you said, we don't

12   know if medical necessity would be included with all the

13   experts that would be involved and medical records that

14   would be shared back and forth.  But I would say at least

15   weeks, based on all the evidence?  A couple weeks?

16        THE COURT:  Are you talking about your side of

17   it, or the whole works?

18        MS. ROCHE:  Um, again, it's dependent on if

19   there's experts --

20        THE COURT:  Right.

21        MS. ROCHE:  -- for the necessity of a piece.

22   Probably the whole thing, I would imagine, could be done

23   in a month?  But I would defer to others and my DOJ

24   colleagues, if they have opinions.

25        THE COURT:  Um-hum.  And then this is all super

1   preliminary, but I'm just trying to get a feeling for what

2   the -- what others think.  What does the defense think?

3              MR. GEYERMAN:  Your Honor, we haven't consulted

4   on that issue, so I don't think we're even really in a

5   position to say something meaningful.  But these cases

6   generally are certainly multiple weeks.

7              THE COURT:  That's a pretty safe estimate.

8              Yeah, I think it would vary a lot, depending on

9   whether medical necessity goes ahead.  And of course the

10  rest of it is that even if I toss the medical necessity,

11  the government's already alluded to the fact that they

12  would try and strengthen their pleading.  That would

13  depend upon what they have to strengthen it with, of

14  course.

15             Well, I think that's all that we can do today.

16  Is there anything further from the government?

17             MS. ROCHE:  Just to clarify, the only thing

18  you're looking for us as we walk away is the letter with

19  our authorities cited herein.  Is that correct?  Copying

20  the other side?

21             THE COURT:  Yes.

22             MS. ROCHE:  Nothing further.  Thank you.

23             THE COURT:  All right.  Anything further from

24  the defense?

25             MR. GEYERMAN:  No, Your Honor.  Thank you for

1    your time today.

2              THE COURT:  All right.  Thank you.  We're in

3    recess.

4              (End of proceedings this date.)

1

2                    COURT REPORTER'S CERTIFICATE

3

UNITED STATES DISTRICT COURT  )
4  DISTRICT OF SOUTH DAKOTA      )     SS
   WESTERN DIVISION              )
5

6           I, Sheri L. Not Help Him, RPR, CRR, Official

7  Court Reporter in and for the United States District

8  Court, District of South Dakota,

9           DO HEREBY CERTIFY that I acted as such Court

10  Reporter for the Motions Hearing of the within-entitled

11  action, and that the foregoing transcript, pages 1 to 98,

12  inclusive, is a true and complete transcript of my

13  stenographic notes taken for said Motions Hearing on July

14  23, 2020.

15           All appearances of participants in this hearing

16  were remotely by videoconference or telephonic conference.

17           Dated at Rapid City, South Dakota, this 16th day

18  of October, 2020.

19           /s/ Sheri L. Not Help Him

                 _____
20               SHERI L. NOT HELP HIM
                 Official Court Reporter
21               515 Ninth Street #302
                 Rapid City, SD  57701
22               Phone:  (605) 399-6007
                 Email: Sheri_nothelphim@sdd.uscourts.gov
23

24

25

# #

**#302** [2] - 3:11, 99:21

# $

**$650,000** [1] - 40:1

# /

**/s** [1] - 99:19

# 1

**1** [1] - 99:11
**10th** [3] - 2:23, 3:3, 3:7
**12** [1] - 91:21
**12(b)(6** [5] - 9:4, 44:8, 44:14, 46:7, 47:18
**12-person** [2] - 95:21, 95:24
**12:16** [1] - 4:6
**12th** [1] - 58:4
**133** [1] - 59:3
**14** [1] - 32:8
**160** [1] - 2:4
**16th** [1] - 99:17
**18** [1] - 13:19
**1942** [1] - 65:23
**1:00** [1] - 95:4

# 2

**20** [2] - 63:2, 65:2
**200** [6] - 2:23, 3:3, 3:7
**2000** [1] - 4:1
**20005** [2] - 2:16, 2:20
**20044** [1] - 1:24
**2006** [1] - 11:21
**2008** [1] - 57:23
**2011** [1] - 33:23
**2012** [1] - 64:1
**2013** [1] - 33:23
**2014** [3] - 57:23, 58:2, 77:7
**202-307-6971** [1] - 1:25
**202-434-5542** [1] - 2:20
**202-434-5833** [1] - 2:17
**2020** [3] - 1:6, 99:14, 99:18
**20770** [2] - 2:8, 2:11
**21** [2] - 12:23, 13:19
**23** [3] - 1:6, 4:1, 99:14
**240-553-1198** [2] - 2:8, 2:12

**255** [1] - 1:19
**260** [1] - 13:6
**261** [1] - 1:23
**2638** [1] - 1:16
**272** [1] - 60:7
**275** [2] - 64:5, 64:16
**277** [11] - 67:23, 67:24, 68:4, 68:5, 69:1, 87:20, 88:11, 88:12, 89:2, 89:5, 89:13
**278** [4] - 89:2, 89:8, 89:13, 89:17
**281** [2] - 64:5, 64:16
**282** [2] - 65:21
**287** [5] - 65:24, 66:6, 68:4, 89:20, 89:25
**288** [5] - 65:25, 66:8, 66:17, 88:13, 89:19
**289** [1] - 67:13

# 3

**30** [1] - 7:4
**337** [1] - 1:19
**38** [1] - 67:17
**399-6007** [2] - 3:12, 99:22

# 4

**4,800** [2] - 16:3, 16:9
**400** [2] - 2:7, 2:11
**45CFR164.514** [1] - 14:3
**4:16-cv-04115-LLP** [1] - 1:4

# 5

**5** [1] - 58:3
**515** [1] - 99:21
**550** [1] - 3:11
**57101-2638** [1] - 1:16
**57104** [3] - 2:23, 3:3, 3:8
**57501** [2] - 1:20, 2:4
**57701** [2] - 3:11, 99:21
**5:00** [1] - 95:4

# 6

**605** [2] - 3:12, 99:22
**605-224-5402** [1] - 1:21
**605-224-8803** [1] - 2:5
**605-330-4400** [1] - 1:17
**605-336-0828** [3] - 2:24, 3:4, 3:8

**6404** [2] - 2:7, 2:11

# 7

**7** [1] - 89:10
**7240** [1] - 1:20
**725** [2] - 2:16, 2:19
**74-2** [1] - 42:9
**743** [1] - 45:20

# 8

**8(a** [1] - 44:13

# 9

**9(b** [14] - 9:2, 23:22, 25:13, 47:23, 49:5, 49:6, 50:8, 50:22, 65:12, 69:6, 69:18, 91:21, 94:2
**9)(d** [2] - 25:2, 88:24
**95** [1] - 26:21
**98** [1] - 99:11
**9:00** [1] - 95:3

# A

**ability** [1] - 27:6
**able** [7] - 15:3, 37:23, 54:14, 56:15, 71:21, 75:16, 95:13
**absence** [5] - 20:21, 21:16, 23:7, 24:6, 24:7
**absolutely** [2] - 65:19, 82:19
**abusive** [1] - 37:12
**academic** [2] - 66:21, 88:14
**accept** [1] - 46:10
**acceptable** [1] - 8:15
**accepted** [2] - 47:20, 50:1
**access** [1] - 78:11
**accomplished** [1] - 7:8
**accordance** [1] - 50:1
**according** [3] - 18:4, 33:5, 33:8
**acknowledged** [1] - 47:22
**Act** [15] - 7:20, 8:17, 10:10, 11:17, 12:19, 15:14, 23:1, 31:3, 41:16, 43:9, 47:25, 69:23, 70:16, 80:14, 83:10
**acted** [2] - 8:20, 99:9
**acting** [1] - 32:23
**action** [7] - 8:18, 8:25,

26:15, 42:19, 42:20, 94:8, 99:11
**active** [1] - 41:13
**actor** [4] - 31:9, 32:1, 34:14, 39:9
**actors** [1] - 31:8
**actual** [2] - 19:24, 40:10
**Adam** [1] - 5:8
**ADAM** [1] - 2:3
**add** [4] - 24:23, 25:22, 45:14, 92:19
**adding** [2] - 64:19, 89:10
**addition** [1] - 9:3
**additional** [3] - 64:6, 86:18, 92:5
**additionally** [2] - 55:22, 64:19
**address** [2] - 56:9, 89:2
**addressed** [3] - 58:13, 66:7, 90:2
**addressing** [1] - 29:18
**adequately** [3] - 12:15, 30:18, 46:19
**admit** [2] - 16:6, 56:11
**admitted** [1] - 40:18
**adopt** [1] - 83:3
**adopted** [1] - 22:13
**advice** [3] - 42:24, 73:3, 86:2
**advised** [2] - 42:15, 42:23
**advocating** [1] - 25:17
**Aegis** [9] - 19:3, 19:9, 63:15, 73:3, 73:9, 73:11, 74:8, 74:12, 74:23
**afternoon** [7] - 4:7, 4:15, 4:19, 4:22, 5:14, 5:17, 5:22
**agency** [2] - 31:18, 39:5
**agent** [2] - 52:11, 55:10
**aggressive** [10] - 16:23, 38:17, 60:6, 61:17, 62:1, 64:18, 66:1, 75:18, 78:4
**ago** [2] - 7:4, 52:6
**agree** [3] - 68:7, 68:16, 68:25
**agreeing** [1] - 42:16
**agreement** [10] - 11:8, 22:15, 40:11, 45:19, 45:20, 45:22, 46:1, 56:20, 73:4, 73:22
**agreements** [4] - 37:1, 40:5, 41:11, 85:13
**ahagen@cadlaw.**

**com** [1] - 3:4
**ahead** [7] - 14:24, 34:8, 47:4, 70:3, 76:2, 94:22, 97:9
**akin** [1] - 21:3
**AKS** [10] - 30:18, 30:22, 31:25, 32:3, 38:3, 39:8, 39:17, 40:16, 40:20, 43:5
**al** [2] - 1:4, 1:6
**alerts** [1] - 35:5
**Alex** [3] - 6:10, 6:13, 6:14
**ALEX** [1] - 3:2
**ALL** [1] - 1:12
**allegation** [20] - 13:2, 13:3, 16:22, 20:21, 21:8, 22:4, 22:14, 34:14, 40:3, 40:4, 40:7, 45:6, 76:23, 78:21, 82:4, 84:11, 84:16, 85:8, 85:12, 85:25
**allegations** [41] - 10:2, 10:5, 10:9, 10:22, 11:2, 11:6, 11:18, 12:10, 17:1, 18:5, 21:12, 22:9, 24:14, 25:19, 26:7, 26:11, 28:5, 28:11, 28:18, 28:24, 30:15, 33:5, 33:9, 38:11, 38:13, 40:6, 44:22, 55:7, 58:17, 65:9, 81:22, 84:21, 87:14, 89:16, 90:13, 91:2, 91:14, 92:4, 92:7, 92:12, 92:14
**allege** [13] - 15:19, 18:14, 22:19, 24:25, 27:10, 27:15, 27:16, 30:11, 30:18, 30:23, 31:2, 57:25, 74:18
**alleged** [29] - 9:25, 13:18, 16:4, 18:12, 19:25, 22:9, 23:7, 27:13, 27:18, 28:12, 28:13, 33:19, 34:15, 51:19, 52:1, 52:2, 52:17, 53:15, 56:13, 57:21, 58:25, 59:17, 66:8, 72:4, 76:11, 76:25, 78:9, 86:21
**allegedly** [3] - 21:9, 57:12, 83:6
**alleges** [2] - 67:13, 67:18
**alleging** [2] - 12:15, 17:14
**allow** [3] - 14:3, 56:21, 95:11
**allowed** [2] - 44:20, 44:24
**alluded** [2] - 65:13,

97:11
  **alone** [1] - 78:6
  **alternate** [1] - 94:10
  **alternates** [1] - 96:2
  **alternative** [2] - 65:14, 73:2
  **alternatives** [1] - 68:13
  **AMA** [1] - 22:10
  **amended** [1] - 70:2
  **America** [2] - 4:11, 4:14
  **AMERICA** [1] - 1:4
  **American** [4] - 21:25, 22:1, 22:11
  **amount** [7] - 50:15, 52:12, 52:15, 52:23, 52:24, 76:12, 89:17
  **amounts** [2] - 63:12, 67:15
  **analysis** [6] - 25:3, 51:7, 61:18, 65:2, 71:4, 88:25
  **analytical** [1] - 18:18
  **analytically** [4] - 17:18, 19:12, 80:16, 86:5
  **analyzing** [1] - 68:23
  **ANDERSON** [2] - 2:3, 5:8
  **Anderson** [1] - 5:8
  **animal** [1] - 61:9
  **answer** [5] - 41:20, 88:4, 93:12, 93:20, 94:20
  **anti** [1] - 54:19
  **Anti** [16] - 8:23, 9:1, 19:20, 29:6, 30:4, 30:12, 31:7, 41:16, 48:4, 53:6, 70:1, 80:24, 81:7, 83:7, 84:10, 93:8
  **Anti-Fraud** [3] - 8:23, 9:1, 29:6
  **anti-kickback** [1] - 54:19
  **Anti-Kickback** [13] - 19:20, 30:4, 30:12, 31:7, 41:16, 48:4, 53:6, 70:1, 80:24, 81:7, 83:7, 84:10, 93:8
  **anyway** [1] - 55:15
  **apart** [3] - 33:14, 35:1, 92:13
  **apparent** [1] - 86:5
  **appear** [2] - 4:11, 31:21
  **appearances** [3] - 4:4, 4:8, 99:15
  **APPEARANCES** [4] - 1:12, 1:14, 2:1, 3:1
  **appearing** [8] - 4:10, 4:13, 4:16, 4:20, 5:1,

5:3, 5:9, 5:15
  **application** [1] - 85:14
  **applied** [1] - 30:16
  **applies** [3] - 30:9, 85:12, 86:20
  **apply** [6] - 9:3, 34:24, 77:16, 77:17, 77:18, 91:13
  **applying** [2] - 91:13, 91:20
  **appreciate** [1] - 92:20
  **approach** [2] - 95:8, 95:11
  **approached** [4] - 33:6, 36:21, 36:22, 52:11
  **approaches** [1] - 33:24
  **appropriate** [13] - 17:5, 17:6, 17:22, 20:2, 22:23, 49:25, 68:22, 71:15, 74:17, 84:4, 89:9, 91:11
  **appropriateness** [1] - 61:1
  **approval** [2] - 37:11, 41:10
  **appurtatious** [1] - 21:13
  **area** [4] - 14:16, 14:19, 39:10, 73:12
  **argue** [1] - 29:15
  **argues** [1] - 28:17
  **arguing** [2] - 49:9, 70:19, 70:20
  **argument** [19] - 8:16, 10:23, 12:21, 14:20, 28:18, 50:6, 50:16, 70:4, 74:18, 75:17, 78:25, 79:18, 80:22, 90:18, 91:9, 92:5, 92:11, 94:1, 94:5
  **arguments** [7] - 9:4, 9:15, 10:19, 11:9, 48:7, 80:2, 93:16
  **Arizona** [1] - 15:12
  **arm** [1] - 66:6
  **arrangement** [3] - 18:23, 51:20, 86:1
  **arrangements** [2] - 42:18, 52:5
  **ASFORA** [2] - 1:6, 2:14
  **Asfora** [100] - 5:21, 7:2, 7:4, 7:12, 7:16, 7:23, 10:10, 12:4, 16:5, 16:20, 18:4, 26:11, 30:15, 30:17, 30:23, 33:6, 33:13, 33:24, 34:15, 34:18, 34:21, 34:24, 37:10, 37:21, 38:3, 38:7, 38:11, 38:22, 39:11, 39:18, 39:23, 40:4, 40:7, 40:17, 40:24, 42:19,

43:1, 43:18, 44:19, 45:24, 51:22, 52:4, 52:11, 52:21, 53:4, 53:11, 53:21, 53:23, 53:24, 54:4, 54:15, 54:24, 55:10, 55:11, 55:16, 55:19, 56:2, 56:5, 56:10, 56:15, 57:22, 58:3, 58:16, 59:4, 60:4, 61:13, 61:21, 63:1, 63:9, 63:13, 64:18, 65:6, 66:9, 67:20, 69:12, 71:22, 72:1, 72:14, 73:13, 74:19, 74:24, 75:4, 75:7, 76:7, 76:13, 76:16, 77:2, 77:17, 77:20, 77:25, 78:8, 78:18, 81:9, 81:20, 81:23, 81:24, 82:5, 84:18, 92:6
  **Asfora's** [12] - 10:6, 21:21, 41:15, 42:14, 42:21, 54:12, 55:8, 56:22, 76:24, 78:15, 79:1, 83:21
  **aside** [4] - 18:3, 56:25, 94:18, 96:7
  **assert** [1] - 90:20
  **asserted** [6] - 8:18, 20:16, 50:10, 80:1, 80:3, 84:8
  **asserting** [6] - 7:19, 18:9, 80:13, 87:15, 90:4, 92:4
  **assertion** [3] - 15:14, 18:25, 73:1
  **assess** [1] - 16:7
  **assessment** [4] - 26:20, 48:20, 68:16, 68:25
  **assistance** [1] - 12:22
  **associated** [3] - 10:15, 42:15, 66:9
  **Associates** [1] - 28:21
  **Association** [4] - 21:25, 22:1, 22:11, 22:12
  **assume** [5] - 58:16, 67:2, 69:19, 75:4, 75:7
  **assuming** [2] - 94:15, 94:18
  **assumption** [1] - 77:18
  **attach** [1] - 25:1
  **attached** [2] - 42:7, 88:23
  **attaching** [1] - 26:4
  **attachment** [1] - 25:11
  **attachments** [1] - 31:20
  **attacking** [1] - 48:18
  **attempt** [2] - 48:7,

55:19
  **attempted** [1] - 31:16
  **Attorney's** [2] - 1:15, 1:19
  **audio** [1] - 34:1
  **authorities** [1] - 97:19
  **authority** [1] - 35:24
  **averse** [1] - 42:14
  **avoid** [2] - 15:1, 38:20
  **aware** [2] - 43:15, 69:4

## B

  **background** [1] - 49:7
  **backs** [1] - 58:7
  **bad** [1] - 37:20
  **BAILEY** [5] - 1:18, 4:19, 13:25, 14:8, 14:21
  **Bailey** [2] - 4:20, 4:25
  **bait** [1] - 44:17
  **balance** [1] - 44:12
  **bar** [1] - 9:20
  **based** [11] - 10:19, 11:4, 31:15, 31:19, 50:14, 58:17, 67:10, 72:4, 76:10, 76:20, 96:15
  **bases** [1] - 9:16
  **basic** [3] - 43:3, 81:2, 81:15
  **basis** [5] - 26:5, 39:13, 79:12, 84:8, 91:4
  **battleground** [1] - 10:21
  **bear** [1] - 11:19
  **became** [3] - 54:23, 56:7, 80:9
  **BECHTOLD** [1] - 2:2
  **Bechtold** [5] - 5:7, 5:10, 5:15, 5:19, 58:19
  **become** [1] - 86:5
  **BEFORE** [1] - 1:10
  **beg** [1] - 93:1
  **began** [1] - 49:9
  **begin** [2] - 4:8, 48:7
  **behalf** [6] - 4:16, 4:20, 5:2, 5:18, 5:23, 54:12
  **behavior** [5] - 31:8, 32:2, 32:19, 53:23, 56:18
  **belief** [2] - 72:5, 85:20
  **believes** [1] - 30:2
  **Ben** [2] - 1:24, 29:17
  **bench** [2] - 95:8, 95:12, 95:16
  **beneficiaries** [6] - 7:24, 13:9, 13:21, 15:24, 20:24, 31:10
  **beneficiary** [7] - 10:3, 12:12, 13:3, 15:8, 62:22, 65:22, 87:6

**benefit** [3] - 21:13, 21:14, 28:12
  **BENJAMIN** [1] - 2:18
  **Benjamin** [1] - 5:25
  **best** [5] - 17:8, 17:10, 37:22, 82:19, 87:18
  **better** [4] - 34:10, 73:18, 73:20, 74:21
  **between** [15] - 8:1, 14:17, 17:19, 18:18, 19:24, 20:8, 27:22, 27:25, 35:20, 48:14, 49:19, 52:21, 55:9, 62:20, 63:13
  **beyond** [3] - 23:21, 25:13, 67:9
  **bgraham@wc.com** [1] - 2:21
  **big** [5] - 14:19, 54:1, 80:6, 80:20, 82:8
  **bigger** [1] - 88:25
  **biggest** [1] - 85:3
  **billing** [2] - 53:10, 75:18
  **bills** [1] - 53:2
  **birth** [1] - 65:23
  **bit** [10] - 23:17, 26:19, 34:2, 34:7, 49:20, 51:6, 74:8, 82:23, 85:1, 94:15
  **blank** [1] - 66:20
  **block** [1] - 25:22
  **blovrien@cadlaw. com** [1] - 2:24
  **blur** [1] - 20:8
  **blurred** [2] - 51:12, 51:14
  **blurring** [1] - 70:5
  **blurs** [1] - 8:1
  **board** [1] - 87:21
  **bogus** [1] - 36:25
  **Bonnie** [1] - 13:24
  **bore** [1] - 95:6
  **Box** [3] - 1:16, 1:20, 1:23
  **BOX** [1] - 2:4
  **boxes** [2] - 12:18, 15:16
  **brains** [1] - 58:7
  **Brazil** [2] - 7:6, 7:7
  **BRETT** [1] - 2:22
  **Brett** [1] - 6:7
  **brief** [18] - 8:1, 11:5, 15:12, 21:23, 28:17, 29:24, 32:9, 35:23, 36:12, 37:3, 50:5, 50:21, 63:8, 71:8, 76:6, 77:7, 79:16, 90:17
  **briefed** [2] - 46:14, 49:13
  **briefing** [2] - 46:23, 86:19

**briefly** [3] - 31:5, 37:25, 50:17
**briefs** [3] - 30:8, 46:18, 49:23
**bright** [4] - 23:25, 25:18, 70:7, 73:1
**bring** [2] - 17:23, 37:16
**broad** [2] - 43:23, 74:3
**broader** [1] - 70:10
**broadly** [1] - 37:18
**brought** [3] - 31:22, 45:15, 54:5
**Bruno** [1] - 37:2
**bullet** [23] - 18:5, 18:11, 33:7, 37:10, 52:5, 52:6, 52:10, 52:19, 52:22, 53:8, 55:12, 59:5, 60:3, 60:4, 63:15, 64:3, 74:14, 74:20, 84:14, 84:19, 84:25, 85:4
**burden** [5] - 29:7, 30:23, 38:5, 44:13, 69:6
**business** [6] - 36:21, 36:22, 38:15, 38:20, 55:9, 85:19
**BY** [1] - 1:13

## C

**C5-C6** [1] - 89:10
**C6** [1] - 89:10
**CADWELL** [1] - 2:22
**cage** [20] - 18:5, 18:11, 37:10, 52:5, 52:6, 52:10, 52:19, 52:22, 53:8, 55:12, 59:5, 59:6, 74:15, 74:20, 84:15, 84:19, 84:25, 85:4
**cages** [6] - 52:24, 60:3, 60:5, 63:15, 64:3, 74:14
**cake** [1] - 85:16
**CALDWELL** [2] - 3:2, 3:7
**California** [2] - 77:6, 92:1
**cannot** [2] - 11:1, 70:13
**capable** [1] - 74:11
**capture** [1] - 56:16
**care** [6] - 32:6, 60:7, 60:11, 66:10, 69:9, 87:8
**career** [1] - 7:15
**case** [110] - 8:18, 10:21, 11:20, 11:23, 15:11, 20:14, 20:17, 21:6, 21:7, 21:22, 21:23, 22:4, 24:20, 25:4, 28:9, 28:21, 29:22, 30:8, 30:13, 31:12, 31:22, 32:5,

32:7, 33:21, 35:10, 36:7, 36:20, 37:2, 37:18, 38:5, 38:14, 39:19, 39:23, 40:19, 41:4, 41:6, 41:13, 41:19, 42:3, 42:5, 45:19, 47:24, 48:3, 49:21, 49:22, 50:4, 50:19, 51:3, 52:19, 57:7, 57:9, 57:11, 58:9, 58:13, 59:24, 60:2, 60:14, 60:24, 61:17, 62:3, 62:4, 63:24, 64:2, 64:3, 65:15, 66:13, 66:15, 66:22, 67:11, 68:24, 70:17, 71:1, 71:7, 71:10, 71:24, 72:23, 76:5, 76:9, 76:16, 77:4, 77:6, 77:7, 78:22, 79:13, 79:19, 79:20, 81:4, 82:15, 87:2, 88:15, 91:1, 91:8, 91:16, 91:25, 92:2, 92:6, 92:10, 92:16, 93:22, 94:16, 94:24, 95:1, 96:2, 96:3, 96:4, 96:5, 96:8
**cases** [40] - 11:5, 17:13, 20:15, 20:19, 24:24, 28:3, 32:2, 35:1, 35:3, 36:10, 36:12, 37:6, 37:13, 37:15, 41:10, 48:12, 60:13, 61:24, 62:22, 63:14, 63:23, 64:8, 64:11, 64:25, 66:19, 70:19, 70:21, 76:17, 79:11, 79:15, 79:17, 86:16, 87:18, 90:11, 90:25, 91:7, 91:11, 91:12, 97:5
**cash** [3] - 36:18, 40:5, 40:13
**cast** [1] - 88:20
**catch** [1] - 56:3
**caused** [1] - 19:22
**cautiously** [1] - 15:2
**center** [3] - 14:17, 66:21, 88:14
**Central** [2] - 77:6, 92:1
**certain** [6] - 21:9, 21:24, 25:21, 74:19, 76:25, 77:10
**certainly** [5] - 27:25, 61:11, 78:20, 88:20, 97:6
**CERTIFICATE** [1] - 99:2
**certified** [2] - 67:20, 87:21
**CERTIFY** [1] - 99:9
**chambers** [1] - 9:8
**chance** [2] - 88:25,

93:12
**change** [3] - 32:1, 32:19, 43:2
**changed** [1] - 78:16
**characteristics** [1] - 59:21
**charge** [1] - 37:16
**chart** [2] - 63:2, 64:12
**check** [2] - 12:17, 15:16
**cherry** [1] - 85:19
**cherry-picking** [1] - 85:19
**chinks** [1] - 24:14
**choices** [1] - 48:19
**choose** [1] - 32:24
**chosen** [1] - 32:24
**CHRISTINE** [1] - 1:22
**chutzpa** [1] - 82:23
**Circuit** [17] - 11:14, 11:21, 12:1, 12:9, 21:23, 36:21, 38:4, 49:22, 50:7, 50:14, 50:17, 51:7, 57:9, 57:10, 71:10, 86:12
**Circuit's** [1] - 24:2
**Circuits** [1] - 51:9
**circumstance** [1] - 24:8
**circumstances** [3] - 27:10, 48:1, 59:18
**circumstantial** [3] - 27:7, 27:9, 38:10
**citation** [2] - 79:14, 79:20
**citations** [2] - 20:19, 90:16
**cite** [1] - 32:8
**cited** [18] - 11:5, 15:12, 28:3, 28:20, 32:2, 35:23, 49:22, 50:5, 50:20, 51:8, 71:8, 76:5, 77:7, 79:11, 79:16, 90:11, 91:8, 97:19
**cites** [3] - 21:19, 36:11, 37:14
**City** [3] - 3:11, 99:17, 99:21
**Civil** [2] - 1:23, 47:18
**civilly** [1] - 96:1
**claim** [44] - 8:7, 8:19, 10:1, 10:3, 11:13, 11:18, 12:2, 13:3, 13:22, 15:8, 18:22, 24:4, 26:10, 26:19, 28:4, 29:4, 35:16, 39:7, 39:13, 39:19, 40:19, 42:25, 44:6, 44:21, 47:20, 48:10, 49:6, 49:14, 49:15, 49:16, 50:9, 51:25, 57:3, 57:12, 67:16, 75:16,

75:25, 76:1, 81:19, 83:17, 85:25, 87:13, 90:20, 94:22
**claimed** [1] - 69:22
**claiming** [1] - 83:20
**claims** [30] - 9:16, 9:17, 10:14, 11:2, 11:6, 12:13, 13:9, 17:9, 26:6, 26:14, 36:8, 39:6, 41:10, 43:18, 44:11, 45:15, 46:12, 48:4, 48:6, 50:23, 50:25, 51:2, 53:17, 67:14, 70:12, 70:19, 70:23, 76:25, 79:1, 80:1
**Claims** [14] - 7:20, 8:17, 10:10, 11:17, 12:19, 15:14, 22:25, 31:3, 43:9, 47:25, 69:23, 70:16, 80:14, 83:10
**clarification** [1] - 30:20
**clarify** [1] - 97:17
**clarifying** [2] - 93:3, 93:5
**clear** [6] - 8:2, 29:21, 34:5, 70:14, 71:3
**clear-cut** [1] - 71:3
**cleared** [2] - 52:6, 59:6
**clearest** [1] - 32:5
**clearly** [2] - 71:20, 92:11
**CLERK** [1] - 6:20
**Clinic** [1] - 14:18
**clinical** [1] - 22:24
**clinically** [1] - 21:15
**close** [2] - 58:20, 93:11
**closer** [1] - 73:18
**closing** [1] - 40:5
**CMS** [2] - 53:24, 67:21
**co** [1] - 7:1
**co-counsel** [1] - 7:1
**code** [3] - 23:3, 66:25, 88:18
**cognizable** [1] - 30:11
**colleague** [3] - 8:13, 80:19, 92:19
**colleagues** [1] - 79:2, 96:24
**columns** [1] - 13:1
**coming** [1] - 34:9, 62:8, 81:10, 82:5, 95:10, 95:17
**comment** [1] - 89:21
**commentary** [1] - 89:8
**committed** [1] - 30:3
**committee** [2] - 59:25, 60:5
**common** [1] - 62:12
**community** [4] - 14:11, 14:12, 22:15, 90:22

**companies** [6] - 7:3, 7:17, 30:24, 35:8, 37:8, 38:14
**company** [25] - 18:20, 19:18, 29:25, 30:2, 30:17, 31:14, 31:23, 34:17, 34:18, 34:22, 34:23, 34:25, 35:5, 36:24, 37:17, 44:19, 59:4, 74:25, 80:25, 81:14, 82:1, 82:7, 92:3
**company's** [2] - 80:25, 82:2
**comparison** [1] - 61:7
**competed** [1] - 7:11
**complain** [1] - 28:1
**complained** [1] - 78:15
**complaint** [27] - 7:18, 8:9, 9:24, 10:8, 12:24, 12:25, 13:6, 13:14, 14:10, 14:22, 15:2, 15:13, 15:19, 16:6, 16:17, 17:13, 19:3, 19:5, 20:9, 20:16, 21:11, 21:19, 23:8, 23:11, 23:15, 23:18, 23:20, 24:24, 25:6, 25:12, 25:19, 26:1, 26:3, 26:11, 26:14, 27:13, 27:18, 28:2, 28:19, 29:19, 29:23, 30:10, 30:17, 31:1, 38:11, 39:4, 40:9, 41:23, 41:24, 47:9, 47:16, 48:11, 48:14, 48:15, 48:21, 51:16, 51:17, 53:16, 54:3, 54:10, 57:18, 57:21, 57:23, 58:1, 58:18, 58:19, 59:1, 59:2, 59:17, 59:24, 60:6, 64:4, 64:13, 64:14, 64:16, 65:20, 65:25, 67:18, 67:19, 70:2, 72:7, 74:10, 77:1, 78:10, 81:23, 82:4, 83:18, 84:7, 84:23, 85:8, 85:15, 87:4, 87:21, 91:14
**complaint's** [3] - 10:5, 10:21, 28:24
**complaints** [11] - 7:25, 8:1, 18:18, 31:20, 58:12, 58:24, 58:25, 66:6, 75:22, 76:11, 87:2
**complete** [2] - 25:21, 99:12
**completely** [2] - 18:24, 19:14
**complex** [1] - 37:24
**compliance** [1] - 8:24
**component** [1] - 8:21

compression [1] - 66:5
computer [1] - 34:10
con [1] - 55:18
concern [3] - 53:5, 61:21, 73:15
concerned [6] - 29:13, 29:15, 38:16, 39:10, 46:17, 59:4
concerning [2] - 53:19, 54:4
concerns [1] - 75:18
conclusion [5] - 16:19, 28:22, 66:20, 72:3, 78:18
conclusions [3] - 17:3, 25:23, 90:6
concrete [2] - 22:18, 27:17
conditions [1] - 81:6
conduct [4] - 30:25, 38:6, 38:8, 38:12
conducts [1] - 42:1
CONFERENCE [1] - 1:13
conference [2] - 4:5, 99:16
conflict [2] - 89:13, 89:16
confusing [1] - 20:9, 91:24
connect [2] - 14:9, 14:12
connection [1] - 27:25
CONNOLLY [2] - 2:15, 2:19
Connolly [2] - 5:23, 29:18
consensus [1] - 62:9
conservative [1] - 16:24
consider [5] - 33:11, 57:20, 61:1, 78:20, 94:12
consideration [1] - 24:13
considered [4] - 58:11, 61:12, 65:5, 71:4
considering [5] - 44:7, 49:8, 72:1, 78:13, 91:22
conspiracy [3] - 16:4, 35:16, 45:15
constantly [1] - 54:25
constitute [1] - 45:5
constituted [1] - 57:8
constitutes [1] - 49:9
constituting [1] - 48:1
consulted [1] - 97:3
consulting [2] - 33:19, 37:1
contains [1] - 10:8

contemplating [1] - 42:16
content [1] - 6:18
contest [2] - 43:25, 80:21
context [6] - 34:13, 34:18, 34:24, 35:17, 86:2, 89:1
continually [1] - 54:20, 54:21
continue [3] - 44:21, 77:13, 77:24
continued [7] - 2:1, 3:1, 44:23, 45:7, 55:15, 55:18, 55:20
continues [3] - 32:21, 43:17, 73:23
continuing [1] - 54:12
contrary [1] - 82:25
contrast [2] - 37:6, 39:9
control [2] - 70:20, 70:21
controlling [1] - 59:1
conventional [1] - 64:20
copy [2] - 9:9, 79:18
copying [1] - 97:19
cord [1] - 66:5
core [1] - 32:10
corporation [1] - 33:12
corporations [1] - 72:15
correct [7] - 6:12, 42:24, 43:22, 48:12, 67:3, 71:17, 97:19
corruption [1] - 53:5
counsel [10] - 6:4, 7:1, 9:8, 42:15, 42:21, 46:16, 47:6, 89:4, 95:8, 95:11
counsel's [2] - 16:11, 42:22
County [1] - 11:22
couple [6] - 9:6, 32:9, 34:13, 63:10, 80:20, 96:15
coupled [1] - 78:16
course [9] - 40:17, 47:23, 49:10, 49:13, 50:15, 58:22, 96:3, 97:9, 97:14
Court [22] - 3:10, 21:15, 22:25, 28:3, 32:21, 44:15, 47:6, 47:8, 48:5, 50:21, 63:6, 64:17, 69:4, 77:8, 79:4, 88:24, 93:9, 93:14, 99:7, 99:8, 99:9, 99:20
COURT [89] - 1:1, 1:11, 3:10, 4:7, 4:18,

4:24, 5:5, 5:12, 5:16, 5:20, 5:25, 6:4, 6:8, 6:14, 6:19, 6:22, 9:19, 9:21, 14:7, 14:15, 14:24, 16:9, 16:13, 18:3, 23:16, 24:19, 25:7, 25:9, 25:16, 26:18, 29:11, 33:3, 33:5, 34:1, 34:5, 35:8, 35:12, 39:21, 40:1, 41:1, 41:16, 42:4, 42:10, 44:2, 44:4, 45:11, 45:25, 46:5, 47:4, 47:10, 48:9, 48:16, 48:22, 48:25, 60:10, 64:7, 65:17, 66:16, 67:23, 68:5, 69:15, 69:17, 70:3, 72:10, 72:12, 75:3, 76:2, 79:6, 79:22, 82:14, 83:14, 85:10, 87:19, 88:7, 88:12, 92:22, 93:1, 93:5, 93:17, 93:21, 96:16, 96:20, 96:25, 97:7, 97:21, 97:23, 98:2, 99:2, 99:3
court [10] - 4:6, 11:1, 14:5, 25:2, 31:17, 44:7, 47:14, 57:8, 58:10, 91:21
Court's [2] - 43:11, 43:20
courts [2] - 11:5, 44:10
cover [2] - 22:6, 49:10
covered [3] - 46:17, 46:19, 67:24
covers [1] - 51:16
COVID-19 [1] - 95:19
coworkers [1] - 52:13
CR [1] - 1:3
Crawford [1] - 11:22
create [1] - 37:10
created [8] - 25:18, 36:14, 36:25, 37:7, 53:9, 56:8, 56:12, 81:21
creates [1] - 40:16
creating [2] - 56:19, 56:21
credentials [3] - 23:14, 23:19, 23:22
crime [1] - 30:3
criminal [1] - 38:4
criminalizes [1] - 31:8
criticism [1] - 15:20
criticisms [3] - 17:19, 18:1, 21:20
critique [2] - 86:24, 87:7
critiques [1] - 23:13
CRR [2] - 3:10, 99:6
cry [1] - 37:12

culling [1] - 49:1
cumulatively [1] - 94:4
cure [2] - 22:2, 22:5
customer [1] - 27:20
cut [1] - 71:3

D

D.C [2] - 2:16, 2:20
dab [1] - 73:16
Dakota [5] - 3:11, 14:11, 52:14, 99:8, 99:17
DAKOTA [2] - 1:2, 99:4
dangerous [4] - 59:20, 66:12, 66:18, 67:6
data [1] - 57:20
date [4] - 14:10, 52:23, 65:23, 98:4
Dated [1] - 99:17
DC [1] - 1:24
dead [1] - 95:13
deal [3] - 32:24, 85:14, 85:19
dealing [1] - 61:5
death [1] - 88:19
debate [2] - 17:4, 90:7
debating [1] - 17:7
decade [1] - 45:8
decide [2] - 96:3, 96:5
decided [2] - 20:7, 57:8
decision [4] - 8:22, 42:2, 43:11, 90:10
decisions [1] - 55:9
decline [1] - 41:12
declined [1] - 41:3
defendant [11] - 6:23, 8:20, 21:8, 24:15, 28:6, 28:18, 36:22, 48:2, 76:8, 79:19, 92:2
Defendant [1] - 5:20
DEFENDANT [3] - 2:14, 3:5, 69:16
defendant's [4] - 6:22, 47:8, 47:14, 78:25
Defendants [1] - 1:7
defendants [18] - 5:24, 7:16, 8:6, 47:23, 49:9, 49:18, 50:10, 51:12, 63:3, 63:9, 64:11, 65:3, 68:9, 68:23, 70:5, 77:11, 92:1, 92:3
defense [6] - 26:20, 32:10, 79:8, 79:23, 97:2, 97:24
defenses [1] - 42:21
defer [1] - 96:23
deficiencies [1] - 8:3
defined [1] - 84:24
definitely [3] - 62:25,

73:18
definition [2] - 32:13, 32:22
definitive [1] - 20:21
degenerative [1] - 66:19
degree [11] - 17:7, 17:15, 17:19, 21:5, 24:8, 49:19, 57:16, 60:23, 61:23, 70:8, 76:1
DEIBERT [3] - 2:22, 3:2, 3:7
demanded [2] - 36:24, 75:20
demanding [1] - 36:16
demonstrate [6] - 10:2, 10:6, 10:9, 12:18, 26:7, 28:19
demonstrating [2] - 11:3, 23:6
demonstration [1] - 18:17
denied [2] - 94:7, 94:9
denominator [2] - 16:7, 16:18
Denver [1] - 14:17
deny [2] - 47:8, 47:14
Department [4] - 1:23, 7:12, 81:5
dependent [1] - 96:18
depose [1] - 71:21
described [1] - 29:20
Designs [1] - 20:11, 30:15, 36:3, 37:9, 38:25, 39:1, 39:2, 51:21, 52:3, 52:9, 52:20, 52:22, 52:25, 53:1, 53:12, 54:13, 54:25, 55:10, 55:14, 55:15, 55:18, 56:2, 56:3, 56:5, 56:7, 56:15, 60:4, 63:17, 69:11, 73:13, 73:14, 74:12, 77:17, 77:21, 81:11, 81:12, 84:14, 84:16, 84:20, 85:5, 85:7
DESIGNS [1] - 3:5
Designs' [1] - 53:22
despite [1] - 43:5
detail [6] - 10:17, 43:23, 48:11, 49:1, 49:2, 54:10
detailed [2] - 59:11, 65:8
details [11] - 23:12, 23:17, 24:2, 25:3, 50:25, 51:15, 51:23, 52:18, 57:1, 57:5, 65:9
determination [1] - 71:15
determined [2] - 77:2, 84:4

develop [1] - 37:23
developed [2] - 56:4, 56:5
device [21] - 7:3, 7:17, 18:20, 29:25, 31:14, 31:23, 34:25, 37:17, 52:16, 54:18, 54:24, 55:20, 59:14, 69:12, 75:6, 77:12, 80:25, 82:1, 82:2, 92:3
devices [13] - 18:20, 19:18, 34:16, 44:19, 53:2, 62:25, 63:16, 75:6, 75:9, 76:12, 76:13, 77:10, 80:25
diagnosis [1] - 49:12
difference [4] - 13:8, 34:12, 48:14, 49:19
differences [1] - 23:5
different [27] - 12:23, 19:14, 33:11, 33:13, 33:16, 34:14, 36:16, 40:3, 50:17, 51:6, 61:9, 64:7, 74:14, 74:15, 78:2, 80:6, 80:7, 84:22, 84:23, 84:24, 85:1, 85:2, 87:12, 90:6, 91:3, 91:23
differing [1] - 90:6
difficult [3] - 14:12, 74:9, 90:20
dime [1] - 72:20
direct [4] - 28:2, 36:11, 36:23, 45:19
directed [1] - 83:2
directing [1] - 34:16
directly [1] - 34:19
disagree [3] - 11:4, 50:13, 60:16
disagreement [3] - 10:24, 49:17, 91:3
disagrees [1] - 87:9
discoverable [1] - 23:19
discovered [1] - 25:16
discovery [10] - 24:15, 41:20, 41:22, 68:10, 70:24, 71:21, 72:8, 74:18, 76:18, 77:3
discuss [2] - 35:2, 49:21
discussed [26] - 40:14, 49:18, 50:19, 51:8, 53:20, 54:2, 54:10, 55:24, 57:7, 57:16, 59:12, 64:14, 64:15, 65:3, 65:11, 65:21, 66:1, 67:19, 69:2, 69:5, 69:7, 72:7, 72:9, 74:10, 78:1, 78:25
discusses [1] - 54:11
discussing [4] - 47:24,

48:18, 63:20, 64:12
discussion [8] - 11:11, 13:18, 62:5, 65:24, 66:23, 66:25, 88:16, 94:16
discussions [1] - 48:20
disguise [1] - 36:18
dismiss [20] - 7:18, 11:1, 11:2, 11:7, 16:14, 28:4, 28:20, 42:8, 43:13, 44:10, 45:21, 47:8, 47:15, 80:11, 87:12, 90:12, 91:1, 91:12, 91:16, 92:16
dismissal [8] - 9:16, 9:17, 9:24, 26:5, 26:10, 29:4, 80:2, 80:22
dismissed [8] - 8:8, 10:16, 11:6, 30:6, 38:2, 45:10, 92:16
dismissible [1] - 45:2
dismissing [2] - 28:3, 43:8
dispute [3] - 11:9, 21:5, 86:17
disputing [1] - 17:15
disregarded [1] - 10:11
disregards [2] - 35:20, 36:2
distinct [7] - 7:20, 19:13, 20:3, 20:5, 32:18, 80:10, 80:17
distinction [3] - 17:18, 35:20, 62:20
distinguishing [1] - 36:6
distorted [1] - 40:18
distortion [1] - 30:19
distribute [7] - 53:11, 53:12, 54:8, 54:22, 55:15, 56:22, 75:1
distributed [1] - 69:11
distributes [2] - 53:3, 63:17
distributing [1] - 74:12
distribution [8] - 30:2, 34:22, 34:23, 40:20, 81:1, 81:13, 82:3, 84:19
distributions [5] - 31:15, 39:2, 39:17, 40:12, 51:20
distributor [6] - 36:14, 54:8, 54:24, 55:14, 56:3, 77:12
distributors [2] - 73:11, 74:23
distributorships [1] - 35:2
District [7] - 15:11, 21:7, 32:8, 77:6, 92:1,

99:7, 99:8
DISTRICT [5] - 1:1, 1:2, 1:11, 99:3, 99:4
Div [1] - 1:23
DIVISION [2] - 1:2, 99:4
DO [1] - 99:9
docket [1] - 45:20
doctor [13] - 21:24, 22:5, 29:24, 30:3, 31:13, 31:23, 33:25, 35:2, 37:7, 44:25, 77:23, 88:3, 90:1
doctor-owned [1] - 35:2
Doctors [1] - 5:18
doctors [5] - 19:20, 23:3, 36:16, 40:6, 40:13
doctrine [1] - 80:2
document [1] - 66:9
documentation [1] - 61:15
DOJ [1] - 96:23
dollar [1] - 63:12
dollars [3] - 33:8, 63:10, 63:11
done [14] - 19:8, 21:4, 22:7, 29:2, 61:16, 61:18, 67:3, 67:6, 67:21, 73:21, 80:7, 89:18, 96:22
dots [1] - 14:13
doubled [1] - 57:25
doubtful [1] - 21:14
down [5] - 15:21, 33:17, 44:25, 91:6, 92:18
Dr [112] - 5:15, 7:2, 7:4, 7:12, 7:16, 7:23, 10:6, 10:10, 16:5, 16:20, 18:4, 21:21, 26:11, 30:15, 30:17, 30:23, 33:6, 33:13, 34:15, 34:18, 34:21, 34:24, 37:10, 37:21, 38:3, 38:7, 38:11, 38:22, 39:11, 39:18, 39:23, 40:4, 40:7, 40:17, 40:24, 41:14, 42:14, 42:19, 42:21, 43:1, 43:18, 44:19, 45:24, 51:22, 52:4, 52:11, 52:21, 53:4, 53:11, 53:21, 53:23, 53:24, 54:4, 54:12, 54:15, 54:24, 55:8, 55:10, 55:11, 55:16, 55:19, 56:2, 56:5, 56:10, 56:15, 56:22, 57:22, 58:3, 58:16, 58:19, 58:22, 59:4, 60:3, 60:4, 61:13, 61:21, 63:1,

63:9, 63:13, 64:18, 65:6, 67:20, 69:12, 71:22, 72:1, 72:14, 73:13, 74:19, 74:24, 75:4, 75:7, 76:7, 76:13, 76:16, 76:24, 77:2, 77:17, 77:20, 77:25, 78:8, 78:15, 78:18, 79:1, 81:9, 81:20, 81:23, 81:24, 82:5, 83:21, 84:18, 92:6
dramatic [1] - 62:6
draw [1] - 14:18, 16:19, 17:18, 87:5
drawing [1] - 27:25
drawn [1] - 27:22
drills [1] - 15:21
drug [1] - 17:17
DuBay [20] - 33:22, 38:24, 39:22, 40:4, 40:6, 40:7, 43:7, 44:23, 45:19, 45:20, 81:9, 81:20, 82:5, 82:15, 82:20, 83:4, 84:12, 84:13, 85:5, 93:10
duck [1] - 95:14
Dunes [1] - 52:14
duplicate [1] - 46:13
duration [2] - 49:25, 61:2
during [6] - 9:11, 16:3, 41:17, 54:9, 57:24, 96:4
Dustin [1] - 5:7
DUSTIN [1] - 2:2
dysfunction [2] - 68:1, 87:23

## E

early [2] - 13:6, 80:4
easier [1] - 95:23
easily [1] - 73:12
Eastern [1] - 32:7
eat [1] - 85:16
ECF [1] - 42:8
economic [1] - 43:2
educational [1] - 7:5
effect [2] - 60:23, 95:24
effectiveness [1] - 21:18
efforts [1] - 31:25
eight [5] - 51:9, 60:1, 62:8, 95:22, 96:2
eight-person [1] - 95:22
Eighth [11] - 11:14, 11:21, 12:1, 12:9, 24:2, 36:20, 38:4, 50:7, 50:14, 50:17, 86:12
either [4] - 20:11,

62:15, 69:6, 75:13
element [6] - 26:15, 26:22, 28:8, 31:3, 44:1, 78:24
elements [6] - 8:19, 32:17, 81:3, 84:8, 84:9
ELLIE [1] - 1:18
Ellie [1] - 4:20
Ellie.Bailey@usdoj. gov [1] - 1:21
Email [1] - 99:22
EMG [2] - 68:1, 87:23
emphasizes [1] - 44:15
employees [1] - 56:10
enact [1] - 19:22
encapsulates [1] - 32:10
encourage [1] - 31:9
end [6] - 11:16, 58:6, 64:12, 70:21, 81:25, 96:3
End [1] - 98:4
ended [2] - 42:24, 89:18
enforced [1] - 43:12
engage [1] - 38:8
engaged [5] - 30:24, 51:21, 51:22, 75:10
engaging [1] - 18:9
enrichment [2] - 45:16, 46:13
entire [5] - 7:9, 76:19, 85:4, 87:12, 88:23
entirely [1] - 19:12
entirety [6] - 7:18, 25:23, 37:19, 39:15, 51:24, 53:16
entities [4] - 36:8, 36:19, 37:4, 38:16
entitled [1] - 99:10
entity [11] - 33:12, 36:1, 36:13, 36:14, 36:17, 36:22, 44:22, 56:11, 56:12, 56:19, 56:21
equivalent [3] - 52:7, 55:25, 56:6
equivocal [1] - 17:3
Escobar [5] - 43:11, 43:14, 43:20, 44:17, 44:24, 45:2
especially [4] - 46:17, 56:25, 60:19, 61:5, 61:24, 63:4, 67:7, 68:7
essence [2] - 33:14, 94:3
essentially [14] - 22:3, 28:17, 48:3, 51:3, 53:10, 56:2, 56:12, 57:22, 64:14, 64:22,

69:5, 73:4, 74:19
**establish** [1] - 75:16
**established** [3] -
11:14, 38:10, 48:2
**estimate** [1] - 97:7
**et** [2] - 1:4, 1:6
**evaluating** [2] - 25:2,
85:24
**evaluation** [1] - 25:19
**event** [1] - 83:1
**eventually** [5] - 53:3,
54:22, 55:13, 58:2,
62:15
**evidence** [19] - 27:5,
27:7, 27:9, 28:9, 38:10,
43:21, 44:4, 44:5, 44:6,
44:12, 53:19, 56:13,
68:1, 76:11, 87:23,
94:23, 95:10, 95:17,
96:15
**evident** [2] - 17:4, 80:9
**evil** [1] - 38:7
**exact** [1] - 28:22
**exactly** [5] - 53:4,
57:20, 61:20, 74:5,
88:18
**examining** [1] - 51:11
**example** [12] - 36:20,
50:12, 51:5, 55:24,
64:24, 65:4, 65:15,
69:3, 69:8, 76:16,
86:13, 86:23
**examples** [7] - 11:13,
11:16, 12:2, 50:23,
62:7, 63:2, 86:22
**exceed** [2] - 50:3, 61:3
**except** [1] - 45:25
**excessive** [1] - 69:9
**exchange** [1] - 31:9
**exclusively** [1] - 59:7
**excuse** [3] - 14:14,
66:16, 83:2
**exist** [2] - 22:19, 37:5
**existed** [1] - 37:4
**exists** [1] - 20:15
**expansive** [1] - 60:9
**expert** [6] - 37:21,
60:20, 62:15, 68:8, 68:9
**experts** [5] - 68:22,
72:8, 90:7, 96:13, 96:19
**explain** [1] - 32:5
**explanation** [1] - 83:25
**explicitly** [1] - 36:16
**exponentially** [1] -
18:6
**expose** [2] - 42:18,
42:19
**expressed** [1] - 29:23
**expressly** [1] - 52:15
**extended** [1] - 66:10
**extensive** [7] - 54:2,

65:9, 75:20, 76:19,
77:15, 78:5
**extensively** [1] - 77:2
**extent** [1] - 14:4
**external** [9] - 59:16,
62:10, 62:13, 63:25,
64:13, 65:1, 78:10,
78:11, 78:17
**extra** [1] - 61:16
**extract** [1] - 27:5
**extremely** [1] - 59:18

---

## F

**face** [1] - 47:21
**facia** [1] - 26:15
**facie** [4] - 8:19, 28:8,
84:8, 84:9
**facilitate** [1] - 95:17
**fact** [23] - 8:4, 18:4,
24:16, 25:20, 26:8,
27:2, 27:18, 27:23,
28:2, 28:5, 35:14,
38:22, 39:16, 43:2,
51:6, 70:23, 72:1, 73:9,
76:20, 77:5, 84:1,
85:24, 97:11
**factor** [1] - 36:7
**facts** [11] - 16:11,
28:13, 43:16, 71:9,
72:4, 73:10, 76:6,
81:15, 81:18, 81:19,
85:19
**factual** [1] - 47:19
**fail** [1] - 18:22
**fails** [1] - 30:10
**fair** [7] - 27:21, 48:17,
48:19, 50:15, 79:10,
79:11, 82:18
**fairly** [1] - 14:16
**falls** [1] - 20:17
**Falls** [11] - 1:15, 1:16,
2:23, 3:3, 3:8, 7:5, 7:9,
14:11, 14:15, 54:16,
73:12
**False** [14] - 7:20, 8:17,
10:10, 11:17, 12:19,
15:14, 22:25, 31:3,
43:9, 47:25, 69:23,
70:16, 80:14, 83:9
**false** [15] - 8:19, 10:1,
11:13, 11:18, 12:2,
17:9, 26:14, 41:10,
49:15, 49:16, 50:23,
50:25, 70:12, 70:13,
70:15
**falsity** [6] - 8:22,
69:23, 69:24, 70:11,
75:17, 92:13
**familiar** [3] - 42:4,
79:15, 95:2

---

**far** [13] - 24:25, 31:19,
37:12, 37:18, 48:17,
53:23, 59:13, 65:5,
71:1, 71:5, 74:22,
76:11, 78:3
**fast** [1] - 34:7
**fatal** [1] - 26:13
**favorable** [1] - 32:15
**FCA** [2] - 38:19, 44:10
**FDA** [3] - 37:11, 52:6,
59:6
**Federal** [2] - 7:19,
47:18
**federal** [14] - 7:24,
10:3, 12:12, 13:2, 13:9,
13:21, 15:8, 15:23,
20:23, 22:25, 49:15,
63:19, 86:24, 87:6
**fee** [2] - 40:8, 75:11
**feedback** [1] - 6:20
**fees** [1] - 33:20
**fellow** [1] - 83:21
**felt** [1] - 9:2
**few** [2] - 9:10, 96:1
**fewer** [6] - 18:15, 19:6,
19:9, 24:11, 66:7, 90:2
**field** [1] - 73:19
**filed** [2] - 7:10, 41:24
**files** [1] - 41:24
**final** [5] - 7:14, 26:9,
78:8, 78:24, 78:25
**finally** [2] - 50:2, 91:25
**financial** [2] - 31:9,
32:1, 72:1
**findings** [1] - 78:8
**fine** [5] - 4:17, 4:21,
5:11, 6:3, 39:24
**first** [19] - 4:10, 8:8,
10:18, 11:11, 13:6,
15:1, 19:10, 19:22,
30:9, 31:6, 33:19,
43:23, 64:15, 65:19,
69:23, 75:17, 79:12,
86:11, 92:8
**first's** [1] - 31:10
**first-name** [1] - 79:12
**fitting** [1] - 80:2
**five** [9] - 15:21, 17:7,
26:21, 59:25, 60:3,
62:4, 85:15, 86:3
**five-level** [2] - 59:25,
62:4
**fleshed** [1] - 86:8
**flip** [3] - 15:20, 17:24,
35:24
**Florida** [1] - 21:7
**flowed** [1] - 52:20
**focus** [1] - 85:4
**focused** [1] - 40:13
**focuses** [1] - 31:25
**folks** [3] - 77:23, 78:3,

78:14
**follow** [1] - 12:8
**FOR** [4] - 1:15, 2:2,
2:14, 3:5
**forcefully** [1] - 46:23
**foregoing** [1] - 99:11
**forms** [1] - 53:25
**forth** [8] - 54:9, 54:13,
54:21, 55:5, 70:18,
96:14
**forward** [5] - 24:15,
24:20, 35:25, 46:23,
87:17
**foundations** [1] - 21:6
**founded** [1] - 37:9
**four** [27] - 11:5, 12:22,
13:17, 13:20, 15:18,
15:22, 16:1, 16:2,
16:21, 17:6, 18:1,
18:11, 19:2, 19:8,
20:22, 23:8, 24:10,
27:25, 34:3, 34:4,
63:25, 64:11, 64:24,
66:3, 87:18, 90:11
**four-level** [3] - 19:2,
63:25, 66:3
**fourth** [1] - 24:23
**Franklin** [1] - 1:24
**frankly** [9] - 17:4,
19:19, 33:7, 37:19,
80:8, 80:20, 87:18,
92:9, 94:5
**Fraud** [3] - 8:23, 9:1,
29:6
**fraud** [12] - 9:1, 11:24,
23:4, 32:3, 35:5, 36:19,
37:12, 48:2, 60:14,
71:6, 71:25
**fraudulent** [1] - 8:19
**Frazier** [1] - 15:11
**frequency** [2] - 50:1,
61:2
**frequently** [1] - 16:8
**front** [1] - 44:20
**front-page** [1] - 44:20
**fronts** [1] - 34:13
**full** [4] - 23:14, 25:5,
79:19, 87:17
**fundamentally** [1] -
71:9
**furnished** [1] - 50:1
**furthermore** [1] - 76:3
**furtive** [2] - 53:23,
56:18
**fused** [1] - 24:10
**fusing** [1] - 16:1
**fusion** [11] - 17:5,
17:22, 19:2, 19:6, 19:8,
59:25, 62:4, 63:25,
66:3, 66:11, 91:3
**fusions** [3] - 59:8,

59:16, 66:18
**future** [1] - 70:2

---

## G

**garbled** [5] - 34:7,
34:8, 34:9, 41:5, 44:2
**garbled)** [1] - 48:23
**garden** [1] - 44:25
**GARRY** [3] - 2:22, 3:2,
3:7
**General** [1] - 39:5
**general** [2] - 22:15,
30:12
**generally** [5] - 30:9,
36:14, 79:15, 94:25,
97:6
**generate** [1] - 76:10
**generating** [1] - 76:12
**Gerdes** [1] - 5:9
**GERDES** [1] - 2:3
**Geyerman** [4] - 5:23,
7:1, 14:1, 14:5
**GEYERMAN** [25] -
2:15, 5:22, 6:25, 9:22,
14:25, 16:10, 16:16,
18:7, 23:25, 24:21,
25:8, 25:15, 25:17,
27:8, 45:13, 46:3,
79:24, 83:5, 84:6,
85:12, 88:1, 88:10,
88:20, 97:3, 97:25
ggeyerman@wc.com
[1] - 2:17
**given** [5] - 8:11, 23:13,
23:14, 73:3, 92:10
**governing** [1] - 11:8
**government** [84] -
7:19, 10:4, 10:20,
11:15, 12:5, 12:14,
13:10, 13:23, 14:6,
15:8, 16:6, 16:18, 18:9,
20:7, 21:22, 26:25,
28:16, 30:2, 30:23,
31:10, 31:12, 31:16,
31:21, 32:11, 35:1,
35:19, 36:8, 36:11,
37:14, 37:16, 38:6,
38:17, 39:3, 39:11,
39:12, 40:19, 40:23,
40:24, 41:3, 41:5, 41:8,
41:10, 41:12, 41:13,
41:25, 42:6, 42:20,
42:25, 43:5, 43:15,
43:19, 43:22, 44:13,
44:18, 44:24, 45:7,
45:12, 45:13, 45:22,
46:22, 53:15, 57:11,
57:17, 62:21, 65:14,
67:13, 67:18, 68:23,
73:9, 80:4, 80:21,

---

80:23, 81:16, 82:9, 85:16, 86:9, 86:11, 86:14, 88:3, 94:3, 96:8, 97:16
**government's** [17] - 7:25, 8:22, 10:24, 10:25, 12:3, 29:22, 29:23, 31:19, 37:3, 43:6, 60:20, 61:21, 62:15, 65:8, 67:18, 91:7, 97:11
**GRAHAM** [20] - 2:18, 6:2, 9:20, 29:17, 30:21, 33:4, 33:18, 34:4, 34:10, 35:11, 35:17, 39:25, 40:3, 41:9, 41:22, 42:5, 42:13, 44:3, 44:10, 92:21
**Graham** [5] - 5:25, 8:13, 29:9, 29:18, 92:19
**Graham's** [1] - 80:19
**GRANT** [1] - 2:15
**Grant** [2] - 7:1, 92:21
**grant** [1] - 5:23
**granted** [1] - 10:14
**gravamen** [1] - 32:3
**great** [1] - 93:15
**greed** [1] - 61:22
**Greenbelt** [2] - 2:8, 2:11
**GREEWALD** [2] - 2:7, 2:10
**ground** [7] - 11:12, 26:9, 30:16, 30:21, 31:1, 36:25, 92:15
**grounds** [7] - 8:7, 9:24, 10:13, 29:3, 38:1, 44:11, 87:12
**guess** [6] - 16:16, 28:16, 50:6, 70:8, 71:13, 72:19
**guessing** [2] - 22:24, 88:5
**guidance** [3] - 31:18, 35:4, 81:4
**guideline** [4] - 22:1, 22:12, 22:14
**guidelines** [1] - 57:15

## H

**HAGEN** [3] - 3:2, 6:13, 6:15
**Hagen** [2] - 6:10, 6:13
**hallmarks** [1] - 36:19
**hand** [2] - 43:23, 46:10
**handed** [1] - 30:7
**handle** [1] - 8:14
**happy** [4] - 45:16, 86:18, 90:15, 93:12
**hard** [2] - 74:7, 96:10

**Harin** [1] - 5:2
**HARIN** [1] - 1:22
**Harin.C.Song@usdoj .gov** [1] - 1:25
**harm** [7] - 43:2, 53:5, 59:13, 61:25, 62:5, 62:6, 67:8
**havoc** [1] - 37:19
**Health** [2] - 28:21, 81:5
**health** [1] - 14:2
**healthcare** [4] - 7:24, 15:23, 36:4, 49:15
**hear** [13] - 4:12, 4:17, 4:21, 5:4, 5:10, 6:3, 25:9, 45:11, 46:25, 47:3, 60:12, 79:22, 93:25
**hearing** [4] - 9:7, 46:7, 46:20, 99:15
**Hearing** [2] - 99:10, 99:13
**HEARING** [3] - 1:5, 1:9, 1:12
**heart** [1] - 21:24
**Heart** [2] - 21:25, 22:11
**heightened** [3] - 9:2, 30:22, 38:5
**held** [4] - 31:17, 71:7, 71:25, 72:5
**help** [2] - 60:13, 94:1
**HELP** [2] - 1:10, 99:20
**Help** [2] - 99:6, 99:19
**helped** [1] - 22:5
**helpful** [3] - 62:11, 71:3, 77:5
**HEREBY** [1] - 99:9
**herein** [1] - 97:19
**HHS** [5] - 31:18, 35:4, 42:9, 43:16, 44:21
**hide** [1] - 20:19
**high** [6] - 27:4, 27:19, 27:22, 58:6, 63:12, 90:5
**high-end** [1] - 58:6
**higher** [1] - 83:8
**highest** [1] - 83:12
**highlighted** [1] - 50:18
**highly** [2] - 21:12, 21:17
**HIM** [2] - 3:10, 99:20
**himself** [9] - 18:21, 26:11, 31:14, 35:14, 40:7, 54:6, 54:14, 75:5, 78:3
**hip** [2] - 58:20
**HIPAA** [1] - 14:2
**history** [2] - 67:10, 68:12
**hit** [1] - 9:20
**hits** [1] - 21:21
**hold** [2] - 4:24
**holding** [1] - 43:20

**holistic** [2] - 24:13, 25:19
**Holland** [2] - 5:13, 5:15
**HOLLAND** [2] - 2:6, 5:14
**home** [2] - 17:23, 21:21
**Hon** [1] - 4:2
**honest** [1] - 58:24
**honestly** [4] - 20:7, 71:6, 71:25, 72:5
**Honor** [77] - 4:15, 4:19, 4:22, 5:10, 5:14, 5:17, 5:22, 6:2, 6:6, 6:13, 6:15, 6:25, 8:15, 9:6, 12:21, 13:25, 14:21, 14:25, 16:10, 16:17, 16:19, 17:23, 20:4, 24:1, 24:4, 29:1, 29:8, 29:10, 29:17, 30:21, 32:2, 33:18, 34:12, 35:11, 36:10, 37:25, 38:9, 39:25, 40:4, 40:15, 41:9, 41:22, 42:8, 42:13, 43:6, 44:3, 44:10, 44:12, 45:3, 45:13, 45:17, 45:18, 47:1, 47:3, 49:3, 52:8, 54:4, 57:20, 58:13, 60:16, 69:16, 74:22, 76:3, 79:21, 79:24, 83:6, 84:6, 85:23, 86:17, 86:19, 87:1, 87:9, 88:1, 91:13, 92:23, 97:3, 97:25
**Honor's** [3] - 68:16, 80:8, 86:7
**HONORABLE** [1] - 1:10
**hospital** [5] - 22:13, 45:23, 57:15, 61:18, 83:23
**Hospital** [2] - 11:23, 54:16
**hospitals** [1] - 38:15
**hours** [1] - 9:7
**HSS** [1] - 39:4
**hum** [2] - 48:22, 96:25
**Human** [1] - 81:5
**hundred** [3] - 45:23, 46:2, 63:10
**hypothetical** [3] - 33:24, 40:14, 75:3
**hypothetically** [2] - 69:17, 69:19

## I

**idea** [2] - 32:22, 63:20
**identical** [1] - 56:9

**identifiable** [1] - 22:18
**identified** [5] - 14:4, 14:7, 14:9, 23:11, 30:7
**identify** [3] - 6:23, 16:18, 47:3
**illegal** [2] - 33:10, 42:22
**illness** [1] - 49:12
**illusion** [1] - 93:17
**imagine** [2] - 68:20, 96:22
**immediately** [1] - 89:20
**imperative** [1] - 50:11
**impermissible** [1] - 84:13
**implant** [1] - 69:11
**implanted** [2] - 18:15, 76:13
**implants** [6] - 18:13, 18:16, 19:13, 19:15, 20:1, 20:13
**Implicit** [1] - 32:21
**imply** [2] - 85:20, 88:21
**important** [7] - 20:4, 54:1, 58:13, 63:6, 64:23, 67:5, 69:10
**importantly** [1] - 67:12
**impossible** [1] - 28:17
**impression** [1] - 13:15
**improperly** [1] - 32:15
**IN** [1] - 1:12
**inadequate** [2] - 11:6, 12:18
**inappropriate** [5] - 13:12, 14:13, 82:6, 85:8, 85:11
**incentive** [1] - 33:2, 72:2
**incentives** [2] - 31:9, 32:1
**incentivized** [1] - 73:6
**incident** [1] - 70:9
**include** [1] - 92:2
**included** [2] - 66:7, 96:12
**includes** [3] - 49:25, 57:2
**including** [3] - 52:12, 52:13, 77:14
**inclusive** [1] - 99:12
**income** [3] - 59:5, 76:10, 76:12
**incompatible** [1] - 71:9
**incorrect** [2] - 67:3, 71:17
**increase** [1] - 62:6
**increased** [2] - 18:6, 57:24

**incremental** [1] - 91:2
**indeed** [1] - 31:19
**independence** [1] - 32:25
**independent** [11] - 8:7, 9:15, 9:23, 10:13, 18:24, 45:9, 60:19, 60:22, 62:16, 86:6, 92:15
**independently** [2] - 9:5, 32:23
**indicate** [1] - 43:16
**indicates** [2] - 11:20, 87:24
**indications** [1] - 68:12
**indicatives** [1] - 38:18
**indicia** [12] - 11:19, 51:1, 51:10, 57:6, 57:9, 57:19, 61:12, 63:7, 63:21, 65:10, 75:21
**indiscernible** [4] - 33:23, 41:24, 90:12, 90:23
**indiscernible)** [1] - 86:4
**individual** [3] - 14:8, 15:7, 18:3
**individual's** [1] - 14:9
**individuals** [1] - 23:12
**induce** [1] - 32:19
**inducement** [3] - 31:25, 32:4, 34:20
**industry** [2] - 37:20, 57:15
**infer** [2] - 77:11, 84:17
**inference** [5] - 27:21, 44:14, 51:1, 72:3, 77:22
**inferences** [3] - 28:12, 78:22, 87:5
**information** [10] - 14:2, 39:3, 40:9, 41:14, 41:17, 49:8, 49:20, 61:10, 69:4, 87:3
**infringer** [1] - 28:21
**injury** [1] - 49:12
**innovate** [1] - 74:24
**innovated** [1] - 54:5
**innovation** [3] - 73:2, 73:19, 74:1
**inserting** [1] - 75:9
**insofar** [1] - 89:16
**Inspector** [1] - 39:4
**instance** [12] - 51:13, 54:5, 59:24, 60:2, 62:2, 64:1, 65:12, 67:7, 68:17, 73:11, 95:9
**instances** [4] - 55:12, 55:13, 63:12, 70:22
**instead** [4] - 19:8, 23:9, 24:11, 95:21
**institutions** [1] - 7:6

**instructive** [1] - 35:3
**insufficiencies** [1] - 20:20
**insufficient** [3] - 10:9, 11:3, 92:7
**insurance** [2] - 13:23, 22:6
**intended** [2] - 8:24, 38:7
**intending** [1] - 53:6
**intent** [3] - 27:6, 88:21
**intentionally** [1] - 14:25
**intercede** [1] - 41:6
**interest** [9] - 7:13, 19:17, 35:21, 51:18, 59:12, 59:14, 60:4, 61:14, 63:14
**interested** [3] - 8:12, 46:20, 48:6
**interests** [2] - 63:5, 76:12
**intermixed** [1] - 90:17
**internal** [8] - 22:14, 59:17, 59:23, 62:4, 62:12, 64:25, 78:9, 78:17
**internally** [1] - 59:25
**interpretation** [2] - 68:7, 70:11
**interrupt** [2] - 92:24, 93:2
**intervene** [3] - 41:11, 41:12, 42:2
**intervened** [1] - 7:13
**intervention** [2] - 47:9, 47:16
**invention** [1] - 74:25
**investigated** [4] - 33:21, 39:6, 44:22, 45:6
**investigation** [13] - 16:11, 33:22, 38:24, 39:12, 42:1, 42:7, 43:7, 81:10, 81:21, 82:6, 84:12, 85:5
**investments** [2] - 36:15, 37:3
**investors** [2] - 77:9, 92:3
**involve** [2] - 16:1, 94:23
**involved** [9] - 35:15, 42:6, 65:8, 69:11, 72:9, 72:22, 73:14, 77:19, 96:13
**involves** [1] - 62:25
**Iqbal** [1] - 36:20
**irrelevant** [1] - 15:13
**issue** [18] - 6:18, 13:4, 15:1, 17:17, 36:13, 37:13, 43:14, 45:8,

47:24, 72:7, 72:8, 74:6, 86:19, 86:25, 89:11, 92:9, 95:14, 97:4
**issued** [2] - 39:6, 41:14, 42:9
**issues** [6] - 17:15, 41:25, 46:20, 46:21, 47:12, 74:8
**itemizes** [1] - 61:2
**items** [3] - 49:11, 58:10, 74:22
**itself** [4] - 31:22, 62:24, 62:25, 83:10
**Ivy** [2] - 2:7, 2:11

---
## J

**Jay** [2] - 5:13, 5:15
**JAY** [1] - 2:6
**Jayne** [1] - 38:5
**jeez** [1] - 84:17
**Jesse** [1] - 74:11
**jholland@jgllaw.com** [1] - 2:9
**job** [1] - 42:23
**joined** [1] - 7:12
**joint** [1] - 58:21
**JOSEPH** [2] - 2:7, 2:10
**Joshi** [1] - 11:20, 50:15, 51:4, 86:15
**Judge** [4] - 4:2, 4:7, 50:22, 96:10
**judge** [1] - 28:9
**JUDGE** [1] - 1:11
**Judge's** [1] - 68:25
**judgment** [16] - 16:15, 23:5, 44:8, 48:19, 49:19, 53:5, 71:5, 71:11, 76:4, 82:17, 82:18, 83:2, 83:3, 84:5, 91:17, 94:16
**judgments** [2] - 22:24, 70:13
**JULY** [1] - 1:6
**July** [2] - 4:1, 99:13
**juror** [1] - 91:19
**jury** [13] - 27:1, 76:8, 76:14, 76:18, 83:16, 83:20, 91:10, 91:18, 95:6, 95:15, 95:19, 95:21, 95:22
**Justice** [1] - 1:23, 7:12, 81:6
**justification** [4] - 20:22, 21:3, 90:9, 90:14

---
## K

**keep** [5] - 50:5, 82:7, 84:14, 90:19, 95:10

**keyed** [1] - 29:14
**kick** [1] - 44:5
**kickback** [39] - 8:10, 8:14, 9:14, 18:10, 18:22, 19:15, 19:22, 29:10, 29:20, 30:10, 31:7, 32:13, 32:23, 33:7, 38:1, 39:15, 43:4, 43:8, 43:24, 45:4, 45:5, 45:9, 54:19, 55:23, 57:2, 69:21, 75:25, 78:20, 78:23, 80:12, 80:14, 80:18, 81:3, 81:17, 82:1, 82:9, 85:21, 86:6, 94:7
**Kickback** [13] - 19:20, 30:4, 30:12, 31:7, 41:16, 48:4, 53:6, 70:1, 80:24, 81:7, 83:7, 84:10, 93:8
**kickbacks** [11] - 7:22, 29:16, 32:7, 51:19, 53:20, 75:16, 77:10, 77:12, 77:14, 77:18, 77:21
**kicks** [1] - 31:14
**kind** [5] - 22:18, 27:5, 40:16, 44:17, 46:7
**kinds** [1] - 40:9
**knowing** [5] - 26:14, 76:6, 83:7, 83:10, 84:10
**knowingly** [2] - 8:20, 30:24
**knowledge** [6] - 11:18, 12:7, 31:15, 76:24, 78:13, 79:1
**known** [1] - 81:11
**knows** [3] - 71:9, 74:24

---
## L

**LAAKE** [2] - 2:7, 2:10
**laboratory** [1] - 37:4
**labs** [1] - 37:5
**lack** [11] - 11:3, 11:6, 17:14, 20:15, 21:1, 22:10, 23:6, 90:4, 90:8, 90:20, 92:12
**lacking** [2] - 32:18, 32:25
**Landon** [4] - 6:5, 6:6, 6:9, 6:20
**LANDON** [3] - 3:6, 6:6, 6:12
**Lane** [2] - 2:7, 2:11
**language** [6] - 63:24, 66:2, 68:19, 68:22, 88:2, 89:4
**large** [5] - 45:4, 57:13, 59:7, 59:15, 77:14

**larger** [1] - 63:20
**last** [7] - 11:22, 58:2, 89:5, 89:25, 91:5, 95:1, 96:9
**law** [13] - 10:7, 20:14, 30:10, 38:4, 50:14, 51:5, 70:14, 71:1, 71:19, 83:8, 83:11, 86:18
**lawful** [1] - 38:23
**LAWRENCE** [2] - 1:10, 4:2
**laws** [2] - 36:4, 54:19
**lawsuit** [3] - 7:10, 69:20, 78:12
**lawyer** [1] - 85:11
**lawyers** [3] - 42:11, 42:13, 95:6
**lay** [2] - 62:12, 68:2, 68:7
**lays** [1] - 12:23
**lead** [5] - 6:23, 44:25, 51:1, 72:3, 85:3
**leading** [1] - 78:23
**leads** [3] - 27:20, 77:22, 78:18
**learnings** [1] - 78:2
**least** [12] - 25:5, 35:15, 51:8, 57:7, 62:2, 63:24, 68:17, 69:4, 76:16, 87:17, 95:14, 96:14
**leave** [2] - 13:15, 79:3
**led** [1] - 43:1
**left** [2] - 80:12, 87:6
**legal** [7] - 8:3, 10:24, 11:8, 11:11, 20:3, 20:5, 86:2
**legally** [1] - 23:9
**legitimate** [1] - 74:1
**lengthy** [1] - 60:8
**less** [2] - 13:12, 48:11
**letter** [3] - 79:18, 90:15, 97:18
**level** [14] - 15:19, 19:2, 21:16, 23:5, 27:4, 59:7, 59:15, 59:25, 62:4, 63:25, 66:3, 78:4, 87:15, 90:13
**leveling** [1] - 95:24
**levels** [19] - 16:2, 17:5, 17:21, 19:6, 19:8, 23:8, 24:11, 61:6, 61:8, 61:16, 64:19, 64:20, 66:7, 72:6, 89:10, 89:11, 90:2, 91:3
**liability** [14] - 7:21, 17:9, 18:8, 19:15, 19:16, 21:1, 30:6, 40:17, 43:4, 43:24, 45:1, 71:6, 71:24, 80:10
**license** [2] - 85:13,

86:1
**licensed** [1] - 37:5
**licensee** [1] - 54:23
**licensing** [1] - 42:17
**Life** [3] - 64:1, 64:3, 84:25
**light** [1] - 94:5
**lightly** [1] - 39:10
**likely** [3] - 7:8, 14:19, 75:25
**likewise** [1] - 46:21
**limitations** [1] - 94:24
**limiting** [1] - 26:2
**line** [10] - 8:1, 11:24, 13:24, 24:1, 25:18, 68:11, 70:7, 73:1, 73:21
**lines** [2] - 20:8, 51:12, 51:14
**listed** [2] - 12:25, 63:2
**listen** [1] - 6:18
**lists** [1] - 9:14
**litigation** [3] - 50:9, 62:19, 70:24
**lived** [2] - 81:9, 84:12
**LLC** [2] - 3:5, 56:9
**LLP** [6] - 2:3, 2:15, 2:19, 2:22, 3:2, 3:7
**local** [1] - 6:4
**locking** [1] - 73:8
**lodged** [1] - 21:20
**look** [12] - 6:10, 17:12, 20:4, 21:22, 25:5, 34:19, 35:4, 41:18, 57:19, 82:21, 88:6, 88:25, 89:7, 91:11, 91:23, 93:22, 94:3, 96:7
**looking** [12] - 32:6, 64:8, 65:17, 65:20, 78:21, 82:16, 82:17, 94:9, 97:18
**loosely** [1] - 27:2
**lose** [1] - 96:4
**lost** [6] - 6:16, 9:19, 47:10
**Lovrien** [2] - 6:7, 6:9
**LOVRIEN** [1] - 2:22

---
## M

**ma'am** [1] - 64:7
**major** [2] - 14:16, 14:17
**majority** [1] - 51:16
**maker** [2] - 71:7, 71:25
**malpractice** [4] - 8:25, 23:2, 29:5, 60:12
**Management** [1] - 28:21
**manifestation** [1] - 11:25

**manner** [1] - 82:21
**manufactured** [2] - 18:20, 81:12
**manufactures** [2] - 52:22, 85:5
**map** [1] - 79:25
**market** [2] - 54:6, 55:3
**markup** [1] - 73:10
**married** [1] - 36:1
**mass** [1] - 80:6
**material** [2] - 8:22, 86:17
**materiality** [6] - 31:2, 43:3, 43:10, 43:21, 44:11, 44:14
**matter** [15] - 15:17, 17:7, 17:15, 17:19, 20:6, 20:12, 20:23, 21:5, 24:8, 30:9, 30:12, 38:21, 39:6, 47:19, 62:17
**matters** [3] - 47:24, 61:23, 82:3
**MAY** [1] - 2:3
**Mayo** [1] - 14:18
**McFarland** [2] - 21:7, 28:20
**MD** [4] - 2:2, 2:8, 2:11, 2:14
**mean** [6] - 38:21, 48:13, 66:24, 89:4, 93:2, 95:16
**meaning** [4] - 10:1, 10:10, 60:8, 67:20
**meaningful** [1] - 97:5
**means** [7] - 27:14, 38:6, 68:2, 88:5, 88:18, 90:3, 90:8
**meant** [2] - 23:1, 23:2
**measure** [1] - 22:22
**measures** [2] - 27:17, 27:19
**Medicaid** [1] - 49:10
**Medical** [42] - 20:11, 30:15, 36:3, 37:9, 38:25, 39:2, 51:20, 52:3, 52:9, 52:20, 52:22, 52:25, 53:1, 53:12, 53:21, 54:13, 54:25, 55:9, 55:14, 55:15, 55:18, 56:2, 56:3, 56:4, 56:7, 56:15, 60:4, 63:16, 69:11, 73:13, 73:14, 74:12, 77:17, 77:21, 81:11, 81:12, 84:14, 84:16, 84:19, 85:5, 85:7
**medical** [118] - 7:3, 7:5, 7:17, 8:12, 8:25, 9:17, 9:18, 9:23, 10:1, 10:15, 11:3, 11:7, 12:19, 13:5, 14:16,

17:12, 17:14, 17:16, 18:20, 20:9, 20:15, 20:21, 21:2, 21:16, 22:10, 22:15, 23:1, 23:5, 23:6, 24:25, 25:5, 25:12, 26:4, 26:6, 26:10, 26:22, 28:4, 28:19, 29:4, 29:5, 29:13, 29:24, 31:11, 31:14, 31:23, 34:25, 37:17, 37:19, 48:3, 48:6, 48:10, 48:18, 48:19, 49:6, 49:9, 49:19, 50:2, 50:3, 50:9, 53:5, 53:17, 57:3, 60:12, 61:4, 62:16, 62:22, 66:21, 68:11, 69:18, 70:12, 70:15, 70:19, 70:22, 71:5, 71:11, 72:9, 73:19, 75:15, 75:17, 75:24, 76:4, 78:19, 79:3, 79:4, 80:11, 80:25, 82:12, 86:7, 86:10, 87:13, 88:5, 88:14, 88:18, 90:5, 90:8, 90:9, 90:10, 90:14, 90:21, 90:22, 90:25, 92:3, 93:7, 93:23, 94:6, 94:11, 94:13, 94:21, 96:11, 96:12, 96:13, 97:9, 97:10
**MEDICAL** [1] - 3:5
**medically** [34] - 10:2, 10:7, 10:12, 12:4, 12:16, 13:12, 13:16, 15:15, 17:2, 17:11, 18:12, 18:25, 19:12, 21:9, 22:20, 23:9, 26:8, 26:12, 26:16, 27:3, 27:24, 28:23, 28:25, 49:16, 60:21, 67:21, 75:10, 76:17, 77:1, 78:23, 79:1, 80:15, 87:11, 87:15
**Medicare** [9] - 32:3, 39:5, 49:10, 53:2, 63:19, 65:22, 67:14, 69:10, 75:19
**medication** [2] - 21:13, 21:15
**medications** [1] - 21:9
**meet** [1] - 91:14
**meeting** [1] - 75:5
**meets** [2] - 50:2, 61:3
**Megan** [2] - 4:16, 47:2
**MEGHAN** [1] - 1:15
meghan.roche@
usdoj.gov [1] - 1:17
**Memorial** [1] - 11:23
**mens** [6] - 8:21, 30:22, 38:5, 38:9, 83:9, 83:12

**mentioned** [1] - 50:18
**mere** [2] - 39:16, 83:10
**messenger** [1] - 34:11
**met** [3] - 29:6, 47:17, 69:6
**mic** [1] - 6:21
**middle** [3] - 73:16, 74:13, 93:8
**Middle** [1] - 21:7
**Midwest** [1] - 37:23
**might** [10] - 12:21, 16:24, 25:22, 38:20, 39:9, 39:10, 81:23, 85:1, 95:13
**migraines** [2] - 22:6, 22:7
**mind** [10] - 50:6, 55:8, 71:23, 72:2, 83:22, 84:2, 85:21, 90:19, 92:24
**mine** [1] - 6:16
**Minnesota** [1] - 14:18
**minute** [18] - 4:24, 16:13, 23:16, 25:10, 26:18, 39:21, 41:1, 82:14, 83:14, 83:15, 85:10, 87:19, 88:9
**misconduct** [1] - 40:11
**misguided** [1] - 7:10
**misreading** [1] - 68:3
**misrepresent** [1] - 22:7
**mistake** [1] - 45:16
**Misty** [1] - 34:6
**misuse** [1] - 28:14
**mix** [1] - 78:21
**moment** [8] - 35:24, 47:10, 48:9, 60:10, 60:11, 68:6, 82:12, 86:10
**monetary** [1] - 69:12
**money** [18] - 33:14, 36:18, 52:15, 52:20, 53:21, 54:14, 55:19, 55:20, 59:15, 61:22, 63:7, 73:5, 74:3, 74:4, 75:8, 76:21, 77:24, 83:24
**month** [1] - 96:23
**moot** [1] - 10:22
**morality** [4] - 66:23, 66:24, 88:16, 88:19
**morbidity** [4] - 66:22, 66:24, 88:16, 88:19
**morning** [2] - 30:8, 95:3
**most** [7] - 7:8, 8:11, 12:21, 37:22, 62:14, 64:24, 73:17
**mostly** [1] - 66:6
**motion** [23] - 6:23,

11:2, 11:7, 16:14, 28:4, 28:20, 42:8, 43:12, 44:8, 44:9, 45:21, 47:8, 47:15, 82:18, 83:1, 84:4, 90:11, 91:1, 91:16, 91:21, 92:16, 94:7
**Motions** [2] - 99:10, 99:13
**MOTIONS** [2] - 1:5, 1:9
**motions** [1] - 91:11
**motivated** [4] - 55:3, 55:4, 61:21, 61:22
**motivating** [1] - 65:5
**move** [1] - 88:11
**moved** [1] - 7:17
**moving** [1] - 11:11
**MR** [49] - 5:8, 5:14, 5:22, 6:2, 6:6, 6:12, 6:13, 6:15, 6:25, 9:20, 9:22, 14:25, 16:10, 16:16, 18:7, 23:25, 24:21, 25:8, 25:15, 25:17, 27:8, 29:17, 30:21, 33:4, 33:18, 34:4, 34:10, 35:11, 35:17, 39:25, 40:3, 41:9, 41:22, 42:5, 42:13, 44:3, 44:10, 45:13, 46:3, 79:24, 83:5, 84:6, 85:12, 88:1, 88:10, 88:20, 92:21, 97:3, 97:25
**MS** [37] - 4:15, 4:19, 4:22, 5:2, 5:17, 13:25, 14:8, 14:21, 47:1, 47:5, 47:13, 48:13, 48:17, 48:24, 49:3, 60:15, 64:10, 65:19, 67:1, 68:4, 68:6, 69:21, 70:4, 72:11, 72:25, 75:14, 76:3, 79:21, 92:23, 93:2, 93:6, 93:19, 96:10, 96:18, 96:21, 97:17, 97:22
**multi** [1] - 78:4
**multi-level** [1] - 78:4
**multiple** [7] - 16:2, 36:15, 59:7, 59:15, 85:18, 97:6
**multiple-level** [2] - 59:7, 59:15
**must** [3] - 30:23, 49:24, 51:4
**mute** [1] - 6:21
**muted** [1] - 9:20
**myopathy** [2] - 68:2, 87:24

**N**

**N.W** [2] - 2:16, 2:19
**name** [14] - 14:9, 15:1, 15:4, 19:1, 23:18, 23:21, 24:18, 37:4, 44:14, 65:15, 79:12, 79:14, 79:19
**named** [1] - 69:4
**names** [6] - 14:1, 14:3, 14:5, 14:13, 15:2, 23:14
**Nannis** [2] - 5:16, 5:18
**NANNIS** [2] - 2:10, 5:17
**nationally** [1] - 7:7
**native** [1] - 7:6
**nature** [5] - 17:25, 31:6, 43:4, 87:14, 90:12
**nearly** [2] - 45:8, 56:9
**necessarily** [2] - 19:16, 75:15
**necessary** [21] - 13:13, 13:17, 21:10, 22:20, 26:23, 27:4, 28:23, 28:25, 31:3, 47:17, 49:11, 49:16, 49:24, 60:9, 60:25, 67:9, 67:22, 68:19, 72:6, 76:20, 77:15
**necessity** [63] - 8:12, 9:17, 9:18, 9:23, 10:1, 10:15, 11:3, 11:7, 12:19, 13:5, 17:12, 17:14, 20:9, 20:16, 21:2, 21:17, 22:10, 23:6, 24:25, 26:6, 26:10, 28:4, 28:19, 29:4, 29:14, 48:4, 48:6, 48:10, 49:6, 49:9, 50:9, 53:17, 57:3, 62:16, 69:19, 70:12, 70:19, 70:22, 75:15, 75:18, 75:25, 79:3, 79:5, 80:11, 82:13, 86:7, 86:11, 87:13, 90:5, 90:8, 90:21, 92:12, 93:7, 93:23, 94:6, 94:11, 94:13, 94:21, 96:11, 96:12, 96:21, 97:9, 97:10
**neck** [1] - 66:6
**need** [15] - 12:1, 12:9, 21:3, 34:21, 50:3, 52:23, 52:24, 53:1, 60:9, 61:4, 70:6, 75:20, 86:1, 90:19, 96:2
**needed** [1] - 10:10
**needs** [1] - 49:5
**negligent** [1] - 60:17
**negotiate** [1] - 54:12
**negotiating** [1] - 40:24

**negotiation** [1] - 54:9
**neurologic** [2] - 67:25, 87:23
**neurological** [1] - 87:21
**neurosurgeon** [5] - 7:8, 52:14, 58:4, 58:14, 58:23
**neurosurgeons** [1] - 58:5
**neurosurgery** [1] - 58:6
**neurosurgical** [1] - 64:21
**never** [4] - 24:9, 42:21, 80:23, 81:18
**new** [3] - 36:14, 56:19, 56:21
**news** [1] - 44:20
**next** [11] - 4:25, 15:21, 17:24, 50:6, 64:3, 67:12, 69:14, 70:4, 72:19, 76:23, 89:7
**nexus** [2] - 18:18, 19:24
**nice** [1] - 90:15
**nine** [1] - 78:7
**nineties** [1] - 37:9
**Ninth** [2] - 3:11, 99:21
**no-reasonable-juror-could-find** [1] - 91:19
**nobody** [3] - 81:20, 85:7, 85:10
**none** [1] - 37:15
**nonetheless** [1] - 75:9
**nonreimbursable** [1] - 49:14
**noon** [1] - 95:4
**normal** [3] - 9:3, 68:1, 87:23
**normally** [3] - 66:18, 73:24, 75:8
**NOT** [2] - 3:10, 99:20
**notable** [1] - 18:11
**note** [5] - 10:17, 28:5, 28:16, 64:24, 72:11
**noted** [9] - 14:23, 57:23, 58:19, 59:19, 59:23, 66:3, 66:5, 66:12, 74:22
**notes** [3] - 26:23, 65:21, 99:13
**nothing** [16] - 20:10, 28:1, 32:19, 43:17, 46:1, 71:1, 75:11, 82:3, 82:9, 86:3, 89:6, 89:14, 92:21, 93:24, 97:22
**notice** [3] - 41:6, 41:25, 43:19
**noticed** [1] - 50:21
**notoriously** [1] - 42:14

**novel** [3] - 30:5, 31:13, 37:18
**number** [23] - 10:5, 12:25, 16:5, 16:12, 18:7, 20:18, 20:20, 23:11, 24:11, 33:7, 42:8, 45:20, 48:20, 52:12, 57:13, 59:7, 59:15, 79:10, 79:11, 80:23, 83:6, 83:12, 87:14
**numbers** [1] - 14:22

## O

**object** [5] - 13:25, 14:1, 14:6, 41:7, 57:14
**objection** [1] - 14:23, 95:11
**objective** [7] - 21:19, 22:22, 23:7, 24:7, 70:6, 70:11, 71:2
**obscures** [1] - 8:2
**obtain** [1] - 32:15
**obvious** [1] - 15:25
**obviously** [9] - 23:19, 25:25, 26:24, 28:9, 29:13, 38:7, 46:20, 60:3, 90:16
**October** [1] - 99:18
**OF** [5] - 1:2, 1:4, 1:9, 1:12, 99:4
**offer** [4] - 34:20, 34:23
**offered** [6] - 32:11, 32:19, 33:16, 37:3, 53:21, 77:11
**offering** [1] - 34:15
**offers** [1] - 33:25
**office** [4] - 6:9, 6:10, 72:16, 72:17
**Office** [3] - 1:15, 1:19, 39:4
**offices** [1] - 72:18
**Official** [3] - 3:10, 99:6, 99:20
**often** [1] - 62:12
**Omaha** [1] - 14:17
**ominous** [2] - 88:17, 88:22
**omission** [2] - 23:10, 26:13
**once** [3] - 72:8, 75:4, 91:16
**one** [86] - 6:9, 7:20, 7:21, 8:19, 9:24, 10:13, 10:14, 12:12, 13:10, 14:17, 15:6, 17:18, 18:7, 18:21, 20:18, 20:20, 23:17, 23:23, 24:17, 26:7, 29:14, 29:25, 30:6, 32:1,

32:11, 32:14, 32:25, 33:8, 34:2, 34:4, 34:13, 35:8, 35:9, 35:12, 35:18, 35:19, 36:1, 36:5, 36:15, 37:22, 40:4, 40:6, 43:12, 45:23, 50:4, 57:7, 58:14, 59:13, 59:24, 61:2, 61:3, 62:1, 62:7, 63:24, 64:15, 64:25, 68:6, 68:17, 72:18, 79:14, 80:23, 81:8, 83:6, 83:12, 84:9, 84:22, 84:25, 85:3, 85:13, 85:19, 86:1, 86:21, 86:22, 86:23, 87:6, 87:14, 88:9, 89:3, 89:16, 91:8, 92:11, 93:3, 96:4
**ones** [2] - 36:11, 46:22
**oops** [1] - 9:19
**op** [1] - 66:10
**open** [2] - 4:6, 14:5
**opening** [1] - 35:23
**operate** [5] - 68:3, 75:8, 87:25, 89:7, 89:9
**operating** [1] - 18:19
**operations** [1] - 37:12
**operative** [1] - 22:14
**opinion** [3] - 50:22, 70:15, 71:10
**opinions** [5] - 20:24, 71:5, 71:11, 71:24, 96:24
**opportunity** [1] - 27:1
**opposed** [1] - 44:8
**opposing** [1] - 9:8
**opposite** [1] - 28:22
**opposition** [4] - 29:24, 31:17, 31:21, 50:20
**OR** [1] - 1:13
**order** [5] - 12:25, 31:4, 41:7, 52:21, 95:17
**ordered** [1] - 76:9
**ordinary** [1] - 30:1
**orient** [1] - 9:11
**originally** [3] - 7:10, 48:12, 48:13
**Orthofix** [1] - 53:13, 54:1, 54:3, 54:17, 54:23, 55:6, 55:13, 55:17, 56:1, 56:20, 73:22
**orthopedic** [1] - 58:15
**otherwise** [5] - 11:18, 20:1, 50:24, 93:19, 94:23
**ourselves** [1] - 47:3
**outcome** [1] - 62:17
**outcomes** [1] - 37:20
**outlier** [1] - 59:9

**outset** [3] - 10:18, 11:10, 29:21
**outside** [1] - 73:13
**overhead** [2] - 72:16, 75:5
**overlap** [1] - 63:13
**overlapping** [1] - 58:15
**overly** [1] - 75:18
**overprescribing** [1] - 19:21
**overreach** [1] - 39:11
**overrid** [1] - 40:7
**overturn** [1] - 91:18
**own** [9] - 20:11, 42:11, 54:18, 65:12, 73:6, 74:5, 80:24, 82:7, 85:11
**owned** [15] - 7:3, 7:17, 20:10, 34:25, 35:2, 35:6, 35:8, 35:9, 35:22, 36:13, 38:15, 44:19, 81:11, 81:13, 84:15
**owner** [1] - 29:15, 36:1, 36:5, 37:7, 37:16, 38:25, 52:11, 55:10, 56:10, 81:2, 84:14
**owners** [2] - 36:9, 59:11
**ownership** [43] - 8:10, 8:14, 9:14, 19:17, 29:10, 29:20, 31:7, 35:20, 36:6, 38:1, 38:23, 39:8, 39:13, 39:14, 39:15, 39:16, 40:20, 40:25, 41:15, 43:4, 43:8, 43:19, 43:24, 45:4, 45:9, 51:18, 55:23, 59:14, 61:14, 63:4, 63:14, 69:24, 69:25, 80:12, 80:13, 80:18, 81:3, 81:17, 82:1, 82:8, 86:6, 93:11
**owning** [1] - 82:1
**owns** [4] - 29:24, 31:13, 31:23, 59:4
**Oxford** [1] - 7:7

## P

**P.A** [2] - 2:7, 2:10
**p.m** [1] - 4:6
**page** [3] - 15:21, 32:8, 44:20
**pages** [2] - 13:7, 99:11
**paid** [6] - 45:23, 46:2, 62:18, 67:15, 75:11
**pain** [1] - 66:7
**paired** [1] - 50:25
**Palin** [6] - 76:5, 76:8, 76:22, 91:8, 91:20,

91:22
**PALIN** [1] - 76:5
**pandemic** [1] - 95:20
**papers** [1] - 45:17
**paperwork** [1] - 66:9
**paragraph** [14] - 14:22, 59:3, 60:7, 65:17, 65:21, 67:5, 67:13, 67:17, 87:20, 88:6, 88:7, 89:8, 89:20
**paragraphs** [6] - 13:7, 51:17, 54:2, 64:5, 64:16, 89:3
**paraparesis** [1] - 62:2
**pardon** [1] - 93:1
**Parenthood** [1] - 50:20
**PARS** [1] - 57:20
**parse** [1] - 84:21
**parsed** [1] - 71:12
**part** [18] - 6:10, 11:4, 20:13, 33:21, 33:22, 40:18, 40:25, 46:3, 46:11, 54:3, 57:4, 62:14, 67:5, 73:17, 76:15, 76:21, 85:6
**participants** [1] - 99:15
**PARTICIPANTS** [1] - 1:12
**particular** [12] - 14:3, 27:24, 28:15, 30:14, 30:16, 38:3, 50:24, 51:15, 51:23, 57:1, 57:4, 89:3
**particularity** [7] - 11:25, 48:1, 52:17, 54:11, 56:14, 62:24, 69:8
**particularly** [5] - 58:8, 58:12, 59:10, 66:13, 66:19
**parties** [9] - 40:15, 40:16, 41:4, 42:17, 49:13, 50:15, 60:22, 70:21, 95:1
**partner** [3] - 29:16, 58:22, 58:23
**partners** [1] - 78:14
**party** [10] - 7:13, 22:21, 24:6, 32:22, 32:25, 34:16, 35:15, 50:22, 50:24, 70:20
**passed** [1] - 39:19
**past** [3] - 70:25, 91:16, 91:17
**Pastor** [1] - 32:21
**patent** [2] - 37:10, 84:15
**patented** [1] - 72:21
**path** [1] - 44:25
**patient** [26] - 13:24, 14:1, 14:5, 19:1, 21:14,

27:17, 50:12, 51:5, 59:20, 62:4, 63:2, 65:20, 65:22, 66:4, 66:13, 66:19, 67:8, 67:10, 67:24, 69:3, 86:21, 86:23, 87:22, 89:6, 89:21

**patient's** [9] - 15:6, 50:3, 59:20, 60:9, 61:4, 65:15, 66:6, 67:10, 69:9

**patients** [14] - 7:11, 12:23, 14:4, 15:18, 34:16, 58:18, 59:13, 62:7, 64:13, 67:20, 72:6, 72:22, 75:20, 76:13

**pattern** [1] - 77:5
**Patzer** [1] - 32:7
**Paulus** [2] - 71:7, 71:23

**PAULUS** [1] - 71:8
**pay** [5] - 8:22, 33:25, 40:1, 43:18, 45:7
**payer** [1] - 63:19
**paying** [3] - 39:5, 40:5, 44:21

**payment** [13] - 8:20, 10:4, 13:4, 13:9, 13:22, 15:8, 33:19, 44:21, 45:15, 45:24, 67:15, 69:12

**payments** [7] - 12:13, 36:2, 36:18, 40:5, 40:13, 40:15, 44:23

**peer** [21] - 59:17, 59:19, 59:22, 59:23, 60:18, 61:14, 62:10, 63:25, 64:13, 64:25, 65:1, 66:15, 66:21, 68:21, 78:7, 78:9, 78:10, 78:11, 78:17, 88:14

**people** [9] - 24:10, 29:15, 32:18, 38:13, 52:12, 74:2, 83:22, 83:23, 95:16

**per** [1] - 11:1
**perceives** [1] - 43:15
**percent** [5] - 26:21, 45:23, 46:2, 58:3
**perform** [1] - 22:2
**performed** [29] - 7:23, 12:4, 12:6, 13:8, 13:16, 16:4, 16:5, 16:20, 16:25, 17:11, 17:21, 18:15, 19:2, 19:6, 20:11, 20:25, 22:16, 24:9, 33:15, 57:13, 66:4, 66:12, 66:18, 67:7, 76:19, 80:16, 89:15, 89:22, 89:24

**performing** [8] - 15:15,

18:25, 19:21, 21:24, 22:8, 22:20, 77:14, 78:19

**performs** [1] - 76:16
**perhaps** [1] - 12:21
**period** [4] - 16:3, 57:25, 74:19, 90:9
**person** [12] - 16:4, 23:21, 32:14, 35:19, 62:12, 68:2, 81:23, 81:24, 84:17, 89:14, 95:22

**personal** [2] - 11:17, 12:7
**personally** [1] - 76:7
**perspective** [1] - 88:5
**Pete** [1] - 74:10
**phase** [1] - 92:17
**Phone** [2] - 3:12, 99:22
**phone** [1] - 6:1
**physically** [1] - 37:5
**physician** [14] - 35:6, 35:9, 35:13, 35:18, 36:9, 36:13, 38:15, 54:15, 58:12, 59:2, 59:8, 61:17, 73:23, 77:9
**physician-owned** [2] - 36:13, 38:15
**physicians** [12] - 33:6, 33:20, 37:21, 37:22, 53:21, 57:14, 58:3, 62:8, 62:17, 73:20, 77:13, 78:15
**pick** [1] - 82:12
**picking** [1] - 85:19
**picture** [3] - 80:20, 82:8, 88:25
**piece** [3] - 79:3, 79:5, 96:21
**Pierre** [5] - 1:19, 1:19, 1:20, 2:4, 5:9
**Piersol** [1] - 4:8
**PIERSOL** [2] - 1:10, 4:2
**pithy** [1] - 90:15
**pivot** [1] - 13:14
**place** [3] - 19:10, 19:23, 92:8
**places** [1] - 54:16
**Plaintiff** [3] - 1:4, 4:10, 5:7
**plaintiff** [2] - 11:17, 24:25
**PLAINTIFF** [2] - 1:15, 2:2
**plaintiffs** [1] - 5:10
**plan** [1] - 8:13
**Planned** [1] - 50:20
**plans** [1] - 14:5
**plate** [1] - 63:16
**plausibility** [3] - 28:10,

85:24, 91:15
**plausible** [11] - 28:24, 44:14, 45:5, 47:21, 75:24, 77:11, 78:18, 78:22, 84:8, 87:15, 92:4
**plausibly** [5] - 17:13, 22:9, 24:24, 28:13, 90:20
**plausity** [1] - 90:4
**Plavix** [1] - 28:20
**played** [1] - 41:13
**plead** [3] - 11:24, 50:24, 62:24
**pleaded** [5] - 47:19, 49:5, 50:12, 69:8, 77:19
**pleading** [17] - 8:3, 9:2, 20:6, 25:4, 29:7, 49:4, 50:23, 69:18, 70:23, 71:15, 71:19, 77:3, 77:7, 87:17, 93:23, 94:2, 97:12
**pleadings** [9] - 41:18, 41:19, 44:11, 50:16, 57:18, 68:8, 82:17, 83:3, 84:5
**pleasure** [1] - 7:2
**pled** [3] - 24:2, 56:14, 94:10
**plenty** [1] - 93:25
**plural** [1] - 86:22
**PO** [4] - 1:16, 1:20, 1:23, 2:4
**pod** [1] - 36:13
**point** [27] - 16:17, 24:23, 26:2, 27:12, 35:4, 46:6, 46:9, 50:13, 54:7, 55:2, 60:19, 62:14, 64:22, 70:25, 77:3, 77:4, 80:22, 81:8, 81:9, 82:19, 84:9, 84:22, 86:4, 86:18, 88:22, 89:19, 96:7
**pointed** [2] - 38:9, 46:16
**pointing** [1] - 86:7
**points** [5] - 29:3, 41:9, 80:20, 82:8, 82:11
**police** [1] - 8:24
**policy** [1] - 37:20
**Polukoff** [8] - 21:23, 49:21, 50:4, 57:9, 58:10, 60:24, 65:11, 70:17
**position** [5] - 10:25, 12:3, 14:23, 19:11, 97:5
**positions** [1] - 37:3
**possibility** [1] - 10:11
**possible** [1] - 82:20
**post** [1] - 66:10
**post-op** [1] - 66:10
**posture** [1] - 91:24

**potential** [2] - 59:13, 67:8
**potentially** [2] - 42:19, 42:20
**practice** [9] - 7:9, 50:2, 55:1, 55:2, 55:3, 57:14, 64:21, 73:24, 78:15
**practices** [1] - 58:16
**practicing** [1] - 37:22
**precedent** [2] - 11:14, 86:12
**precisely** [3] - 15:1, 38:11, 38:16
**predicate** [2] - 43:15, 44:1
**predicated** [2] - 7:22, 9:4
**predominant** [1] - 8:9
**prefer** [3] - 14:14, 95:22
**preference** [1] - 14:21
**preliminary** [3] - 94:19, 96:6, 97:1
**premised** [1] - 7:21
**prepared** [1] - 12:22
**prescribed** [1] - 21:8
**prescription** [1] - 17:17
**presentation** [5] - 8:11, 8:14, 9:11, 80:4, 82:10
**presented** [2] - 67:25, 87:22
**presently** [1] - 62:3
**pretty** [4] - 24:20, 51:6, 92:10, 97:7
**prevail** [1] - 28:18
**prevailing** [1] - 40:18
**prevalent** [1] - 16:19
**prevent** [3] - 19:20, 22:17, 44:18
**previous** [1] - 64:2
**prima** [5] - 8:19, 26:15, 28:8, 84:8, 84:9
**principal** [2] - 7:13, 8:17
**principle** [6] - 10:18, 10:20, 10:22, 11:8, 11:20, 11:23
**private** [1] - 13:22
**privy** [1] - 78:3
**problem** [5] - 34:1, 81:21, 85:21, 95:12, 95:13
**procedural** [1] - 29:1
**Procedure** [1] - 47:18
**procedure** [24] - 20:13, 22:5, 22:8, 22:16, 22:20, 25:2, 26:7, 49:24, 55:17, 60:5, 60:8, 60:21, 60:25,

61:1, 61:3, 61:25, 63:1, 66:1, 68:18, 69:9, 70:8, 72:2, 87:16, 91:23
**procedures** [15] - 19:21, 20:12, 26:1, 26:12, 28:23, 48:18, 48:19, 57:13, 57:15, 58:20, 73:7, 75:19, 75:20, 78:19, 78:24
**proceed** [2] - 15:2, 36:24
**proceeded** [2] - 70:24, 70:25
**proceeding** [1] - 4:4
**proceedings** [3] - 41:5, 41:18, 98:4
**PROCEEDINGS** [1] - 4:1
**Proceedings** [1] - 4:6
**proceeds** [3] - 53:4, 56:4, 56:16
**process** [6] - 53:3, 54:11, 55:20, 62:13, 62:14, 76:18
**processes** [2] - 78:8, 78:9
**product** [16] - 37:11, 39:16, 39:17, 40:8, 52:21, 54:8, 56:6, 64:2, 73:13, 73:23, 74:5, 74:16, 75:1, 82:7, 84:15, 84:25
**products** [18] - 37:8, 37:23, 39:1, 40:8, 53:22, 63:13, 64:4, 72:21, 74:12, 81:11, 82:2, 84:22, 84:24, 85:1, 85:15, 85:18, 85:22, 86:3
**profit** [16] - 30:1, 31:15, 34:22, 34:23, 39:2, 40:12, 40:20, 73:5, 73:20, 74:21, 75:2, 81:1, 81:13, 82:2, 84:19, 85:7
**profited** [2] - 18:10, 72:16
**profiting** [2] - 73:25, 76:7
**programs** [1] - 49:15
**proper** [1] - 91:4
**prophylactic** [1] - 38:20
**proposition** [4] - 86:12, 86:14, 86:16, 91:9
**protected** [1] - 14:2
**prove** [6] - 11:15, 12:1, 24:3, 77:20, 86:13, 87:10
**proven** [1] - 24:4
**provide** [2] - 16:7,

32:14
**provided** [1] - 88:23
**providing** [2] - 33:1, 75:19
**proving** [1] - 77:9
**provision** [1] - 48:21
**public's** [1] - 12:10
**punish** [1] - 23:1
**purity** [3] - 62:4, 62:13
**purpose** [9] - 22:2, 22:8, 22:17, 36:16, 37:8, 56:14, 62:19, 73:19, 90:22
**purposes** [6] - 17:9, 34:16, 35:19, 36:4, 85:24, 94:15
**pursue** [3] - 30:11, 39:7, 40:19
**pursued** [2] - 36:8, 42:25
**pursuing** [1] - 31:13
**pursuit** [1] - 43:5
**pushing** [1] - 58:18
**put** [11] - 12:13, 15:4, 20:19, 26:22, 31:16, 46:23, 63:3, 65:4, 82:4, 82:16, 87:17
**putting** [2] - 82:14, 82:19

## Q

**qualify** [2] - 10:6, 88:16
**qualifying** [1] - 68:19
**quality** [3] - 66:22, 86:24, 87:7
**questionable** [2] - 21:17
**questions** [11] - 29:8, 29:12, 45:17, 46:15, 52:9, 79:4, 79:7, 86:8, 93:9, 93:12, 93:15
**qui** [1] - 42:19
**quibbling** [1] - 90:3
**quick** [2] - 49:7, 92:23
**quiet** [2] - 83:18, 93:19
**quite** [4] - 16:23, 19:19, 82:23, 92:9
**quot** [1] - 32:9
**quotations** [1] - 25:21
**quote** [6] - 11:15, 11:16, 22:15, 36:25, 37:4, 38:7
**quoted** [1] - 25:23
**quoting** [2] - 23:21, 25:22

## R

**raise** [2] - 40:11, 70:5
**raised** [4] - 29:19, 40:15, 57:21, 93:10
**raising** [1] - 45:7
**random** [2] - 52:13, 52:14
**Rapid** [3] - 3:11, 99:17, 99:21
**rare** [3] - 59:18, 66:4, 89:22
**rarely** [2] - 66:12, 67:6
**rather** [7] - 10:20, 17:11, 17:15, 17:21, 25:6, 28:23, 73:15
**rba@mayadam.net** [1] - 2:5
**re** [1] - 94:5
**re-review** [1] - 94:5
**rea** [6] - 8:21, 30:22, 38:5, 38:9, 83:9, 83:12
**reach** [2] - 53:6, 91:1
**reached** [3] - 31:19, 31:20, 39:7
**read** [3] - 14:5, 36:12, 79:10
**reader** [2] - 84:7, 88:21
**reading** [3] - 57:18, 83:4, 89:5
**reads** [1] - 86:14
**reaffirmed** [1] - 11:21
**real** [5] - 10:19, 37:7, 37:8, 80:20
**realize** [1] - 94:19
**really** [26] - 13:17, 18:8, 18:18, 20:7, 21:6, 21:21, 22:23, 53:14, 53:19, 61:20, 63:24, 64:17, 70:8, 70:10, 71:5, 71:13, 71:14, 71:18, 74:15, 76:5, 80:22, 86:7, 88:3, 91:23, 97:4
**realm** [1] - 22:24
**realtime** [1] - 47:11
**reason** [20] - 22:9, 24:17, 27:23, 30:9, 31:24, 38:19, 38:22, 39:18, 39:23, 40:25, 43:8, 45:9, 48:25, 54:3, 60:17, 68:3, 72:21, 76:15, 87:4, 87:24
**reasonable** [12] - 20:25, 21:4, 23:4, 49:11, 49:23, 60:25, 67:9, 76:8, 84:17, 89:24, 90:9, 91:19
**reasonably** [1] - 67:21
**reasoned** [1] - 43:11
**reasons** [4] - 29:14,

30:7, 31:2, 45:3
**rebuttal** [1] - 79:8
**receipt** [2] - 39:17, 40:12
**receive** [1] - 41:17
**received** [5] - 39:3, 41:4, 41:14, 77:9, 78:8
**receives** [2] - 30:1, 59:14
**receiving** [7] - 7:5, 7:22, 31:14, 39:2, 40:8, 77:14, 77:21
**recently** [1] - 11:22
**recess** [1] - 98:3
**recitations** [1] - 65:8
**recklessly** [1] - 10:11
**recognized** [1] - 7:7
**recognizing** [1] - 94:24
**record** [8] - 25:5, 26:4, 45:21, 46:2, 46:4, 46:9, 46:11, 47:12
**records** [4] - 68:11, 69:7, 72:9, 96:13
**recovery** [1] - 46:14
**recurring** [2] - 22:3, 22:17
**red** [1] - 13:1
**refer** [1] - 35:21
**reference** [2] - 9:10, 13:21
**referenced** [2] - 12:24, 15:13
**references** [1] - 13:8
**referrals** [2] - 36:17, 36:23
**referred** [2] - 79:17, 80:5
**reflected** [2] - 41:20, 41:21
**regard** [10] - 35:15, 46:12, 46:15, 48:11, 66:17, 79:17, 84:2, 87:20, 95:19
**regarding** [3] - 50:9, 69:8, 76:24
**regimes** [1] - 8:25
**regulates** [1] - 23:3
**regulatory** [1] - 8:24
**rejected** [1] - 70:14
**relater** [4] - 39:4, 57:10, 57:11, 58:22
**relaters** [3] - 12:5, 58:14, 78:14
**relaters'** [1] - 48:14
**relation** [1] - 38:2
**relationship** [2] - 36:21, 36:23
**released** [1] - 33:22
**relevant** [14] - 58:8, 59:10, 61:11, 63:4,

63:7, 63:17, 63:20, 65:1, 65:4, 67:17, 76:6, 76:9, 76:22, 85:23
**reliability** [1] - 11:19
**reliable** [9] - 51:1, 51:10, 57:6, 57:8, 57:19, 61:12, 63:21, 65:10
**Reliance** [7] - 77:4, 77:6, 77:16, 78:22, 91:25, 92:1, 92:10
**relief** [1] - 47:20
**rely** [1] - 62:21
**remains** [1] - 70:1
**remember** [1] - 20:22
**remotely** [1] - 99:16
**REMOTELY** [1] - 1:13
**removal** [1] - 25:18
**removing** [1] - 49:1
**remuneration** [1] - 34:15
**rendered** [1] - 23:12
**renowned** [1] - 37:22
**rent** [1] - 72:18
**repeatedly** [1] - 54:17
**repetitive** [2] - 9:25, 86:22
**replacement** [2] - 23:2, 53:10
**report** [3] - 25:1, 25:5, 88:23
**reported** [1] - 67:24
**REPORTER** [1] - 3:10
**Reporter** [5] - 3:10, 30:20, 99:7, 99:10, 99:20
**REPORTER'S** [1] - 99:2
**reporting** [1] - 58:2
**reports** [1] - 25:12
**represent** [1] - 16:21
**representation** [2] - 46:6, 46:10
**representative** [14] - 11:12, 11:16, 12:1, 12:8, 24:3, 50:11, 50:12, 50:23, 51:4, 64:11, 65:14, 69:3, 86:13, 87:10
**representatives** [1] - 74:10
**representing** [2] - 7:2, 46:4
**reputation** [1] - 7:14
**requested** [1] - 47:2
**requests** [2] - 47:7, 47:14
**required** [4] - 12:8, 23:24, 71:19, 82:22
**requirement** [4] - 12:9, 24:3, 43:10, 49:5

**requirements** [4] - 9:2, 9:3, 12:11, 25:13
**requires** [3] - 32:13, 41:17, 83:7
**resolution** [1] - 39:7
**resolve** [1] - 47:12
**respect** [2] - 20:15, 42:25
**respectfully** [3] - 47:7, 47:14, 91:10
**respective** [1] - 86:20
**respects** [2] - 51:13, 85:17
**respond** [4] - 12:20, 48:7, 83:5, 93:12
**responded** [1] - 93:7
**response** [4] - 32:12, 35:25, 63:8, 80:8
**responses** [2] - 18:7, 33:18
**responsible** [1] - 39:5
**rest** [2] - 45:16, 97:10
**restraints** [1] - 95:5
**result** [7] - 43:1, 61:25, 69:13, 75:19, 75:24, 76:14, 95:24
**return** [1] - 36:24
**returns** [1] - 91:18
**revealed** [1] - 38:24
**review** [14] - 61:18, 63:25, 64:13, 64:25, 66:15, 66:21, 68:21, 78:7, 78:9, 78:17, 88:14, 88:15, 94:5
**reviewed** [3] - 60:1, 60:2, 93:14
**reviewer** [12] - 64:5, 64:18, 65:25, 66:3, 66:5, 66:8, 66:11, 66:14, 66:20, 88:24, 89:11, 90:1
**reviewers** [5] - 24:17, 61:15, 61:24, 68:18, 68:21
**reviewing** [1] - 62:8
**reviews** [9] - 59:17, 59:19, 59:22, 59:23, 60:18, 62:10, 65:1, 78:10, 78:11
**reward** [1] - 32:15
**rigorous** [2] - 43:11, 44:16
**rise** [4] - 21:16, 23:5, 87:15, 90:13
**risk** [11] - 26:20, 26:22, 27:12, 27:14, 27:19, 28:1, 42:14, 57:22, 57:24, 95:7
**risks** [2] - 42:15, 42:23
**risky** [1] - 58:7, 81:24
**Robert** [1] - 5:8

**ROBERT** [1] - 2:3
**Roche** [2] - 4:16, 47:2
**ROCHE** [31] - 1:15, 4:15, 47:1, 47:5, 47:13, 48:13, 48:17, 48:24, 49:3, 60:15, 64:10, 65:19, 67:1, 68:4, 68:6, 69:21, 70:4, 72:11, 72:25, 75:14, 76:3, 79:21, 92:23, 93:2, 93:6, 93:19, 96:10, 96:18, 96:21, 97:17, 97:22
**Rochester** - 14:18
**role** [4] - 6:17, 13:23, 41:13, 43:7
**Roman** - 58:22
**rooting** [1] - 20:14
**round** [1] - 67:2
**round-tabled** [1] - 67:2
**routinely** [1] - 63:9
**rows** [1] - 13:19
**royalties** [3] - 54:18, 73:22, 73:25
**RPR** [2] - 3:10, 99:6
**Rule** [8] - 9:2, 9:3, 44:13, 47:18, 50:22, 65:12, 88:24, 91:21
**rule** [6] - 10:24, 12:8, 24:1, 86:20, 86:22, 94:12
**ruled** [1] - 94:21
**rules** [1] - 9:5
**ruling** [1] - 44:7
**running** [1] - 22:23

## S

**safe** [1] - 97:7
**sale** [1] - 18:10
**SAMBA** [12] - 53:9, 53:12, 54:7, 54:15, 54:23, 55:14, 55:16, 56:1, 56:20, 58:21, 63:14
**sample** [5] - 12:8, 12:18, 24:3, 50:11, 86:20
**samples** [1] - 87:10
**Sanchez** [1] - 74:11
**Sanford** [11] - 45:23, 46:2, 52:13, 53:24, 54:15, 56:17, 56:22, 57:21, 59:1, 60:1, 67:14
**SANFORD** [3] - 2:22, 3:2, 3:7
**satisfaction** [2] - 27:17, 27:20
**satisfied** [3] - 49:6, 78:24, 81:7
**satisfy** [2] - 50:22,

65:12
**saw** [1] - 78:10
**scaling** [1] - 27:16
**Schaeffer** [1] - 37:2
**scheduling** [1] - 94:17
**scheme** [12] - 50:25, 51:24, 54:2, 57:1, 57:2, 57:5, 62:24, 62:25, 63:7, 63:21, 65:10
**schemes** [13] - 18:10, 52:1, 52:2, 53:8, 53:15, 53:19, 61:13, 65:8, 72:5, 80:5, 84:23, 84:24, 85:18
**scienter** [9] - 10:9, 28:14, 30:18, 30:22, 43:3, 45:6, 84:3, 92:5, 92:15
**score** [10] - 27:4, 27:12, 27:14, 27:16, 27:19, 27:22, 28:1, 57:22, 57:24
**scrambled** [1] - 34:2
**screw** [16] - 19:3, 53:9, 53:12, 54:7, 54:15, 54:23, 55:15, 55:16, 55:25, 56:1, 56:4, 56:16, 56:20, 56:22, 58:21
**screws** [6] - 19:4, 19:9, 19:10, 52:24, 63:15
**scrutinize** [1] - 21:11
**scrutinized** [1] - 28:11
**scrutinizing** [1] - 12:10
**scrutiny** [2] - 35:7, 70:16
**SD** [7] - 1:16, 1:20, 2:4, 2:23, 3:3, 3:8, 99:21
**se** [1] - 11:1
**seal** [1] - 41:24
**search** [1] - 87:3
**second** [11] - 10:23, 21:19, 22:24, 26:5, 29:19, 30:14, 30:16, 30:21, 38:1, 57:4, 83:14
**second-guessing** [1] - 22:24
**secondary** [1] - 45:15
**secretive** [1] - 53:22
**section** [2] - 13:15, 25:23
**see** [6] - 6:16, 29:16, 59:16, 59:19, 70:22, 72:21, 80:1, 83:1, 89:1, 91:1, 94:1, 94:3
**seeing** [2] - 6:14, 6:16
**seeks** [1] - 10:20
**seem** [2] - 43:25, 89:13
**sell** [1] - 74:24
**selling** [1] - 75:6

**send** [3] - 79:18, 90:16, 95:15
**sent** [3] - 9:6, 9:8, 40:22
**sentence** [2] - 89:5, 89:25
**sentences** [2] - 25:21, 32:9
**separate** [14] - 8:4, 8:7, 9:15, 19:12, 20:3, 20:5, 33:12, 33:14, 56:9, 56:11, 80:10, 80:17, 92:13, 92:15
**separately** [1] - 8:5
**separates** [1] - 9:16
**served** [1] - 25:21
**services** [3] - 31:11, 49:10
**Services** [1] - 81:5
**set** [5] - 12:22, 23:25, 56:24, 94:17, 95:5
**sets** [1] - 34:25
**setting** [2] - 68:21, 96:7
**settled** [1] - 33:22
**settlement** [15] - 40:2, 40:11, 40:12, 40:17, 40:24, 41:2, 41:7, 41:11, 45:19, 45:20, 45:22, 45:24, 45:25, 82:20
**setup** [1] - 72:14
**seven** [1] - 51:8
**several** [2] - 18:7, 45:14
**share** [1] - 36:24
**shared** [3] - 16:12, 25:20, 96:14
**sharing** [1] - 58:18
**SHERI** [2] - 3:10, 99:20
**Sheri** [2] - 99:6, 99:19
**sheri_nothelphim@ sdd.uscourts.gov** [1] - 99:22
**Sheri_Nothelphim@ sdd.uscourts.gov** [1] - 3:12
**shielded** [1] - 70:15
**shift** [1] - 31:10
**short** [2] - 20:17, 92:10
**short-shrift** [1] - 92:10
**shots** [1] - 68:14
**show** [6] - 23:8, 27:1, 27:6, 38:6, 50:8, 82:5
**showcases** [1] - 21:22
**showing** [1] - 21:16
**shown** [4] - 27:6, 27:8, 69:18, 90:24
**shows** [2] - 56:13, 91:9
**shrift** [1] - 92:10

**SI** [6] - 55:3, 55:25, 56:4, 56:16, 56:22, 58:21
**Sicage** [15] - 36:3, 51:21, 52:4, 53:9, 55:10, 55:22, 55:24, 56:1, 56:8, 56:21, 58:21, 77:18, 77:22
**side** [2] - 96:16, 97:20
**signatory** [1] - 45:22
**significant** [3] - 23:10, 24:17, 27:2
**signs** [2] - 67:25, 87:22
**similar** [2] - 31:2, 75:21
**simply** [3] - 52:15, 72:16, 84:6
**single** [1] - 81:4
**Sioux** [11] - 1:15, 1:16, 2:23, 3:3, 3:8, 7:5, 7:9, 14:11, 14:15, 54:16, 73:12
**siphoning** [1] - 36:18
**sister** [1] - 51:9
**sitting** [2] - 40:23, 93:13
**situation** [5] - 27:3, 38:17, 60:6, 61:7, 73:21
**six** [8] - 20:18, 80:2, 84:23, 85:15, 85:21, 87:17, 96:1, 96:4
**Sixth** [1] - 71:10
**slandon@cadlaw. com** [1] - 3:9
**slide** [7] - 9:13, 9:14, 12:22, 15:21, 17:24, 20:18, 87:17
**slides** [5] - 9:7, 9:10, 12:22, 15:20, 30:7, 65:4, 87:16
**slowly** [1] - 34:6
**smack** [1] - 73:16
**small** [2] - 14:11, 14:12
**snapshot** [1] - 49:7
**softer** [1] - 17:3
**sold** [5] - 53:13, 54:7, 55:21, 56:1, 73:12
**sole** [4] - 36:6, 37:7, 37:16, 56:10
**solely** [2] - 35:10, 59:13
**solicit** [2] - 34:22, 35:14
**solicitation** [1] - 34:21
**solicited** [1] - 36:15
**solve** [1] - 95:13
**someone** [2] - 36:21, 38:19
**sometimes** [1] - 79:13
**somewhat** [1] - 93:8

**SONG** [3] - 1:22, 4:22, 5:2
**Song** [1] - 5:2
**soon** [1] - 24:20
**sorry** [4] - 6:15, 13:7, 44:3, 64:10
**sort** [30] - 20:9, 20:14, 22:21, 45:14, 49:18, 51:11, 53:4, 53:14, 56:8, 56:18, 56:23, 60:12, 61:6, 61:9, 61:17, 62:20, 65:13, 67:2, 70:5, 70:6, 70:7, 70:9, 70:10, 71:12, 71:14, 74:7, 75:21, 76:4, 80:6, 90:7
**sought** [2] - 37:16, 40:10
**sound** [7] - 30:19, 40:18, 41:5, 44:2, 44:6, 48:22, 88:17
**sounds** [2] - 83:20, 88:18
**source** [1] - 53:10
**SOUTH** [2] - 1:2, 99:4
**South** [5] - 1:19, 3:11, 14:11, 99:8, 99:17
**SOUTHERN** [1] - 1:2
**space** [1] - 9:20
**speaker** [1] - 71:8
**speaking** [6] - 4:12, 6:17, 6:21, 34:6, 43:6, 47:2
**special** [1] - 35:5
**specialist** [1] - 58:20
**Specialty** [1] - 54:16
**specialty** [1] - 58:6
**specific** [17] - 17:24, 20:20, 25:3, 25:20, 28:25, 29:1, 48:11, 48:18, 48:20, 51:15, 59:11, 60:2, 60:25, 62:19, 67:20, 71:22, 73:9
**specifically** [12] - 22:13, 24:2, 45:18, 46:16, 49:23, 52:3, 58:25, 59:3, 59:8, 66:2, 79:17, 87:20
**specified** [1] - 46:21
**speculating** [1] - 67:4
**spent** [2] - 86:11, 93:24
**spin** [2] - 82:15, 82:20
**spinal** [10] - 17:22, 18:1, 59:8, 59:15, 64:20, 66:5, 71:17, 75:23, 78:4, 88:15
**spine** [10] - 16:2, 17:5, 24:11, 58:23, 61:6, 61:23, 66:11, 66:19, 66:21, 91:3

**Spine** [3] - 64:1, 64:3, 84:25

**split** [1] - 8:15

**spouse** [1] - 36:2

**SS** [1] - 99:4

**stage** [21] - 25:4, 28:4, 28:20, 50:8, 50:10, 50:14, 57:18, 58:17, 61:23, 68:8, 70:1, 70:23, 71:14, 71:16, 71:20, 72:4, 77:3, 77:20, 90:12, 91:17

**stake** [1] - 62:17

**stand** [4] - 86:6, 86:16, 91:6, 92:18

**standard** [34] - 21:1, 22:19, 22:22, 23:7, 23:23, 24:1, 24:7, 25:11, 32:6, 43:3, 43:12, 44:16, 44:24, 45:2, 47:17, 50:7, 60:7, 60:11, 60:16, 70:6, 70:7, 71:2, 71:17, 71:18, 75:23, 83:9, 83:13, 90:4, 91:13, 91:15, 91:19, 91:21, 91:22

**standards** [2] - 21:20, 50:2

**standing** [2] - 78:6, 86:14

**stark** [1] - 62:11

**start** [7] - 8:11, 8:13, 9:6, 9:13, 9:18, 85:3, 95:3

**starting** [2] - 52:5, 95:4

**starts** [1] - 45:14

**state** [7] - 7:9, 18:22, 23:3, 48:1, 81:19, 83:22, 84:2

**STATES** [3] - 1:1, 1:4, 99:3

**States** [20] - 4:11, 4:13, 4:16, 4:20, 5:3, 46:25, 47:7, 47:13, 47:17, 47:22, 47:25, 50:8, 58:5, 58:25, 69:6, 74:2, 74:4, 74:17, 77:8, 99:7

**States'** [6] - 47:8, 47:16, 48:15, 49:4, 51:16, 51:25

**Static** [2] - 30:19, 44:2

**Station** [1] - 1:24

**statistics** [1] - 58:9

**statute** [14] - 8:21, 8:24, 9:1, 11:24, 19:22, 23:1, 23:4, 24:5, 29:5, 34:19, 35:18, 36:4, 38:4, 83:6

**Statute** [15] - 8:23, 9:2, 19:20, 29:6, 30:4,

30:12, 31:8, 48:4, 53:6, 70:1, 80:24, 81:7, 83:7, 84:11, 93:8

**statutory** [1] - 35:23

**stenographic** [1] - 99:13

**stents** [1] - 61:7

**step** [4] - 73:1, 74:7, 79:25, 80:19

**STEPHEN** [1] - 3:6

**Steve** [2] - 6:5, 6:6

**still** [7] - 37:15, 54:24, 63:3, 63:19, 75:1, 87:11, 96:4

**story** [1] - 85:2

**Street** [8] - 1:19, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11, 99:21

**strengthen** [2] - 97:12, 97:13

**stretching** [1] - 23:17

**Stroke** [2] - 22:1, 22:11

**strokes** [2] - 22:3, 22:17

**strong** [5] - 43:21, 44:4, 44:5, 44:6, 51:1

**Strubbe** [1] - 11:22

**structure** [7] - 32:6, 38:23, 39:8, 39:13, 39:14, 43:19, 51:19

**subject** [2] - 35:7, 66:15

**submission** [2] - 24:13, 26:14

**submit** [10] - 17:12, 24:16, 50:25, 80:21, 82:11, 84:16, 85:25, 86:18, 88:4, 92:9

**submits** [3] - 43:18, 52:24, 52:25

**submitted** [7] - 10:4, 13:10, 49:14, 51:2, 63:19, 67:14, 69:10

**subpoena** [2] - 40:10, 42:9

**subpoenas** [5] - 39:6, 40:23, 41:14, 42:1, 42:7

**subsequently** [1] - 94:12

**substantially** [4] - 52:7, 55:25, 56:5, 95:20

**substitute** [1] - 8:25

**successful** [1] - 77:8

**sue** [1] - 45:1

**suffering** [1] - 43:1

**sufficiency** [2] - 92:12, 92:14

**sufficient** [8] - 11:12, 11:19, 26:6, 47:19, 52:18, 65:11, 81:16, 81:19

**sufficiently** [5] - 9:25, 24:3, 25:20, 28:24, 77:19

**suggest** [5] - 23:20, 28:6, 28:25, 57:17, 92:7

**suggested** [2] - 48:5, 52:8

**suggesting** [2] - 25:11, 25:17

**suggestion** [4] - 13:11, 15:9, 19:7, 25:7

**suggestions** [1] - 17:20

**suggests** [3] - 71:2, 85:20, 89:17

**suing** [1] - 81:25

**Suite** [6] - 1:19, 2:7, 2:11, 2:23, 3:3, 3:7

**sum** [1] - 33:14

**summary** [5] - 16:14, 44:8, 82:17, 91:17, 94:16

**super** [1] - 96:25

**supplying** [1] - 19:18

**support** [1] - 9:25

**suppose** [1] - 55:23

**supposed** [2] - 7:21, 92:14

**Supreme** [4] - 22:25, 43:10, 43:20, 44:15

**surgeon** [13] - 20:25, 21:4, 33:17, 52:14, 55:11, 57:12, 58:15, 74:1, 87:21, 89:24, 90:10, 92:2

**surgeon's** [1] - 57:14

**surgeons** [7] - 7:11, 16:24, 33:20, 60:1, 66:22, 88:15, 90:6

**surgeries** [51] - 7:23, 9:25, 10:6, 10:12, 12:6, 13:8, 13:11, 13:16, 13:17, 14:15, 15:15, 15:16, 15:19, 15:22, 16:1, 16:2, 16:20, 17:2, 18:1, 18:3, 18:11, 18:14, 18:25, 19:25, 20:22, 21:21, 23:8, 23:13, 27:11, 27:25, 28:15, 30:1, 37:24, 39:1, 55:4, 65:2, 65:6, 66:4, 71:22, 76:7, 76:20, 76:22, 77:15, 78:4, 78:5, 80:16, 81:1, 81:12, 85:6, 87:3

**surgery** [57] - 10:2, 12:4, 12:12, 12:14, 12:16, 12:17, 12:24, 13:11, 13:19, 13:23, 15:4, 15:7, 15:9, 15:12, 16:23, 16:25, 17:8, 17:10, 17:16, 17:20,

18:14, 19:4, 19:6, 20:2, 20:25, 21:25, 22:2, 22:6, 22:23, 24:9, 25:1, 26:16, 26:23, 27:24, 28:6, 33:15, 52:23, 58:6, 64:20, 66:8, 66:10, 68:12, 71:18, 75:10, 75:23, 76:19, 86:24, 87:6, 87:11, 89:9, 89:15, 89:17, 89:22, 90:21, 90:24, 92:7

**surgical** [4] - 62:6, 63:16, 73:6, 75:11

**survive** [1] - 25:4

**survived** [1] - 70:23

**survives** [1] - 94:16

**sustaining** [1] - 95:11

**sweep** [2] - 37:18, 51:7

**sweeping** [2] - 30:5, 43:23

**swirling** [2] - 56:24, 80:5

**switch** [1] - 44:17

**symptoms** [4] - 67:10, 67:25, 87:22, 90:1

## T

**table** [5] - 12:23, 13:2, 13:20, 15:21, 15:25

**tabled** [1] - 67:2

**tactical** [1] - 20:6

**tactics** [1] - 37:13

**tainted** [2] - 19:17, 75:16

**Talcott** [1] - 74:11

**tam** [1] - 42:19

**targeting** [1] - 31:22

**tarnished** [1] - 7:14

**teaching** [1] - 64:21

**technical** [1] - 47:12

**telephone** [1] - 5:3

**TELEPHONIC** [1] - 1:13

**telephonic** [2] - 4:5, 99:16

**tension** [1] - 54:20

**Tenth** [4] - 21:23, 49:22, 57:9, 57:10

**terms** [4] - 16:20, 17:7, 27:21, 34:24

**test** [5] - 17:17, 29:1, 50:17, 51:10, 69:7

**testing** [1] - 34:2

**tests** [1] - 76:9

**Thayer** [16] - 50:19, 50:21, 51:3, 51:5, 51:8, 51:10, 56:25, 57:5, 63:20, 63:22, 65:2, 65:7, 69:7, 86:14, 86:16

**THE** [91] - 1:10, 1:15, 2:2, 2:14, 3:5, 4:7, 4:18, 4:24, 5:5, 5:12, 5:16, 5:20, 5:25, 6:4, 6:8, 6:14, 6:19, 6:20, 6:22, 9:19, 9:21, 14:7, 14:15, 14:24, 16:9, 16:13, 18:3, 23:16, 24:19, 25:7, 25:9, 25:16, 26:18, 29:11, 33:3, 33:5, 34:1, 34:5, 35:8, 35:12, 39:21, 40:1, 41:1, 41:16, 42:4, 42:10, 44:2, 44:4, 45:11, 45:25, 46:5, 47:4, 47:10, 48:9, 48:16, 48:22, 48:25, 60:10, 64:7, 65:17, 66:16, 67:23, 68:5, 69:15, 69:16, 69:17, 70:3, 72:10, 72:12, 75:3, 76:2, 79:6, 79:22, 82:14, 83:14, 85:10, 87:19, 88:7, 88:12, 92:22, 93:1, 93:5, 93:17, 93:21, 96:16, 96:20, 96:25, 97:7, 97:21, 97:23, 98:2

**themselves** [2] - 58:14, 76:10

**theories** [14] - 7:20, 8:2, 8:4, 20:4, 20:5, 20:8, 38:18, 48:3, 57:2, 75:13, 80:6, 80:10, 80:17, 94:10

**theory** [63] - 7:21, 8:3, 8:6, 8:9, 8:10, 8:12, 8:14, 9:14, 9:17, 9:23, 10:1, 10:15, 11:13, 12:19, 18:8, 18:21, 19:15, 19:16, 29:9, 29:10, 29:19, 29:20, 29:22, 30:5, 30:11, 30:14, 31:7, 31:13, 31:18, 31:22, 35:13, 37:17, 38:2, 39:15, 43:9, 43:24, 44:15, 45:4, 45:10, 51:19, 52:18, 55:23, 69:21, 69:25, 70:13, 72:24, 75:15, 80:11, 80:12, 80:18, 81:3, 81:17, 82:1, 82:9, 82:13, 86:6, 86:7, 86:11, 93:11, 94:7, 94:11, 94:13, 94:21

**therapy** [1] - 68:14

**thereafter** [1] - 67:14

**therefore** [4] - 12:7, 80:14, 89:14, 91:24

**they've** [5] - 25:23, 28:12, 29:2, 29:6, 84:7

**thief** [1] - 86:25
**thin** [1] - 93:24
**thinking** [2] - 92:25, 93:3
**thinks** [3] - 82:24, 85:23, 86:17
**third** [12] - 8:21, 10:19, 11:9, 22:21, 24:6, 26:9, 31:1, 34:15, 35:15, 40:16, 42:17, 43:8
**third-party** [2] - 22:21, 24:6
**THIS** [1] - 1:12
**Thompson** [1] - 5:9
**THOMPSON** [1] - 2:3
**thoracic** [1] - 66:11
**thorough** [1] - 42:1
**thoroughly** [1] - 93:14
**thousands** [1] - 63:11
**three** [30] - 7:16, 8:6, 8:18, 9:13, 9:23, 10:8, 10:14, 12:11, 12:15, 12:17, 13:1, 13:20, 15:23, 17:5, 19:8, 20:22, 23:9, 23:11, 29:3, 30:6, 34:3, 34:4, 45:3, 64:13, 65:1, 81:1, 81:2, 81:6, 81:15
**throughout** [2] - 53:3, 54:11
**thrown** [1] - 78:21
**thrust** [1] - 89:8
**today** [7] - 8:5, 8:11, 50:16, 57:7, 57:16, 97:15, 98:1
**toes** [1] - 80:19
**together** [4] - 55:8, 56:24, 78:7, 94:14
**took** [4] - 77:13, 77:23, 81:13, 89:11
**top** [3] - 26:21, 58:3, 89:11
**toss** [1] - 97:10
**total** [1] - 16:20
**touch** [2] - 26:19, 37:25
**touched** [1] - 60:23
**towards** [2] - 31:10, 34:16
**traditional** [1] - 90:7
**training** [1] - 7:6
**traipsing** [1] - 95:16
**transaction** [2] - 32:23, 73:14
**transactions** [1] - 42:16
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 99:11, 99:12
**transfer** [1] - 54:22
**tread** [1] - 39:10

**treat** [1] - 22:7
**treated** [1] - 35:18
**treating** [1] - 22:13
**treatment** [2] - 32:16, 49:12
**tremendous** [1] - 43:1
**trial** [7] - 11:1, 11:5, 70:25, 74:17, 94:18, 95:2
**tried** [2] - 17:24, 20:19
**tries** [1] - 13:15
**trigger** [2] - 71:6, 71:24
**trouble** [1] - 38:18
**true** [10] - 24:4, 30:13, 46:3, 46:4, 47:20, 73:18, 76:14, 82:25, 94:9, 99:12
**try** [17] - 12:20, 15:1, 17:23, 20:8, 27:1, 31:5, 68:13, 68:14, 68:15, 79:25, 95:20, 95:25, 96:1, 97:12
**trying** [7] - 19:20, 23:25, 44:18, 73:19, 85:20, 95:1, 97:1
**turn** [2] - 29:9, 45:1
**turned** [1] - 33:17
**Twelfth** [2] - 2:16, 2:19
**two** [43] - 7:2, 7:11, 7:16, 7:20, 8:2, 8:20, 10:5, 11:8, 12:5, 12:13, 20:8, 31:8, 32:15, 32:17, 33:18, 34:3, 34:4, 38:1, 41:9, 46:19, 46:21, 48:3, 61:16, 63:23, 64:6, 64:7, 64:19, 64:20, 69:22, 72:15, 72:17, 72:18, 73:11, 74:9, 80:9, 80:17, 81:9, 85:13, 87:11, 89:10, 91:5, 91:7, 96:4
**type** [1] - 70:7
**types** [1] - 51:20
**typically** [1] - 27:8

**U**

**U.S** [4] - 1:11, 1:15, 1:19, 1:23
**ultimately** [3] - 24:1, 80:8, 94:22
**um-hum** [1] - 96:25
**unabated** [1] - 43:17
**under** [51] - 7:20, 10:7, 10:10, 10:18, 11:13, 11:24, 12:19, 15:11, 18:14, 18:22, 23:22, 24:2, 30:12, 30:22, 31:3, 31:7, 35:17, 38:4,

38:5, 38:19, 39:14, 41:5, 41:24, 43:2, 43:5, 43:9, 43:10, 43:14, 43:18, 43:20, 43:24, 44:13, 44:24, 45:2, 47:24, 49:5, 50:8, 51:10, 63:7, 63:21, 65:2, 69:6, 69:18, 69:23, 70:16, 72:24, 75:13, 81:17, 81:25, 86:12
**undercover** [1] - 83:19
**underlying** [3] - 21:20, 25:1, 80:22
**undermines** [1] - 82:10
**underpins** [1] - 43:7
**understood** [1] - 16:16
**undertake** [1] - 41:3
**undisputed** [2] - 84:11, 84:13
**unfair** [1] - 45:1
**unfortunately** [1] - 7:10
**unique** [1] - 61:6
**United** [26] - 4:11, 4:13, 4:16, 4:20, 5:3, 46:25, 47:7, 47:8, 47:13, 47:16, 47:17, 47:22, 47:25, 48:14, 49:4, 50:7, 51:16, 51:24, 58:5, 58:25, 69:5, 74:2, 74:4, 74:16, 77:8, 99:7
**UNITED** [3] - 1:1, 1:4, 99:3
**universally** [1] - 90:22
**University** [1] - 27:16
**unjust** [2] - 45:16, 46:13
**unknown** [1] - 87:4
**unlawful** [7] - 30:25, 35:6, 38:8, 38:12, 38:21, 42:22, 77:9
**unless** [7] - 11:17, 29:8, 45:17, 70:2, 92:18, 93:19, 95:19
**unlikely** [1] - 21:12
**unnecessary** [34] - 7:23, 10:3, 10:7, 10:12, 12:5, 12:16, 15:15, 17:2, 17:11, 18:12, 18:25, 19:12, 19:21, 19:25, 20:11, 23:9, 26:8, 26:13, 26:17, 27:24, 28:7, 60:21, 75:10, 76:17, 77:1, 77:15, 78:19, 78:23, 79:1, 80:16, 87:3, 87:11, 87:16, 92:8
**unprecedented** [1] - 89:23

**unsealed** [1] - 41:23
**unspoken** [1] - 19:2
**unusual** [2] - 46:7, 95:23
**unusually** [1] - 57:13
**up** [7] - 29:14, 30:8, 33:13, 42:24, 63:3, 89:18, 95:16
**upper** [1] - 66:11
**urges** [1] - 94:4
**usage** [1] - 74:3
**users** [3] - 52:10, 54:6, 74:16
**uses** [2] - 29:25, 85:6
**utilize** [3] - 14:13, 14:22, 75:1
**utilizing** [3] - 55:16, 56:4, 74:20

**V**

**value** [4] - 17:16, 32:14, 33:1, 90:25
**Vanderbilt** [1] - 27:15
**variation** [1] - 55:23
**varied** [3] - 52:12, 60:7, 60:11
**varieties** [1] - 69:22
**various** [4] - 53:25, 57:25, 59:18, 78:7
**vary** [1] - 97:8
**verbs** [1] - 34:19
**verdict** [3] - 83:2, 91:18
**VERONICA** [1] - 2:10
**Veronica** [2] - 5:16, 5:18
**version** [1] - 69:24
**versus** [2] - 50:19, 55:11
**vertebra** [1] - 89:10
**via** [1] - 4:4
**viable** [1] - 31:18
**video** [2] - 6:16, 6:17
**VIDEOCONFERENC E** [1] - 1:13
**videoconference** [2] - 4:5, 99:16
**view** [3] - 20:3, 29:23, 82:19
**viewed** [2] - 33:2, 55:8
**viewing** [1] - 78:16
**views** [1] - 71:16
**violate** [1] - 54:19
**violated** [2] - 57:15, 83:6
**violates** [1] - 39:17
**violating** [1] - 75:23
**violation** [25] - 11:16, 12:18, 14:2, 15:14, 24:5, 30:3, 32:4, 39:8,

40:21, 43:16, 69:22, 69:25, 72:23, 75:12, 75:14, 80:14, 80:15, 80:24, 81:8, 81:17, 83:8, 83:9, 83:10, 84:10, 93:8
**violations** [2] - 7:19, 48:5
**violators** [1] - 48:21
**vnannis@jgllaw.com** [1] - 2:12
**vs** [1] - 1:5

**W**

**Wait** [1] - 85:10
**wait** [4] - 4:24, 16:13, 23:16, 41:1, 82:14, 83:14
**waived** [1] - 93:16
**walk** [1] - 97:18
**wants** [1] - 85:16
**warn** [1] - 24:14
**warned** [1] - 66:20
**warnings** [3] - 42:11, 55:5, 78:7
**Washington** [3] - 1:24, 2:16, 2:20
**waved** [1] - 93:17
**ways** [1] - 65:25
**weeks** [3] - 96:15, 97:6
**well-put** [1] - 82:4
**Wellman** [3] - 5:10, 5:15, 5:18
**WERE** [1] - 1:12
**WESTERN** [1] - 99:4
**whatsoever** [2] - 73:15, 74:16
**whichever** [1] - 75:6
**whoa** [1] - 64:7
**whole** [8] - 26:4, 51:24, 52:18, 54:11, 76:15, 76:21, 96:17, 96:22
**wholly** [7] - 7:3, 7:17, 29:24, 31:13, 31:23, 34:25, 35:21
**wide** [2] - 14:16, 51:6
**wife** [3] - 35:9, 35:13, 35:18
**willful** [2] - 83:8, 84:10
**willfully** [1] - 30:24
**Williams** [2] - 5:23, 29:18
**WILLIAMS** [2] - 2:15, 2:19
**Wilson** [2] - 5:20, 7:22
**WILSON** [1] - 2:14
**win** [1] - 86:20
**winds** [1] - 33:13
**Wisconsin** [1] - 32:8

**wishes** [1] - 79:8
**withhold** [1] - 68:21
**within-entitled** [1] - 99:10
**Wollmann** [1] - 50:22
**women** [1] - 72:17
**word** [1] - 59:9
**wording** [1] - 27:2
**words** [2] - 19:1, 43:22
**works** [1] - 96:17
**world** [1] - 74:3
**wreak** [1] - 37:19
**wringer** [1] - 40:22

## Y

**year** [4] - 11:22, 57:24, 58:2, 65:23
**years** [7] - 7:4, 7:14, 43:17, 44:20, 44:25, 57:23, 85:13
**younger** [1] - 7:11
**yourselves** [1] - 6:24